Receipt number 9998-5048028

## UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ROBERT J. LABONTE, JR.,<br><br>*Plaintiff*,<br><br>v.<br><br>THE UNITED STATES OF AMERICA,<br><br>*Defendant*. | No. _____ 18-1784 C<br><br><br>**COMPLAINT** |

Plaintiff Robert J. LaBonte, Jr., through counsel, alleges the following facts:

### INTRODUCTION

Robert J. LaBonte, Jr. is a United States Army veteran who served his country honorably from 2003 to 2008, at the height of the Iraq War. He joined the Army, pledging to fight for his country, when he was 18 years old. While in Iraq, he participated in heavy combat and witnessed gruesome violence. In 2004, Mr. LaBonte fell thirty feet from a guard tower, where a fellow soldier found him unconscious. His head was bleeding profusely. Because of his service, Mr. LaBonte suffered a traumatic brain injury (TBI), post-traumatic stress disorder (PTSD), and other debilitating injuries.

After his return home from Iraq, Mr. LaBonte unsuccessfully sought help from superiors in his chain-of-command and from military mental health resources. The Army should have recognized Mr. LaBonte's service-connected injuries and granted him medical retirement. Instead, as a result of misconduct arising from his undiagnosed, untreated PTSD and TBI, the Army court-martialed Mr. LaBonte and separated him with a bad conduct discharge.

Nearly a decade later, Mr. LaBonte obtained a discharge upgrade from the Army Discharge Review Board to general, under honorable conditions. That upgrade, however, did not

1

do enough. Without a medical retirement, Mr. LaBonte was denied access to retirement pay and associated health benefits. Therefore, in 2015 Mr. LaBonte applied to the Army Board for the Correction of Military Records (ABCMR) to correct his record to medical retirement. The Deputy Assistant Secretary of the Army (Review Boards) directed the Office of the Surgeon General "to determine if [Mr. LaBonte] should have been retired or discharged by reason of physical disability through the Integrated Disability Evaluation System (IDES)." As a result, the Army began processing Mr. LaBonte through the Disability Evaluation System (DES). He submitted medical records and other evidence documenting his pre-discharge health conditions. Two Army physicians examined him. Both concluded that he met the threshold for medical retirement.

But rather than completing the DES process, the Army abruptly terminated Mr. LaBonte's application. The ABCMR reversed course and simply denied Mr. LaBonte's claim, basing its decision on the cursory and incorrect opinion of a single, unqualified Army physician whom Army personnel themselves referred to as "[Dr.] Doane (Denies Everything)."

The Army's rejection of Mr. LaBonte's claim for medical retirement status was arbitrary, capricious, unsupported by the evidence, contrary to the Army's own rules, and in violation of the Due Process Clause of the Fifth Amendment. Mr. LaBonte respectfully asks the Court to hold unlawful the Army's decision, grant his medical retirement, and award him the back pay and retirement pay to which he is entitled.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491. Plaintiff raises claims arising under the Military Pay Act, 37 U.S.C. § 204(a); the Disability Retirement and Compensation Act, 10 U.S.C. § 1201; and the Fifth Amendment of the U.S. Constitution.

2.      If successful in this action, Plaintiff would be entitled to monetary relief in excess of $10,000.00.

## PARTIES

3.      Plaintiff Robert J. LaBonte, Jr. served in the United States Army and is a combat veteran of Iraq. He is a citizen of the United States and currently resides in Connecticut.

4.      Defendant is the United States of America.

## STATUTORY AND REGULATORY BACKGROUND

5.      The Secretary of each military branch may retire a service member with disability retirement pay upon determining that the service member is "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay." 10 U.S.C. § 1201(a).

6.      The Department of Defense established the Disability Evaluation System (DES) to determine if the service member is unfit for further military service due to a medical condition or physical defect. Department of Defense Instruction (DODI) 1332.18; Department of Defense Memorandum (DODM) 1332.18. The Army adopted this system in Army Regulation (AR) 635-40; *see also* AR 40-501, 3-1 (medical fitness standards for retention, separation, and retirement).

7.      The DES process consists of three main steps: (1) Medical Evaluation Board (MEB); (2) Physical Evaluation Board (PEB); and (3) final disposition by the Secretary. DODI 1332.18.

8.      The purpose of the first step, the MEB, is to determine whether the service member has one or more medical conditions that fail to meet Army retention standards under AR 40-501. Conditions that fail to meet retention standards prevent him from "reasonably

performing" the "duties of [his] office, grade, rank, or rating." DODI 1332.18; AR 635-40, 4-7(a).

9.      The MEB is comprised of two or more physicians. One physician serves as the MEB "approving" or "convening" authority, who must have "detailed knowledge of regulations pertaining to standards of medical fitness and disability separation processing." AR 635-40, 4-11(a)(2). "When a MEB is considering a psychiatric diagnosis," such as PTSD, "the MEB will include a psychiatrist or a clinical psychologist with a doctoral degree in psychology, who may also substitute for the second MEB physician member." AR 635-40, 4-11(a)(2); DODI 1332.18.

10.      A member of the MEB also prepares a Narrative Summary (NARSUM) of the Soldier's history, present status, and medical conditions. DODM 1332.18. "The MEB NARSUM is the heart of the MEB." AR 635-40, 4-12(a).

11.      After the Board has made its decision, "it will recommend that the case file be forwarded to a PEB for a fitness determination when the MEB finds that one or more of a Soldier's medical conditions individually or collectively do not meet medical retention standards." AR 635-40, 4-12(b).

12.      Upon receiving the MEB's decision, the Soldier may elect to (1) concur with the MEB decision, (2) request an impartial medical review (IMR) by a physician independent of the MEB, or (3) submit a written rebuttal of the MEB findings. AR 635-40, 4-13.

13.      Following the MEB, the second step of the DES process is a Physical Evaluation Board. Upon referral from the MEB, all cases are initially adjudicated by an Informal Physical Evaluation Board (IPEB). The IPEB determines the Soldier's fitness for purposes of retention, separation, or retirement for disability based on a "documentary review" of the Soldier's case file. AR 635-40, 4-22.

14.     A soldier who disagrees with the IPEB's findings may appeal by requesting a Formal Physical Evaluation Board or submitting a written rebuttal. *Id.* at 4-23.

15.     The final step in the DES process is a "final disposition by the Secretary of the Military Department concerned." DODI 1332.18; AR 635-40, 2-2(b)(f). This disposition constitutes the final decision as to whether or not the Soldier is eligible to be retired or discharged by reason of physical disability.

## FACTS AND PROCEEDINGS

### *Mr. LaBonte's Military Service*

16.     Mr. LaBonte was born in 1984, in Springfield, Massachusetts. He grew up in Rocky Hill, Connecticut.

17.     Around November 2002, at 18 years old, Mr. LaBonte enlisted in the Army as a 95B Military Police (MP). As an MP, he hoped to fulfill his dream of becoming a police officer like his father, while protecting his country and continuing a family tradition of military service.

18.     Mr. LaBonte completed his basic training in Fort Leonard Wood, Missouri and was initially stationed at Fort Hood, Texas. Mr. LaBonte excelled during training, becoming a squad leader, representing his unit as the guidon carrier, and carrying the phase banner at his graduation.

19.     The following photograph was taken shortly before Mr. LaBonte's deployment to Iraq:



20.     In September 2003, Mr. LaBonte deployed to Tikrit, Iraq. Mr. LaBonte had two main duties at the Forward Operating Base (FOB) Ironhorse in Tikrit: (1) provide security on patrols as a turret gunner on an unarmored Humvee and (2) serve as a prison guard at a containment facility.

21.     In Tikrit, Mr. LaBonte manned the guard towers and watched over enemy prisoners of war at the containment facility, where he was a frequent target of mortar, small arms fire, and rocket attacks.

22.     As a turret gunner, Mr. LaBonte's unit traveled outside the FOB Ironhorse gate almost every day. The enemy frequently targeted Mr. LaBonte and his unit, which engaged in several firefights with insurgent groups. Their vehicles often encountered improvised explosive devices (IEDs), which severely injured Mr. LaBonte's fellow soldiers and Iraqi civilians.

23.     On or about January 23, 2004, Mr. LaBonte witnessed a disturbing death. He was guarding a convoy when a man stepped out in front of one of the convoy's trucks, was hit by a truck, and flew through the air.

24.     The convoy stopped, and Mr. LaBonte saw the man lying in a puddle of water with a confused look on his face. The man's head then suddenly started gushing blood, which the

wind picked up and sprayed everywhere. The person in charge of the convoy feared that the man had killed himself so that the convoy would stop and expose itself to attack. He therefore ordered the convoy to move out without helping the man.

25.     On or about February 6, 2004, near the end of his deployment, Mr. LaBonte fell from a 30-foot guard tower. Mr. LaBonte lost consciousness and has no memory of what caused his fall.

26.     His friend and fellow MP, Brandon DeLaune, found him face down and unconscious in a pool of blood near the base of the tower. Mr. DeLaune, a trained medic, helped rouse Mr. LaBonte and, at the order of a non-commissioned officer (NCO), helped him to the bathroom. Mr. DeLaune was surprised by the amount of blood from Mr. LaBonte's injuries. He took a photograph to document Mr. LaBonte's facial gash and extreme bleeding.  Shortly afterwards, Mr. LaBonte began rambling incoherently. Mr. DeLaune took Mr. LaBonte to the FOB Ironhorse medical aid center.

27.     Mr. LaBonte received stitches at the medical aid center, but no other medical treatment. Sergeant (SGT) James Mastroianni stated that he saw Mr. LaBonte both before and after the fall and noticed the new gash on his face. Mr. LaBonte explained to SGT Mastroianni that he had fallen from the guard tower. Mr. LaBonte also sent an AOL message to his family to let them know about the injury. Apart from the photo taken by Mr. DeLaune, SGT Mastroianni's statements, Mr. LaBonte's AOL message, and numerous photos of Mr. LaBonte taken before and after the fall, Mr. LaBonte's official military treatment records contain no documentation of his fall or treatment at the aid station.

28.     Following his head injury, Mr. LaBonte became markedly more depressed and anxious. He had significant difficulty sleeping, experienced constant nightmares, and woke up throughout the night panicking.

29.     As a result of his fall, Mr. LaBonte also began to experience back pain and severe headaches. Army medics provided him over-the-counter painkillers, and he began taking 16 to 20 painkillers daily.

30.     Mr. LaBonte's combat tour ended on or about April 5, 2004.

31.     Between April and June 2004, when he returned to Fort Hood, Mr. LaBonte repeatedly told his chain of command about the symptoms he was experiencing, including increased mental distress due to the traumatic events he witnessed in Iraq. He explained that he felt both physically and mentally unable to continue serving.

32.     Mr. LaBonte shared his concerns with his company commander, Captain (CPT) Murray; his Platoon Sergeant, Sergeant Michaud; and several other NCOs. Mr. LaBonte's parents also called Sergeant Michaud and other members of Mr. LaBonte's chain of command several times to plead with the Army to provide their son with the medical attention he needed.

33.     Mr. LaBonte's chain of command told him to toughen up and to tell his parents to stop calling. Instead of referring Mr. LaBonte for evaluation and treatment, Mr. LaBonte's chain of command sent him to speak with a chaplain.

34.     Mr. LaBonte explained to the chaplain that he did not feel that he was able to continue serving. Yet the chaplain also did not refer Mr. LaBonte for medical care.

35.     After returning to Fort Hood, Mr. LaBonte believed he could not handle life in the Army any longer. On two separate occasions around June 2004, he drove off base in his car, each time for only a few hours. The second time, he missed formation, and an NCO called and

promised Mr. LaBonte that he would receive help if he returned. Instead, when Mr. LaBonte returned to base, CPT Murray placed him on barracks restrictions and threatened that he could be executed for going AWOL.

36.     On June 30, 2004, shortly after his barracks restriction ended, Mr. LaBonte sought help at the Fort Hood Mental Health Clinic during walk-in hours.

37.     On the clinic's intake form, Mr. LaBonte noted that he was experiencing poor and disrupted sleep, excessive anxiety, rapid breathing, rapid heartbeat, decreased appetite, frequent crying, racing thoughts, and difficulty controlling worry. He wrote that he was seeking help because he was "depressed" and could not "take military life away from home." Mr. LaBonte answered the question "What result do you desire from this clinic today?" by writing, "my chain of command to realize I need to be chapterd [sic] out of the army ASAP."

38.     SPC Jason S. Keith, an enlisted mental health specialist, evaluated Mr. LaBonte. SPC Keith's notes state that Mr. LaBonte was feeling anxious, was getting only "5 hrs restless" sleep, had a decreased appetite, and felt "[h]opeless about situation in military" and "trapped."

39.     SPC Keith, whose military occupational specialty did not qualify him to make a medical diagnosis, misdiagnosed Mr. LaBonte with Axis I Adjustment Disorder. He did not inform Mr. LaBonte of this diagnosis, schedule any follow-up evaluation, or confer with Mr. LaBonte's chain of command.

### *Mr. LaBonte's Separation*

40.     In 2004, Mr. LaBonte's unit dissolved. He joined a new unit and learned it would deploy to Iraq. He immediately told his new chain of command that he was not physically or mentally ready to deploy for a second time, reporting severe symptoms including panic attacks.

41.     Mr. LaBonte's new chain of command did not refer him for medical evaluation and told him that he would have to re-deploy.

42.     Shortly before his unit's scheduled deployment, in November 2005, Mr. LaBonte went home to Connecticut for his grandfather's funeral on emergency leave. When Mr. LaBonte arrived at the airport to board his return flight to Texas, he found himself unable to return to his impending deployment. He instead remained at his parents' home for about six months.

43.     In May 2006, after Mr. LaBonte was able to bring himself to return to base, he sought help from the new chain of command at Fort Hood. However, like his previous chains of command, this new one also did not refer Mr. LaBonte for evaluation or treatment.

44.     Instead, on June 9, 2006, Mr. LaBonte received an Article 15, an administrative, non-judicial punishment, for going AWOL that lowered his rank to private first class. The Army instructed Mr. LaBonte to prepare for deployment.

45.     On September 11, 2006, over three months after Mr. LaBonte had returned to base, Major Paul Webb charged Mr. LaBonte with desertion despite his previous non-judicial punishment.

46.     Mr. LaBonte's court-martial took place on October 23, 2006. At that time, he continued to suffer from symptoms of his undiagnosed and untreated PTSD, depression, and TBI. Under the advice of the defense counsel provided to him, Mr. LaBonte pled guilty to the charge and highlighted marital problems as the main source of his stress.

47.     Mr. LaBonte was sentenced to a reduction in his pay grade to E-1, forfeiture of $849 pay per month for four months, four months confinement at Fort Sill, Oklahoma, and a bad conduct discharge, which made Mr. LaBonte ineligible for VA and nearly all other post-service care and benefits.

10

### Post-Discharge Struggles

48.     After separating from the Army, Mr. LaBonte struggled with the symptoms of his undiagnosed PTSD and TBI, and the stigmatizing effects of his bad conduct discharge.

49.     Mr. LaBonte was unable to retain employment because his debilitating symptoms made it difficult for him to perform basic professional tasks. He repeatedly made impulsive financial and personal decisions that were entirely out of character with his pre-service personality. His relationship with his family and his then-wife deteriorated as he increasingly withdrew from the outside world.

50.     Because the Army had repeatedly told him that he was healthy, Mr. LaBonte convinced himself that there was no medical cause for his distress. This added to his sense of despair and belief that he was "weak" for being unable to cope with the war.

51.     Even if Mr. LaBonte had sought medical help, it would have been difficult for him to obtain. Because of his bad conduct discharge, Mr. LaBonte did not have access to medical benefits, including Tricare,[1] that help traumatized veterans transition back into civilian life.

### PTSD and TBI Diagnosis

52.     Mr. LaBonte continued to suffer. In 2012, Mr. LaBonte's father convinced him to see Dr. J. Mark Hall, a clinical psychologist in Glastonbury, Connecticut. Dr. Hall diagnosed Mr. LaBonte with service-connected PTSD.

53.     Dr. Hall also evaluated the intake form and notes from Mr. LaBonte's visit to the Fort Hood Mental Health Clinic and concluded that at the time of this visit Mr. LaBonte was "a

---

[1] Tricare is a government-managed health care program available to active duty and medically retired/discharged service members. *About Us*, Tricare (June 15, 2018), https://www.tricare.mil/About.

highly compromised individual" who "should [have been] referred for treatment . . . as well as an evaluation for psychiatric medication."

54.     In March 2014, Dr. Bandy Lee, Assistant Clinical Professor of Psychiatry at Yale University School of Medicine and Director of the Violence and Health Study Group at Yale University, evaluated Mr. LaBonte and diagnosed him with service-connected PTSD.

55.     In August 2015, Dr. Sanjay Rathi, a neurologist with more than 25 years of experience, evaluated Mr. LaBonte and diagnosed him with a TBI. Dr. Rathi concluded that he suffered a "severe concussive injury" and at least a moderate TBI when he fell from the guard tower. He explained that Mr. LaBonte's motor activity is impaired because his central nervous system was damaged by the fall, his left hemisphere showed subtle signs of damage from his TBI, and that his severe, persistent migraine headaches "are causally related to the original traumatic brain injury [e.g. caused by the fall from the guard tower]."

### *Applications for Discharge Upgrade*

56.     After being diagnosed with PTSD, Mr. LaBonte began to come to terms with the extent to which his medical conditions had contributed to his struggles both in the Army and after his discharge. At the encouragement of his father, Mr. LaBonte sought formal review of his service history and post-discharge benefits.

57.     In January 2014, a U.S. Department of Veterans Affairs (VA) Character of Service Determination concluded that Mr. LaBonte's service was "honorable and . . . not a bar to VA Benefits under the provisions of 38 CFR 3.12(c)(6)(i-ii)," relying in part on the symptoms that Mr. LaBonte reported during his visit to the Fort Hood Mental Health Clinic. The VA service-connected Mr. LaBonte for PTSD, TBI, depression, headaches, back pain, tinnitus, painful scar, and ulcers.

58.     In September 2014, after Mr. LaBonte retained undersigned counsel and made the appropriate application, the Army Discharge Review Board (ADRB) upgraded his discharge status to general, under honorable conditions. The ADRB concluded that the "overall length and quality of [Mr. LaBonte's] service," his combat tour in Iraq, and his PTSD were mitigating factors for his misconduct. The ADRB further concluded that "[i]f [Mr. LaBonte] had a firm diagnosis of PTSD and indication of TBI, this would have been mitigating at his trial, [sic] in turn would have led to a more lenient sentence."

59.     On November 17, 2015, Mr. LaBonte filed a petition to the ABCMR asking the Board to (1) retroactively medically retire him by reason of permanent disability for PTSD, depression, and TBI, (2) upgrade his discharge status to honorable, and (3) correct his DD-214, Certificate of Release or Discharge from Active Duty, to remove the reason for his separation (e.g. court-martial conviction) and to reflect his accomplishments while serving in Iraq and the education he obtained while in the military.

60.     On September 29, 2016, the VA increased Mr. LaBonte's combined service-connected disability rating to 100%, based on ratings of 70% for PTSD, 70% for TBI, 50% for headaches, 20% for gastric ulcers, 20% for convergence insufficiency with accommodative disorder and photosensitivity, and 10% for disfigurement of forehead scar.

61.     On October 19, 2017, the ABCMR unanimously granted Mr. LaBonte partial relief. The Board corrected his DD-214 to reflect some of his military accomplishments but denied his discharge upgrade request. The ABCMR further found that it did not have authority to amend his DD-214 to remove his court-martial conviction.

62.     As to his request for medical retirement, the ABCMR concluded that "based on the post-service medical evidence," Mr. LaBonte may have met the criteria for referral to the

13

Army Physical Disability Evaluation System at the time of his separation. The ABCMR observed that "it appears from reviewing the record [Mr. LaBonte's] behavioral health conditions were not duly considered during medical separation processing."

63. On November 27, 2017, Deputy Assistant Secretary of the Army (Review Boards) Francine Blackmon found "sufficient evidence to grant additional relief" and therefore "direct[ed] that [Mr. LaBonte's] case be referred to the Office of the Surgeon General to determine if he should have been retired or discharged by reason of physical disability through the Integrated Disability Evaluation System."

### Disability Evaluation System Processing

64. After Secretary Blackmon referred Mr. LaBonte into the DES process, the Army assigned Mr. LaBonte a Physical Evaluation Board Officer (PEBLO) with the West Point Keller Army Community Hospital.

65. In an e-mail, the PEBLO explained that Mr. LaBonte had "been referred to our office for a Medical Evaluation Board as part of the ABCMR Decision."

66. At the PEBLO's request, Mr. LaBonte provided the Office of the Surgeon General with a memorandum describing his extensive post-separation medical records. He had also included the records as part of his application to the ABCMR.

67. As part of the Legacy Disability Evaluation System,[2] Mr. LaBonte was then evaluated by two Army providers.

---

[2] Although Mr. LaBonte was referred to the IDES by Secretary Blackmon, he was processed through the Legacy Disability Evaluation System (LDES). Army regulations provide that "[t]he legacy process will be used for Army Veterans referred to the DES by the Army Board for Correction of Military Records." AR 635-40, 402(e). Unlike the IDES, the LDES uses military instead of VA physicians to evaluate fitness for military duty at the time of separation and does not interact with the VA system. *See* Dep't of Def. Manual 1332.18, Vol. 1 (Aug. 5, 2014), http://www.secnav.navy.mil/mra/CORB/Documents/DoDM-1332.18-Volume-1.pdf. However,

68.     Major Kai Chitaphong, a licensed clinical social worker and an Activated Army Reservist at West Point, evaluated Mr. LaBonte on March 20, 2018.

69.     Major Chitaphong concluded that Mr. LaBonte "was experiencing PTSD, Depression, Anxiety, and mTBI symptoms post his deployment from Iraq in 2004" and that "[t]hese symptoms interred [sic] with his sleep, appetite, concentration, focus, energy, and ability to perform his duties." He also noted that "[t]here is no history in the family of mental health issues, and [Mr. LaBonte] did not exhibit these symptoms prior to deploying to Iraq in 2003."

70.     Dr. Labib N. Labib, an MEB physician at West Point, evaluated Mr. LaBonte on April 2, 2018 and completed Mr. LaBonte's Narrative Summary (NARSUM) later that day. The NARSUM states that Mr. LaBonte's conditions—PTSD, generalized anxiety disorder, major depressive disorder, and TBI—did not meet medical retention standards at the time of Mr. LaBonte's separation from the Army. The NARSUM further states that Mr. LaBonte was "not deployable" to outside the continental United States.

71.     The Army began to complete Mr. LaBonte's MEB Proceedings Form, DA Form 3947, dated April 2, 2018. The form states that Mr. LaBonte's PTSD, generalized anxiety disorder, major depressive disorder, and mTBI are service-connected and did not meet AR 40-501 retention standards at the time of separation.

72.     Consistent with Army regulations, the form was signed by the provider who completed the NARSUM, Dr. Labib, and a clinical psychologist with a doctoral degree in psychology, Dr. Joseph Marasia. AR 635-40, 4-11(a)(2). The form also lists Colonel Laura Dawson of West Point as the MEB Approval Authority.

---

both processes are part of the DES and governed by DoD regulations establishing procedures for medical retirement. *See* DoD 1332.18.

73.     On April 3, 2018, the PEBLO contacted Dr. Eric L. Doane, a Senior MEB

Physician at Fort Gordon, Georgia, and asked him to "sign [Mr. LaBonte's] medical board" as

the "Approving Authority." She contacted Dr. Doane despite the fact that Mr. LaBonte was

being processed at West Point, and his DA Form 3947 therefore properly lists Colonel Dawson

at West Point as the Approval Authority.

74.      Dr. Doane graduated from Kansas City University of Medicine and Biosciences,

College of Osteopathic Medicine, in 1983 and completed a residency in Family Practice at Ft.

Belvoir, VA in 1986.

75.     Dr. Doane is a family medicine specialist. According to the Georgia Composite

State Board of Medical Examiners, Dr. Doane reports that he does not hold certifications from

any mental health or neurological field or sub-specialty.

76.     On April 4, 2018, Dr. Doane responded to the PEBLO, "I cannot sign this. The

ABCMR . . . was sent to your IDES to determine whether PDES [Physical Disability Evaluation

System] processing WAS WARRENTED [sic] at the time of separation. Clearly it was NOT

warranted."

77.     Dr. Doane further stated that Mr. LaBonte "cannot come back years later after

receiving VA ratings and now demand that he should have been put through the MEB." Dr.

Doane did not refer to the NARSUM, Mr. LaBonte's post-separation medical records, the

ABCMR decision, or Secretary Blackmon's order to refer Mr. LaBonte into the IDES process.

78.     In response, and at the PEBLO's request, Mr. LaBonte's counsel sent a letter

explaining that after returning from Iraq, Mr. LaBonte repeatedly sought help from his superiors

and the Fort Hood Mental Health Clinic, but that the Army failed to properly diagnose or treat

his injuries while he was in service.

79.     The PEBLO forwarded the letter to Dr. Doane on April 12, 2018, along with Mr.
LaBonte's pre- and post-discharge medical records, the ABCMR decision, and the Secretary's
order to refer Mr. LaBonte into the IDES. She also stated that she had attached an email from
Jacqueline Floyd, DES Consultant at the Office of the Surgeon General, "directing us to do the
board."

80.     After receiving from the PEBLO over one hundred pages of Mr. LaBonte's
medical records, ABCMR application, decision, and further explanation from Mr. LaBonte's
counsel, Dr. Doane replied, "Well this is amazing" and added that he was "still not convinced we
are being forced to do IDES processing on him." The PEBLO replied that she understood
Secretary Blackmon's directive to require conducting an MEB.

81.     On April 20, 2018, Colleen P. Campbell, Chief of the Patient Administration
Branch for Keller Army Community Hospital, wrote to Dr. Doane and the PEBLO requesting
that "[i]f there is still an issue with signing this board please let me know, we will have COL
Dawson do the review." Dr. Doane responded that "[t]here is clearly no basis for this soldier
requiring a MEB prior to his separation" and told her to wait for his reply.

82.     In an email regarding Mr. LaBonte's case, the Soldiers' MEB Counsel at West
Point referred to Dr. Doane as "Dr. Eric Doane (Denies Everything)."

### *Denial of Medical Evaluation Board*

83.     On May 7, 2018, the PEBLO told Mr. LaBonte that she had spoken with the
Office of the Surgeon General and that Dr. Doane would not be permitted "to not sign the
board." Although Dr. Doane could disagree with the NARSUM, "[t]his board is going to proceed
like any other board—the board can't just be stopped/ not signed [sic] by the approving
authority."

17

84.     On May 15, 2018, Dr. Doane sent a memorandum to Ms. Campbell at Keller

Army Community Hospital denying Mr. LaBonte an MEB, even though the MEB had already

begun and the NARSUM had been completed. On May 21, 2018, the PEBLO informed

Mr. LaBonte that Dr. Doane had unilaterally denied Mr. LaBonte access to the MEB. She also

stated that Mr. LaBonte would not be permitted to appeal this decision through the regular DES

channels, as provided for under AR 635-40, 4-13(a).

85.     The Doane memorandum fails to reference to any of the evidence provided by

Mr. LaBonte or produced by the Army during its review of his case, including: medical

examinations conducted by Army, VA, and independent physicians; Mr. LaBonte's NARSUM;

contemporaneous communications and records documenting Mr. LaBonte's symptoms during

his time in service; sworn affidavits by members of Mr. LaBonte's family and members of the

Army who served with him in Iraq; and determinations by the ADRB, ABCMR, and VA that

Mr. LaBonte suffers from service-connected PTSD or TBI.

86.     The Doane memorandum also contains numerous significant factual errors.

87.     For example, the memorandum states that "Mr. LaBonte and his legal team

contend that because Mr. LaBonte currently has a 90% rating by the Veteran's Administration

[sic], he must therefore have been unfit for duty at the time of separation March 2008."

88.     This is incorrect. Mr. LaBonte is rated at 100% by the Department of Veterans

Affairs.

89.     Further, Mr. LaBonte has never argued that he is entitled to a disability retirement

simply because of his VA rating.

90.     Mr. LaBonte has instead argued that the Army improperly evaluated and

misdiagnosed him, that he would have been entitled to DES processing had he been properly

diagnosed, and that his subsequent medical history—including, but not limited to, examinations

by competent VA physicians, in addition to multiple examinations conducted by independent

expert physicians and, in 2018, the Army's own medical personnel—demonstrates that he should

have been medically retired at the time of his discharge.

91.     Dr. Doane also states that Mr. LaBonte "was in good health with no physical

limitations" throughout his time in the Army.

92.     This too is incorrect. The Army diagnosed Mr. LaBonte with Adjustment

Disorder in 2004, based on severe symptoms he reported to the Fort Hood Mental Health Intake

physician. Although this erroneous diagnosis failed to identify his PTSD, it demonstrates that

Mr. LaBonte was not "in good health" for the entirety of his service.

93.     Dr. Doane claims that there is "no documentation of" Mr. LaBonte's fall from the

guard tower or a "subsequent head bump."

94.     This is also incorrect. Mr. LaBonte provided to the Office of the Surgeon General

a photograph of him bleeding profusely from his head on the night he fell from the guard tower.

He also provided sworn affidavits from his fellow soldier Brandon DeLaune attesting that Mr.

DeLaune found Mr. LaBonte face down and unconscious near the guard tower, that Mr. LaBonte

was bleeding profusely from his forehead, and that Mr. LaBonte began rambling incoherently

soon after regaining consciousness; and Sergeant James Mastroianni attesting that he saw Mr.

LaBonte after the fall with a new "huge gash on his forehead that was stitched up." Additionally,

the Army Discharge Review Board, ABCMR, and VA have all acknowledged Mr. LaBonte's

service-connected TBI and suggested no alternative source for his symptoms other than his fall

from the guard tower in Tikrit.

95.     Dr. Doane states that Mr. LaBonte was "still DEERS/Tricare eligible"[3] from the time he left the military until August 2010. Dr. Doane concludes that because Mr. LaBonte did not seek treatment for his condition at "any military treatment facility or use his Tricare benefit," he "apparently [was] not in need of any healthcare during this period, which I would contend, further supports the finding that Mr. LaBonte was not in need of disability processing at the time of separation from Active Duty."

96.     This is incorrect. Mr. LaBonte was not DEERS/Tricare eligible upon his separation because Mr. LaBonte received a bad conduct discharge by way of court-martial. 38 CFR § 3.12.

97.     Dr. Doane states that "the scar that Mr. LaBonte allegedly received from his fall . . . was also noted in his 2002 MEPS [Military Entrance Processing Station] induction physical examination."

98.     This is incorrect. The scar noted in Mr. LaBonte's 2002 MEPS induction physical examination is a different scar than the one he incurred after his fall from the 30-foot guard tower in Iraq. The VA recognized the difference when it rated Mr. LaBonte as service-connected for the painful scar resulting from his fall.

99.     On June 21, 2018, the ABCMR denied Mr. LaBonte's claim for medical retirement. Because Mr. LaBonte did not receive the DES processing to which he was entitled at the time of his discharge, the June 2018 decision was the first time any competent military board had denied the claim in a final decision.

---

[3] The Defense Enrollment Eligibility Reporting System (DEERS) is a "computerized database of active duty and retired service members, their family members and others who are eligible for TRICARE. *Keep Your DEERS Information Up To Date*, Tricare (May 30, 2018), https://tricare.mil/CoveredServices/BenefitUpdates/Archives/05_30_18_DEERS_Update.

100.    In its denial, the ABCMR relied solely on Dr. Doane's memorandum, which did not cite any of the medical records produced subsequent to Mr. LaBonte's discharge, or any of the contemporaneous records attesting to Mr. LaBonte's symptoms.

101.    Mr. LaBonte submitted a request for reconsideration to the ABCMR on August 9, 2018. In support of his request for reconsideration, Mr. LaBonte again submitted extensive medical evidence documenting his pre-discharge PTSD and TBI.

102.    On September 7, 2018, the ABCMR denied Mr. LaBonte's request for reconsideration.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Tucker Act, 28 U.S.C. § 1491; Retirement, 10 U.S.C. § 1201;
### Military Pay, 37 U.S.C. § 204(a)

*The ABCMR Decision is Arbitrary, Capricious, and Not Supported by Substantial Evidence*

103.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

104.    This Court has jurisdiction "to render judgment upon any claim against the United States founded upon either the Constitution, or any Act of Congress or any regulation of an executive department, . . . in cases not sounding in tort." 28 U.S.C. § 1491 (Tucker Act).

105.    37 U.S.C. § 204 and 10 U.S.C. § 1201 are money-mandating statutes within the meaning of the Tucker Act.

106.    The ABCMR's decision denying Mr. LaBonte medical retirement was arbitrary, capricious, unsupported by substantial evidence, contrary to law, and an abuse of discretion for reasons including but not limited to those discussed below.

107.    The ABCMR's decision is arbitrary and capricious because it was not based on substantial evidence. In adopting and relying solely upon Dr. Doane's memorandum, the Board failed to acknowledge, much less consider, the extensive medical evidence of Mr. LaBonte's PTSD, TBI, and other injuries arising from his service prior to his discharge.

108.    Moreover, the Board incorrectly concluded that Mr. LaBonte did not suffer from any physical or psychological impairment before his discharge, despite contemporaneous documentation of Mr. LaBonte's injuries, his improper diagnosis of Adjustment Disorder at an Army medical facility, and the Deputy Assistant Secretary's conclusion that there was "sufficient evidence" of Mr. LaBonte's service-connected injuries to warrant referring him to the DES.

109.    The Board erred by relying upon a highly selective, factually incorrect, and incomplete analysis of Mr. LaBonte's records.

110.    The ABCMR failed to give due consideration to Mr. LaBonte's arguments in his request for medical retirement. By fundamentally mischaracterizing Mr. LaBonte's claim and the record evidence, the Board failed to address Mr. LaBonte's arguments, and failed to provide substantial evidence supporting its conclusion that Mr. LaBonte was not entitled to medical retirement.

111.    The ABCMR also failed to articulate and apply the legal standards under which Mr. LaBonte's conditions were evaluated. The Board did not refer to a single DoD or Army regulation establishing the standards for medical retention and referral to an MEB.

112.    The Army violated its own procedures in processing Mr. LaBonte's DES referral. Dr. Doane acted contrary to Department of Defense Instructions and Army Regulations by unilaterally terminating Mr. LaBonte's DES processing. No DoD Instruction or Army Regulation grants one MEB physician, acting as Approving Authority, the authority to halt the

MEB process without issuing a decision and allowing an opportunity for an independent medical review and/or rebuttal.

113.    Dr. Doane was unqualified to serve as an Approving Authority as he lacked the required medical training and experience in mental health or neurology. He did not provide substantial evidence supporting his decision to override the opinions of the multiple expert neurological and mental health professionals who previously evaluated Mr. LaBonte and determined him unfit for military duty.

### *Dr. Doane Acted in Bad Faith*

114.    Dr. Doane's actions and statements demonstrate that he acted in bad faith in adjudicating Mr. LaBonte's claim.

115.    Upon receiving Mr. LaBonte's case, Dr. Doane pre-judged the outcome and immediately expressed his displeasure. Rather than cooperate in the legally-mandated procedure for processing medical retirement claims, Dr. Doane expressed his disbelief that the Army had referred Mr. LaBonte's case to him.

116.    The record Dr. Doane encountered was lengthy and complicated. Rather than attempt to resolve this complexity, Dr. Doane failed to so much as consider the evidence in Mr. LaBonte's medical records. Dr. Doane impliedly dismissed Mr. LaBonte's account by suggesting that he had never fallen from a guard tower in Iraq. Dr. Doane did not engage in a judicious weighing of the evidence. Instead, he ignored the evidence entirely and arrived at a conclusion based on reasoning that did not meaningfully engage with the underlying record.

117.    Dr. Doane's unwillingness to provide fair, honest, and unbiased evaluations is apparently so well known to Army personnel that at least one official has referred to him as "Dr. Doane (Denies Everything)."

118.    Dr. Doane's repeated expressions of displeasure and disbelief at being asked to participate in a Mr. LaBonte's DES processing, his immediate assessment that Mr. LaBonte's claim lacked merit and that Mr. LaBonte was not credible without even considering the record and medical evidence, and his refusal to cede to the proper Approving Authority when asked all demonstrate that he did not act with the requisite good faith in evaluating Mr. LaBonte's record.

### SECOND CLAIM FOR RELIEF
### Fifth Amendment to the U.S. Constitution,
### Violation of Procedural Due Process

119.    The allegations of the preceding paragraphs are incorporated by reference as if fully set forth herein.

120.    This Court has jurisdiction over ancillary constitutional claims and the authority to grant injunctive relief. 28 U.S.C. § 1491(a)(2).

121.    The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

122.    Military disability retirement status and its corresponding benefits are a statutorily granted property interest within the meaning of the Fifth Amendment.

123.    At a minimum, procedural due process requires notice and an opportunity to be heard prior to deprivation of life, liberty, or property.

124.    The Due Process protections of the Fifth Amendment also require that an administrative agency conduct adjudications in a fair and orderly manner.

125.    The Army violated Mr. LaBonte's Due Process rights by prematurely terminating the DES process and prohibiting Mr. LaBonte from accessing the DES or MEB appeal procedures, based solely on a cursory, factually erroneous, and legally incorrect memorandum by

Dr Doane, who lacks training and expertise in mental health and neurology and acted in bad faith.

126.     The Army's perversion of the normal adjudication process unconstitutionally infringed upon Mr. LaBonte's property and liberty rights protected by the Due Process Clause of the Fifth Amendment.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(1)     Grant Mr. LaBonte all appropriate back pay, retirement pay, benefits, and allowances to which he is entitled;

(2)     Direct, by issuance of an injunction, that the Board correct Mr. LaBonte's record to reflect medical retirement by reason of permanent disability for PTSD and TBI, with a physical disability rating of at least 80% for all purposes, including healthcare and education benefits and backpay retirement;

(3)     Award attorneys' fees and costs; and

(4)     Grant any other relief that the Court deems just and proper.

Dated: November 20, 2018
       New Haven, Connecticut

Respectfully Submitted,

By: s/Michael J. Wishnie

Samuel Davis, Law Student Intern[*]
Diana Lee, Law Student Intern[*]
Renee A. Burbank
Michael J. Wishnie
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
t. (203) 432-4800
f. (203) 432-1426
renee.burbank@ylsclinics.org
michael.wishnie@ylsclinics.org

*Counsel for Plaintiff*

---

[*] Application for law student admission forthcoming.