IN THE UNITED STATES COURT OF FEDERAL CLAIMS

18–1784C
(Judge Hertling)

ROBERT J. LABONTE, JR.,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

PLAINTIFF'S BRIEF IN OPPOSITION TO THE GOVERNMENT'S MOTION TO DISMISS
AND PLAINTIFF'S MOTION TO COMPLETE AND SUPPLEMENT THE
ADMINISTRATIVE RECORD

Sebastian Bates, Law Student Intern
Matthew D. Handley, Law Student Intern
Diana Lee, Law Graduate Intern
Catherine E. McCarthy, Law Graduate Intern
Jared M. Quigley, Law Student Intern
Renée A. Burbank, Supervising Attorney
Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
Fax: (203) 432-1426
renee.burbank@ylsclinics.org
michael.wishnie@ylsclinics.org

July 17, 2019                                   *Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. iii

PRELIMINARY STATEMENT ............................................................................1

FACTS AND PROCEEDINGS..............................................................................3

   I.   Service History........................................................................................3

   II.   Medical Evaluations and Administrative Appeals ...........................................4

      A.   Post-Separation Proceedings......................................................................4

      B.   Legal Framework of the Integrated Disability Evaluation System ................................5

      C.   Mr. LaBonte's Integrated Disability Evaluation System Processing and Subsequent

      Proceedings...............................................................................................8

ARGUMENT ...........................................................................................11

   I.   Opposition to the Government's Motion to Dismiss........................................11

      A.   Standard of Review ...............................................................................11

      B.   This Court Possesses Subject-Matter Jurisdiction over Mr. LaBonte's Tucker Act

      Claim ...................................................................................................11

         1.   The Statute of Limitations Does Not Bar Mr. LaBonte's Claim.............................12

         2.   Mr. LaBonte's Claim is Not a Collateral Attack on His Court-Martial ..................13

         3.   Army Regulation 635–40 Does Not Preclude Mr. LaBonte from Disability

         Retirement Processing ...............................................................................15

         4.   This Court Possesses Ancillary Jurisdiction Over Mr. LaBonte's Due Process Claim

         ……………………………………………………………………………………21

   II.   Motion to Complete and Supplement the Administrative Record...................................22

      A.   Standard of Review ...............................................................................22

B.   The Administrative Record Must Be Completed and Supplemented Prior to

Completing the Parties' Briefing ........................................................................24

C.   Mr. LaBonte's Digital Service Medical Records from January 2004 to March 2008

Were Improperly Omitted from the Administrative Record ...............................26

D.   The Medical Record Files Sent to Mr. LaBonte's PEB Liaison Officer Were

Improperly Omitted from the Administrative Record.........................................28

E.   Email Messages Between Mr. LaBonte's PEB Liaison Officer and Dr. Eric L. Doane

Clearly Show Dr. Doane's Personal Bias...........................................................29

F.   The Court Should Order a Deposition of Dr. Eric L. Doane to Explain His Basis for

Deciding to Abruptly Terminate Mr. LaBonte's Claim .....................................33

CONCLUSION .........................................................................................................36

# TABLE OF AUTHORITIES

## CASES

*Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 82 Fed. Cl. 757 (2008) ...........28, 29

*Allied Tech. Grp., Inc. v. United States*, 92 Fed. Cl. 226 (2010)................................................29

*Anderson v. United States*, 111 Fed. Cl. 572 (2013) ..................................................................22

*Bannum, Inc. v. United States*, 404 F.3d 1346 (Fed. Cir. 2005) .................................................23

*Bassett, New Mexico L.L.C. v. United States*, 136 Fed. Cl. 81 (2018) .......................................11

*Baude v. United States*, 137 Fed. Cl. 441 (2018) .......................................................................24

*Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223 (2004) ............................................31

*Black v. United States*, 928 F.2d 412 (Fed. Cir. 1991) ...............................................................12

*Chambers v. United States*, 417 F.3d 1218 (Fed. Cir. 2005) ...............................................12, 13

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)…………….……..33

*Cooper v. Marsh*, 807 F.2d 988 (Fed. Cir. 1986) ......................................................................13

*Cybertech Grp., Inc. v. United States*, 48 Fed. Cl. 638 (2001) ..................................................34

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019)...................................................................33

*Eberg v. Dep't of Def.*, 193 F. Supp. 3d 95 (D. Conn. 2016)......................................................34

*El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285 (D. Conn. 2008).........................34

*Exnicios v. United States*, 140 Fed. Cl. 339 (2018)....................................................................22

*Filipiczyk v. United States*, 88 Fed. Cl. 776 (2009)....................................................................22

*Fisher v. United States*, 402 F.3d 1167 (Fed. Cir. 2005) ...........................................................11

*Friedman v. United States*, 310 F.2d 381 (Ct. Cl. 1962) ...........................................................12

*Fuentes v. United States*, No. 10–861C, 2012 WL 1650748 (Fed. Cl. May 11, 2012)...............24

*Fulcra Worldwide, L.L.C. v. United States*, 97 Fed. Cl. 523 (2011) ...........................................23

*Hatmaker v. United States*, 136 Fed. Cl. 454 (2018) ................................................. 30

*Holley v. United States*, 124 F.3d 1462 (Fed. Cir. 1997) ................................. 11, 21, 22

*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324 (Fed. Cir. 2001)

.......................................................................................................... 30, 33, 34

*Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312 (Fed. Cir. 2003) .................. 30

*Int'l Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38 (2004) ................................. 34

*J.C.N. Const. Co. v. United States*, 60 Fed. Cl. 400 (2004) ........................................ 34

*Kalvar Corp. v. United States*, 543 F.2d 1298 (Ct. Cl. 1976) ...................................... 31

*Kennedy v. United States*, 140 Fed. Cl. 506 (2018) ............................................... 29

*Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312 (2009) ................................. 23

*Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549 (2012) ..................................... 23

*Lechliter v. United States*, 70 Fed. Cl. 536 (2006) .............................................. 21

*Linc Gov't Servs., L.L.C. v. United States*, 95 Fed. Cl. 155 (2010) .......................... 23, 27

*Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120 (2010) .................................... 31

*Mazon v. United States*, 112 F. App'x 741 (Fed. Cir. 2004) ....................................... 12

*McNeil v. United States*, 78 Fed. Cl. 211 (2007) ................................................ 22

*Montana Fish, Wildlife, & Parks Found. v. United States*, 91 Fed. Cl. 434 (2010) .................. 23

*Moyer v. United States*, 41 Fed. Cl. 324 (1998) .............................................. 20, 21

*Murakami v. United States*, 46 Fed. Cl. 731 (2000) .......................................... 24, 29

*Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338 (2004) ..................................... 30

*Price Gordon Servs. v. United States*, 139 Fed. Cl. 27 (2018) .................................... 24

*Real v. United States*, 906 F.2d 1557 (Fed. Cir. 1990) ...................................... 12, 13

*Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746 (Fed. Cir. 1988) ......................... 11

*Roth v. United States*, 378 F.3d 1371 (Fed. Cir. 2004) ............................................................... 18

*Schnable v. United States*, 105 Fed. Cl. 610 (2012) .................................................................... 15

*Smith v. United States*, 114 Fed. Cl. 691 (2014) ............................................................. 23, 26, 27

*Smith v. United States*, 709 F.3d 1114 (Fed. Cir. 2013) ............................................................. 22

*Sonoran Tech. & Prof'l Servs., L.L.C. v. United States*, 132 Fed. Cl. 644 (2017)........... 24, 28, 29

*Stanton v. United States*, 111 Fed. Cl. 263 (2013) .................................................................... 30

*The Few, The Proud, The Forgotten v. Dep't of Veterans Affairs*, 254 F. Supp. 3d 341 (D. Conn.

    2017) ......................................................................................................................................... 34

*United States v. Pineda*, 54 M.J. 298 (C.A.A.F. 2001)............................................................... 17

*Vanalco, Inc. v. United States*, 48 Fed. Cl. 68 (2000) ................................................................ 11

*Watson v. United States*, 113 Fed. Cl. 615 (2013)............................................................... passim

*Watson v. United States*, 2015 WL 4914966 (Fed. Cl. Aug. 17, 2015) ..................................... 35

## STATUTES

10 U.S.C. § 1201 (2018) ........................................................................................................ passim

10 U.S.C. § 1552 (2019) ............................................................................................................. 15

Military Pay Act, 37 U.S.C. § 204 (2013)................................................................................... 11

## OTHER AUTHORITIES

*About Us*, Tricare (last visited July 11, 2019), https://www.tricare.mil/About............................. 8

*Armed Forces Health Longitudinal Technology Application (AHLTA)*, Health.mil (Nov. 16,

    2015), https://health.mil/Reference-Center/Glossary-Terms/2015/11/16/Armed-Forces-Health-

    Longitudinal-Technology-Application................................................................................... 27

Army Regulation 40–501 (2017)................................................................................................... 6

Army Regulation 40–501 (2003).........................................................................................passim

Army Regulation 635–200 (2005)...........................................................................................17

Army Regulation 635–40 (2006)........................................................................................passim

Army Regulation 635–40 (2017)........................................................................................passim

Def. Health Agency, HAIMS: Health Artifact and Image Management Solution (2018),

    https://health.mil/Reference-Center/Fact-Sheets/2019/04/05/HAIMS-Fact-Sheet .................27

Dept. of Def. Instruction 1332.18..........................................................................................6, 8

Dept. of Def. Memorandum 1332.18......................................................................................6, 7

**RULES**

RCFC 52.1(c)..............................................................................................................................22

**REGULATIONS**

38 C.F.R. § 3.12 (2019).............................................................................................................10

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROBERT J. LABONTE, JR.,

       Plaintiff,

    v.

THE UNITED STATES,

       Defendant.

No. 18–1784C
(Judge Hertling)

## PRELIMINARY STATEMENT

Robert J. LaBonte, Jr., seeks medical retirement, back pay, and benefits after the Army repeatedly failed to address his post-traumatic stress disorder (PTSD), traumatic brain injury (TBI), and other serious injuries that he suffered during his 2003–2004 combat service in Iraq. Although Mr. LaBonte reported numerous debilitating symptoms and repeatedly requested care, the Army misdiagnosed him and never referred him for proper medical treatment. Instead, the Army court-martialed Mr. LaBonte for misconduct stemming from his PTSD and TBI, stigmatizing him and denying him access to the benefits to which he was entitled.

Nearly a decade later, the Army Discharge Review Board recognized that Mr. LaBonte's PTSD mitigated his misconduct and upgraded his discharge, making him eligible for some benefits. However, Mr. LaBonte remained ineligible for medical retirement, retiree medical insurance, and other benefits that he would have received if not for the Army's failure to provide him with appropriate care when it owed it to him. Again Mr. LaBonte sought the benefits to which he was entitled, seeking retroactive medical retirement from the Army Board for Correction of Military Records (ABCMR). In 2017, the ABCMR denied Mr. LaBonte's request. After reviewing the ABCMR's decision, however, Deputy Assistant Secretary for the Army (Review Boards)

Francine Blackmon determined that there was enough evidence to provide additional relief and directed the Office of the Surgeon General to determine if he should have been retired or discharged by reason of physical disability.

In accordance with Secretary Blackmon's directive, the Army began processing Mr. LaBonte through its disability evaluation system. The report prepared by the Army's medical board found that the onset of Mr. LaBonte's TBI, PTSD, and other mental health conditions occurred as a result of his 2004 deployment to Iraq and meant that he did not meet retention standards at that time. He should, therefore, have been medically retired because of his injuries.

However, Dr. Eric L. Doane, an osteopathic physician with no mental health or neurological specialty, ignored the report and hundreds of pages of relevant records and unilaterally halted Mr. LaBonte's processing, making many significant misstatements of fact. On June 21, 2018, the ABCMR adopted Dr. Doane's flawed conclusions in full and denied Mr. LaBonte's claim for medical retirement.

The ABCMR's decision—which failed to consider all of the evidence presented and relied on an inaccurate and bad-faith analysis—is arbitrary and capricious. This Court should rectify the Army's perversion of the adjudicative process and grant Mr. LaBonte the benefits that he has rightly earned by directing the ABCMR to correct his record to reflect the medical retirement to which he has long been entitled. Neither statute nor Army regulations preclude Mr. LaBonte from being processed through the Army's disability evaluation system, and he does not ask this Court to disturb his court-martial conviction. Mr. LaBonte respectfully requests that this Court deny the Government's motion to dismiss and grant his motion to complete and supplement the administrative record before requiring him to respond to the Government's motion for judgment on the administrative record, so that the Court may properly evaluate the Army's decision.

# FACTS AND PROCEEDINGS

## I.     Service History

In November 2002, at 18 years old, Mr. LaBonte enlisted in the Army as a military police officer in order to follow in his father's footsteps and fulfill his dream of serving his country. Compl. ¶ 17. In September 2003, Mr. LaBonte deployed to Tikrit, Iraq, where he manned guard towers, watched over enemy prisoners of war at a containment facility, and traveled outside the base with his unit as a turret gunner. *Id.* ¶¶ 20–22. When outside the base, Mr. LaBonte frequently encountered improvised explosive devices and engaged in several firefights with insurgent groups. *Id.* ¶ 22. In 2004, Mr. LaBonte fell 30 feet from a guard tower, where a fellow soldier found him unconscious and bleeding profusely from his head. *Id.* ¶¶ 25–26. Because of his experiences in combat, Mr. LaBonte suffered a TBI, PTSD, major depressive disorder, and a host of other serious injuries. *Id.* ¶¶ 28–29, 37–38, 40, 46, 48–49, 52–55.

After returning from Iraq, Mr. LaBonte repeatedly sought help from his superiors and the Fort Hood Mental Health Clinic, but the Army failed to properly diagnose or treat his injuries. *Id.* ¶¶ 31–39. Between April and June 2004, Mr. LaBonte told his chain of command that he was experiencing mental distress, anxiety, difficulty sleeping, and panic attacks. *Id.* ¶ 31. But instead of referring Mr. LaBonte for evaluation and treatment, his chain of command sent him to speak with a chaplain. *Id.* ¶ 33. Mr. LaBonte sought treatment at the Fort Hood Mental Health Clinic. *Id.* ¶ 36. A junior-enlisted mental health specialist noted Mr. LaBonte's symptoms but misdiagnosed him with an adjustment disorder. *Id.* ¶¶ 38–39. The specialist did not inform Mr. LaBonte of this diagnosis, schedule any follow-up evaluation, or confer with Mr. LaBonte's chain of command. *Id.* ¶ 39. The Army also did not refer Mr. LaBonte for disability evaluation, even though he had reported his symptoms and the Army was aware, or should have been aware, of Mr. LaBonte's condition. *Id.* ¶¶ 31–39.

3

Instead, in 2004, Mr. LaBonte learned that his new unit would deploy to Iraq. *Id.* ¶ 40. He immediately told his new chain of command that he was not physically or mentally ready to deploy for a second time, reporting symptoms including panic attacks. *Id.* Mr. LaBonte's new chain of command still did not refer him for medical evaluation. *Id.* ¶ 41.

In November 2005, more than a year after he first sought medical care for his injuries, Mr. LaBonte's untreated PTSD and TBI worsened to the point where he could not bring himself to return to his unit for another deployment. *Id.* ¶ 42. He went Absent Without Leave (AWOL) for a period of six months before voluntarily returning to Fort Hood in 2006, at which point he was charged with desertion, pled guilty at a special court-martial, and was given a Bad Conduct Discharge. *Id.* ¶¶ 42–43, 45–47.

## II.    Medical Evaluations and Administrative Appeals

### A.  Post-Separation Proceedings

After separating from the Army, Mr. LaBonte continued to struggle with symptoms of his PTSD and TBI. *Id.* ¶ 48. In 2012, Mr. LaBonte's father convinced him to see Dr. J. Mark Hall, a clinical psychologist, who diagnosed him with service-connected PTSD. *Id.* ¶ 52. Dr. Hall concluded that at the time of his visit to the clinic at Fort Hood Mr. LaBonte should have been referred for treatment and a psychiatric evaluation. *Id.* ¶ 53. In March 2014, Dr. Bandy Lee, Assistant Clinical Professor of Psychiatry at Yale University School of Medicine, also diagnosed Mr. LaBonte with service-connected PTSD. *Id.* ¶ 54. In August 2015, Dr. Sanjay Rathi, a neurologist with more than 25 years of experience, evaluated Mr. LaBonte and diagnosed him with a TBI caused by his fall from the guard tower. *Id.* ¶ 55.

In 2014, nearly a decade after his separation from the Army, the Army Discharge Review Board upgraded Mr. LaBonte's discharge status to General, Under Honorable Conditions. *Id.* ¶ 58. The Board concluded that Mr. LaBonte's length and quality of service, his combat tour in Iraq,

and his PTSD were mitigating factors for his misconduct. *Id.* It further noted that if Mr. LaBonte had had a "firm diagnosis of PTSD and indication of TBI, this would have been mitigating at his trial, [and] in turn would have led to a more lenient sentence." *Id.* The following year, Mr. LaBonte petitioned the ABCMR to retroactively medically retire him by reason of permanent disability for PTSD, depression, and TBI; upgrade his discharge status to Honorable; and correct his Certificate of Release or Discharge from Active Duty (DD-214) to remove the court-martial as the narrative reason for his separation and to reflect his accomplishments while serving in Iraq. *Id.* ¶ 59.

On October 19, 2017, the ABCMR partially denied Mr. LaBonte's petition on the basis that it did not have the authority to remove his court-martial from his DD-214. *Id.* ¶ 61. The ABCMR also incorrectly stated that the court-martial precluded it from referring Mr. LaBonte for medical retirement processing. AR45. However, the ABCMR accepted that, "based on the post-service medical evidence," Mr. LaBonte might have met the criteria for referral for disability evaluation at the time of his separation. Compl. ¶ 62. The ABCMR further observed that "it appears from the record [that Mr. LaBonte's] behavioral health conditions were not duly considered during medical separation processing." *Id.*

Secretary Blackmon "reviewed the findings, conclusions, and [ABCMR] member recommendations" and found "sufficient evidence to grant additional relief." *Id.* ¶ 63. Secretary Blackmon "direct[ed] that [Mr. LaBonte's] case be referred to the Office of the Surgeon General to determine if he should have been retired or discharged by reason of physical disability through the Integrated Disability Evaluation System." *Id.*

### B.  Legal Framework of the Integrated Disability Evaluation System

The Secretary of each military branch may retire a service member with disability retirement pay upon determining that the service member is unfit to continue military service because of a physical disability "incurred while entitled to basic pay." 10 U.S.C. § 1201(a) (2018).

5

To implement this provision, the Department of Defense established the Disability Evaluation System (DES) to determine if a service member is unfit for further military service due to a medical condition or physical defect. Dep't of Def. Instruction (DODI) 1332.18; Dep't of Def. Memorandum (DODM) 1332.18. This system is governed by Army Regulation ("Army Reg.") 635–40 (2017). *See* Army Reg. 40–501 ¶ 3–1 (2017) (medical fitness standards for retention, separation, and retirement).[1]

The Army has a duty to refer a service member who may have a qualifying disability that renders them unfit to serve for DES evaluation. Medical authorities must refer eligible service members into the DES who have "one or more medical conditions that may . . . prevent [them] from reasonably performing the duties of their office, grade, rank, or rating . . . for more than 1 year after diagnosis." DODI 1332.18, at 23. Army Reg. 635–40 requires unit commanders to ensure that soldiers with certain permanent or temporary medical conditions are referred into the DES. ¶ 2–6(a)10, (b)(1) (2017).

Once a soldier has been referred into the DES, the Army's Disability Evaluation System consists of three main steps: (1) the Medical Evaluation Board (MEB); (2) the Physical Evaluation Board (PEB); and (3) final disposition by the Secretary. DODI 1332.18, at 13. The purpose of the MEB is to document a soldier's medical status and, based on this documentation, determine whether the service member has one or more medical conditions that fail to meet the Army's medical retention standards under Army Reg. 40–501. Army Reg. 635–40 ¶ 4–7 (2017); *see* DODI 1332.18, at 14.

---

[1] This section references the 2017 versions of Army Reg. 635–40 and Army Reg. 40–501, which were in effect on the date of Secretary Blackmon's referral.

The MEB is comprised of two or more physicians. Army Reg. 635–40 ¶ 4–11(a)(2) (2017). One of the physicians evaluates the soldier and prepares the Narrative Summary of the soldier's history, present status, and medical conditions. *Id.*; DODM 1332.18, at 14. "The MEB [Narrative Summary] is the heart of the MEB." Army Reg. 635–40 ¶ 4–12(a) (2017). Most notably, "[f]or medical conditions that, individually or collectively, may render the member unfit to perform [their] duties," the MEB results will describe the impact of the soldier's medical conditions on their "required duty and associated operational assignment limitations," and "[w]hether the medical conditions are likely to improve sufficiently for the member to perform the full duties of the member's office, grade, rank, or rating within 12 months." DODM 1332.18, at 44. When a MEB is considering a psychiatric diagnosis, such as PTSD, "the MEB will include a psychiatrist or a clinical psychologist with a doctoral degree in psychology, who may also substitute for the second MEB physician member." *Id.* at 24. A senior medical officer also serves as the MEB "approving" or "convening" authority and must have "detailed knowledge of regulations pertaining to standards of medical fitness and disability separation processing." Army Reg. 635–40 ¶ 4–11(a)(2) (2017).

After reviewing the soldier's Narrative Summary and medical documentation, the MEB will either: (1) recommend that the soldier's case be forwarded to the PEB for a fitness determination when "one or more of [the] Soldier's medical conditions individually or collectively do not meet medical retention standards;" or (2) recommend that the soldier be returned to duty or returned to duty with limitations. *Id.* ¶ 4–12(f). If the MEB does not recommend referral to the PEB, the soldier may elect to: (1) concur with the MEB decision; (2) request an impartial medical review by a physician independent of the MEB; or (3) submit a written rebuttal of the MEB findings. *Id.* ¶ 4–13.

7

Upon referral from the MEB, the second step of the DES process is the PEB. All cases are initially adjudicated by an Informal PEB. The Informal PEB determines the soldier's fitness for purposes of retention, separation, or retirement for disability based on a "documentary review" of the soldier's case file. *Id.* ¶ 4–22. A soldier who disagrees with the Informal PEB's findings may appeal by requesting a Formal PEB or submitting a written rebuttal. *Id.* ¶ 4–23.

The third and final stage of the DES process is a final disposition by the Secretary of the military department. DODI 1332.18, at 47; Army Reg. 635–40 ¶ 2–2(f)(5) (2017). This disposition constitutes the final decision as to whether or not the soldier is eligible to be retired or discharged from the Army by reason of physical disability. DODI 1332.18, at 47. Soldiers retired by reason of an unfit condition are entitled to military retirement pay and associated benefits, including Tricare, a government-managed healthcare program available to active duty and medically retired or discharged service members. 10 U.S.C. § 1201; *see About Us*, Tricare (last visited July 11, 2019), https://www.tricare.mil/About.

### C. Mr. LaBonte's Integrated Disability Evaluation System Processing and Subsequent Proceedings

After Secretary Blackmon referred Mr. LaBonte to the DES, the Army began processing Mr. LaBonte through the Legacy DES[2] in accordance with the Secretary's direction. Compl. ¶¶ 64, 67. The Army assigned Mr. LaBonte a PEB Liaison Officer with the West Point Keller Army Community Hospital. *Id.* ¶ 64. As part of the Legacy DES, Mr. LaBonte was also evaluated by two Army medical providers. *Id.* ¶¶ 68, 70. The first provider determined that Mr. LaBonte was

---

[2] The Legacy DES is a variation of the DES which is used when a veteran is referred to the DES by the ABCMR. Army Reg. 635–40 (2017) ¶ 4–2(e). It follows the same procedures as the standard DES process, but clarifies that examinations must be conducted by military physicians (not Department of Veterans Affairs physicians) and that medical conditions are evaluated in the context of their status at the time of the veteran's separation. *Id.* ¶ 4–18.

experiencing PTSD, depression, anxiety, and mTBI (mild traumatic brain injury) symptoms following his 2004 deployment to Iraq. *Id.* ¶ 69.

Consistent with Army regulations, the second Army medical provider completed Mr. LaBonte's Narrative Summary, which states that because of Mr. LaBonte's PTSD, generalized anxiety disorder, major depressive disorder, and TBI, he did not meet medical retention standards at the time of his separation from the Army. *Id.* ¶ 70. It further states that at the time of his separation, Mr. LaBonte was "not deployable" outside the continental United States. *Id.* Both the second medical provider and a clinical psychologist with a doctoral degree in psychology signed Mr. LaBonte's MEB Proceedings Form (DA Form 2947), which likewise states that Mr. LaBonte's PTSD, generalized anxiety disorder, major depressive disorder, and mTBI are service-connected and did not meet Army Reg. 40–501 retention standards at the time of his separation. *Id.* ¶ 72; Army Reg. 635–40 ¶ 4–11(a)(2) (2017).

Mr. LaBonte's PEB Liaison Officer then contacted Dr. Eric L. Doane, a Senior MEB Physician at Fort Gordon, Georgia, and asked him to sign Mr. LaBonte's medical board as the approving authority. Compl. ¶ 73. As the approving authority, Dr. Doane should have conducted a review of the Narrative Summary and medical evidence, and made a recommendation based on the findings of the MEB physicians on whether to forward Mr. LaBonte's case to the PEB stage of DES processing. Army Reg. 635–40 ¶ 4–12(f) (2017). Since the MEB physicians had concluded that Mr. LaBonte did not meet medical retention standards, Dr. Doane should have forwarded Mr. LaBonte to the PEB stage of the process. *Id*.

Dr. Doane did not do so.  Instead, the following day, Dr. Doane informed the PEB Liaison Officer that he would not sign the form because DES processing was "NOT warranted" at the time of separation. Compl. ¶ 76 (emphasis in original). Dr. Doane did not refer to the Narrative

9

Summary, Mr. LaBonte's post-separation records, the ABCMR decision, or Secretary Blackmon's order referring Mr. LaBonte to the DES process. *Id.* ¶ 77. Dr. Doane then sent a memorandum purporting to deny Mr. LaBonte a MEB, even though the MEB had already begun and the Army had completed the Narrative Summary. *Id.* ¶ 84. The PEB Liaison Officer informed Mr. LaBonte that Dr. Doane had unilaterally terminated Mr. LaBonte's processing and that he would not be permitted to appeal this decision through the regular DES channels provided for in Army Reg. 635–40 ¶ 4–13(a) (2017). *Id.* ¶ 84.

The Doane memorandum contains numerous significant misstatements of fact that reveal Dr. Doane did not properly review or rely on the evidence provided by Mr. LaBonte or produced by the Army during its review of his case. *Id.* ¶¶ 85–98. Dr. Doane's tendency to make such arbitrary and capricious denials is so well-known that at least one Army employee referred to him in an email as "Dr. Eric Doane (Denies Everything)." *Id* ¶ 82. The Doane memorandum states, for example, that Mr. LaBonte "was in good health with no physical limitations" throughout his time in the Army. *Id.* ¶ 91. This is incorrect. The Army diagnosed Mr. LaBonte with an adjustment disorder in 2004. *Id.* ¶ 92. Mr. LaBonte also provided to the Office of the Surgeon General a color photograph of him bleeding profusely from his head on the night he fell from the guard tower as well as sworn affidavits from a fellow soldier who discovered him on the ground that night. *Id.* ¶ 94. The Doane memorandum further states that Mr. LaBonte was still eligible for Tricare at the time that he left the military until August 2010, but did not seek treatment for his condition. *Id.* ¶ 95. Dr. Doane concludes on this basis that Mr. LaBonte was not in need of disability processing at the time of his separation. *Id.* However, Mr. LaBonte was *not* eligible for Tricare upon his separation because he received a Bad Conduct Discharge. 38 C.F.R. § 3.12 (2019).

10

On June 21, 2018, the ABCMR denied Mr. LaBonte's claim for medical retirement, relying solely on the Doane memorandum. Compl. ¶¶ 99–100. Because Mr. LaBonte did not receive the disability evaluation processing to which he was entitled at the time of his discharge, the June 2018 decision was the first time any competent military board had denied the claim in a final decision. *Id*. ¶ 99. Mr. LaBonte timely submitted a request for reconsideration, which the ABCMR denied. *Id*. ¶¶ 101–102. On November 20, 2018, Mr. LaBonte filed the instant complaint, challenging the ABCMR's denial as arbitrary and capricious, not supported by substantial evidence, in bad faith, and in violation of the Due Process Clause of the Fifth Amendment. *Id*. ¶¶ 106, 125.

## ARGUMENT

### I.   Opposition to the Government's Motion to Dismiss

#### A.  Standard of Review

A motion to dismiss for lack of jurisdiction must be denied if the plaintiff asserts facts that establish subject-matter jurisdiction "by a preponderance of the evidence." *Bassett, New Mexico L.L.C. v. United States*, 136 Fed. Cl. 81, 84 (2018); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). When, as here, the claim is attacked on facial grounds, this Court "must construe the allegations of the complaint favorably to the pleader." *Vanalco, Inc. v. United States*, 48 Fed. Cl. 68, 73 (2000).

#### B.  This Court Possesses Subject-Matter Jurisdiction over Mr. LaBonte's Tucker Act Claim

This Court possesses subject-matter jurisdiction over Mr. LaBonte's Tucker Act claim for back pay under the money-mandating provisions of the Military Pay Act, 37 U.S.C. § 204 (2013). *Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997). This is also true of Mr. LaBonte's claim for disability retirement pay under the money-mandating provisions of 10 U.S.C. § 1201 (2008). *Fisher v. United States*, 402 F.3d 1167, 1174–75 (Fed. Cir. 2005). The Government's

arguments to the contrary fail for three reasons: (1) the statute of limitations does not bar Mr. LaBonte's claim; (2) Mr. LaBonte's claim is not a collateral attack on his court-martial; and (3) Army Reg. 635–40 (2006)[3] does not make Mr. LaBonte ineligible for the disability retirement pay which § 1201 mandates. This Court possesses jurisdiction and should deny the Government's motion to dismiss.

### 1.   The Statute of Limitations Does Not Bar Mr. LaBonte's Claim

The statute of limitations does not rob this Court of jurisdiction over Mr. LaBonte's claim because his claim did not accrue until the first competent board, the ABCMR, took final action on his request for disability retirement. The "first competent board rule" is straightforward and well-established: "claims of entitlement to disability retirement pay generally do not accrue until the appropriate military board either finally denies such a claim or refuses to hear it." *Chambers v. United States*, 417 F.3d 1218, 1224 (Fed. Cir. 2005) (citing *Real v. United States*, 906 F.2d 1557, 1560 (Fed. Cir. 1990)); *accord Friedman v. United States*, 310 F.2d 381, 389 (Ct. Cl. 1962). The Federal Circuit has repeatedly held that when a veteran did not undergo disability retirement evaluation while in service, the statute of limitations begins to run only on the date on which a records correction board denies a request or refuses to hear it. *See, e.g., Mazon v. United States*, 112 F. App'x 741, 743 (Fed. Cir. 2004) (claim accrued on the date that the Army Discharge Review Board refused to review request); *Black v. United States*, 928 F.2d 412 (Fed. Cir. 1991) (claim accrued on the date that the Air Force Board for the Correction of Military Records denied request).

The ABCMR was the proper tribunal to hear Mr. LaBonte's request for disability retirement because he was never evaluated while in service. *See Friedman*, 310 F.2d at 396 (explaining that "in that instance [the Correction Board] stands in the place of the Retiring Board

---

[3] Here, in contrast to the explanation of the Integrated DES above, reference will be made to the Army regulations applicable to Mr. LaBonte during his service.

as the proper tribunal to determine eligibility for disability retirement"). The Government argues that the "first competent board" rule does not apply here because the ABCMR determined that Mr. LaBonte's court-martial conviction prevented it from granting the relief sought. Def.'s Mot. to Dismiss at 26–27 (citing *Cooper v. Marsh*, 807 F.2d 988, 991 (Fed. Cir. 1986)). However, the "gravamen" of the appellant's request in *Cooper* was that he wanted his court-martial conviction declared void, which the Court held that the Board lacked statutory authority to grant. *Id.* at 989–91. In this case, as the Government notes repeatedly, Def.'s Mot. to Dismiss at i, 1, 9, 22, 27, 30, and as explained more fully below, Mr. LaBonte neither challenges his court-martial conviction nor asks that it be voided. Instead, Mr. LaBonte seeks disability retirement pay and retroactive retirement pay. Compl. at 25. This is relief that the ABCMR is statutorily empowered by 10 U.S.C. § 1201 to grant. *Chambers*, 417 F.3d at 1224.

The ABCMR was the first competent board to fully consider Mr. LaBonte's eligibility for disability retirement. *See* AR107 ¶ 15(g) ("the applicant's behavioral health conditions were not duly considered during medical separation processing"). There is nothing in the record to suggest that Mr. LaBonte was ever evaluated for eligibility for disability retirement while in service, even though the Army's own regulations required such a referral. Army Reg. 40–501 ¶¶ 3–30(g), 3–31, 3–32, 3–33 (2003). Therefore, once the ABCMR considered and denied Mr. LaBonte's request for disability retirement, his claim accrued under this Court's jurisdiction. *See Real*, 906 F.2d at 1560. Since the ABCMR was the first competent board to rule on Mr. LaBonte's eligibility for disability retirement, the statute of limitations began to run upon its denial of his claim on June 21, 2018.

### 2.  Mr. LaBonte's Claim is Not a Collateral Attack on His Court-Martial

Mr. LaBonte does not challenge his court-martial conviction—a fact that, as noted above, the Government states repeatedly in its own brief. Mr. LaBonte seeks direct review of a 2018 decision by the ABCMR rather than collateral review of his 2006 court-martial. As this Court has

13

previously recognized, a claim for back pay and retroactive disability retirement is not a collateral attack on a court-martial conviction. *Watson v. United States*, 113 Fed. Cl. 615, 630 (2013), *clarified*, 118 Fed. Cl. 266 (2014), *modified*, 2015 WL 4914966 (Fed. Cl. Aug. 17, 2015). This Court, therefore, may review Mr. LaBonte's claim that he should have been medically retired based on his undiagnosed conditions in 2004, notwithstanding his court-martial in 2006.

In *Watson*, the plaintiff deployed to Iraq in 2005 and 2007. 113 Fed. Cl. at 618. In 2006, between the two deployments, he was diagnosed with optic nerve atrophy and optic neuritis— conditions which Army Reg. 40–501 (2005) required be referred to a MEB for consideration of disability retirement. *Id*. at 618–21. The Army ordered the plaintiff to deploy again, but he refused and was subsequently convicted under the Uniform Code of Military Justice (UCMJ) for missing movement to Iraq and involuntarily discharged with an Other Than Honorable discharge. *Id*. at 623–25. The plaintiff applied to the ABCMR for correction of his records and then brought a Tucker Act claim in this Court, asking for his discharge to be voided, reinstatement to active duty with back pay, and referral to a MEB. *Id*. at 619. The Government raised the defense that the plaintiff's claims amounted to a collateral attack on his court-martial conviction. *Id*. at 629. However, because the plaintiff did not request that his court-martial conviction be voided or altered, but instead requested a review of the military's failure to follow its own regulations regarding disability retirement evaluations prior to his court-martial, the *Watson* Court held that the plaintiff's claim was not in fact a collateral attack on his court-martial conviction. *Id*. at 630.

Mr. LaBonte's case fits squarely within the holding of *Watson,* in which the plaintiff sought correction of his military records, reinstatement to active duty, back pay and allowances, and referral for disability processing. *Id*. at 619. Mr. LaBonte similarly seeks back pay and allowances, correction of his military records, and medical disability retirement. Compl. at 25. Like the plaintiff

in *Watson*, who did "not request that this [C]ourt void or otherwise alter his court-martial conviction," 113 Fed. Cl. at 630, Mr. LaBonte does not challenge his court-martial conviction. Accordingly, as in *Watson*, this Court should find that Mr. LaBonte's claim is not a collateral attack on his conviction. *Id.*

*Schnable v. United States*, 105 Fed. Cl. 610 (2012), on which the Government relies, does not support its position. Def.'s Mot. to Dismiss at 12–14. The plaintiff in *Schnable* challenged the validity of his court-martial conviction on constitutional grounds and sought back pay and allowances, and the Government argues that this Court should similarly dismiss all of Mr. LaBonte's claims—even those that do not directly relate to the court-martial. *Id*. at 13–14. In *Schnable*, however, the plaintiff challenged his discharge in this Court on the grounds that he was denied his rights under the Fifth and Sixth Amendments during the appeal of his court-martial conviction. 105 Fed. Cl. at 611. In other words, the plaintiff's claim for back pay and allowances was premised on the alleged invalidity of his court-martial conviction.

Mr. LaBonte does not challenge the validity of his court-martial conviction, making *Schnable* inapplicable. Instead, Mr. LaBonte's claim is based on the Army's failure to recognize his service-connected TBI and PTSD and refer him for medical retirement long before his court-martial—an injustice that the ABCMR should have rectified. Compl. at 1. Because his claim does not require disturbing his court-martial conviction, it does not implicate 10 U.S.C. § 1552(f) (2019).

### 3.  Army Regulation 635–40 Does Not Preclude Mr. LaBonte from Disability Retirement Processing

The Government claims that Army Reg. 635–40 (2006) barred Mr. LaBonte from undergoing disability processing. Def.'s Mot. to Dismiss at 23–24, 32. But that regulation is inapplicable to Mr. LaBonte because his discharge is no longer characterized as a Bad Conduct

Discharge.  The regulation therefore does not stand in the way of referral to, or a continuation of, the disability evaluation process.

The text of Army Reg. 635–40 (2006) demonstrates that once a court-martial has been concluded, the severity of the sentence is the dispositive factor in determining whether disability retirement processing is prohibited. *See* App. to Def.'s Mot. to Dismiss at 4 ¶¶ 4–2, 4–3. It provides that a soldier who has been convicted by a court-martial remains eligible for disability retirement processing so long as they are not subject to: (1) punitive discharge; (2) dismissal; or (3) administrative Other Than Honorable separation. *Id*. The Army Discharge Review Board's upgrade of Mr. LaBonte's discharge to General, Under Honorable Conditions, places him in the category of soldiers who have been sentenced by a court-martial but are not under a sentence of dismissal, punitive discharge, or administrative discharge characterized as Other Than Honorable. Therefore, Mr. LaBonte is eligible for referral for disability processing.

Army Reg. 635–40 (2006) contains three paragraphs that dictate how the Army must handle disability evaluation processing for soldiers facing investigation or charges for violations of the UCMJ. *See* App. to Def.'s Mot. to Dismiss at 4. Reading all these provisions in concert, it is clear that there are two circumstances in which Army Reg. 635–40 (2006) prevents a soldier from participating in disability retirement evaluation processing. *First*, during the pendency of an investigation or court-martial proceeding, the provisions of ¶ 4–1 prevent the soldier from participating in disability processing. *Id.* at ¶ 4–1. This case, of course, does not fall within that circumstance because it has been more than a decade since the investigation and court-martial of Mr. LaBonte concluded, and he is no longer charged or under investigation. Compl. ¶¶ 44–46. *Second*, when an investigation or court-martial has concluded, the provisions of ¶¶ 4–2 and 4–3 govern whether a soldier can be referred for, or continue, disability retirement processing. App. to

Def.'s Mot. To Dismiss at 4 ¶¶ 4–2, 4–3. This case is not barred by those provisions, either, because Mr. LaBonte is not under a sentence of dismissal or punitive discharge, nor does he have an Other Than Honorable characterization of service.

The provisions of ¶ 4–2 specify that a soldier who has been sentenced by a court-martial may not be referred for, or continue, disability processing if they are under a sentence of dismissal or punitive discharge, unless that sentence has been suspended. *Id*. at ¶ 4–2. A punitive discharge consists of either a Bad Conduct Discharge or a Dishonorable Discharge. *United States v. Pineda*, 54 M.J. 298, 300 (C.A.A.F. 2001). Under ¶ 4–2, an enlisted soldier who is subject to a sentence which *does not* include a punitive discharge, or whose sentence has been suspended, can thus participate in the disability retirement process.

In September 2014, the Army Discharge Review Board upgraded Mr. LaBonte's discharge status to General, Under Honorable Conditions. Compl. ¶ 58. The Government alleges that the ABCMR was not empowered to process Mr. LaBonte through the disability retirement system because the ABCMR lacks the authority to set aside his conviction and is only empowered to change the severity of the sentence imposed. Def.'s Mot. to Dismiss at 19–20. However, the severity of the sentence imposed is the dispositive factor that ¶ 4–2 uses to determine if a soldier may begin or continue disability processing. The severity of Mr. LaBonte's sentence is now a discharge of General, Under Honorable Conditions, and *not* a punitive discharge or dismissal. Thus, Army Reg. 635–40 ¶ 4–2 (2006) does not bar him from disability processing.

Under ¶ 4–3 of the regulation, soldiers who are subject to an administrative separation may not continue disability retirement processing if that separation authorizes an Other Than Honorable discharge. App. to Def.'s Mot. to Dismiss at 4 ¶ 4–3. Separation by the sentence of a general or special court-martial is not an administrative separation. Army Reg. 635–200 (2005), at 128.

17

Mr. LaBonte was separated as the result of a special court-martial, AR261, therefore the provisions of ¶ 4–3 do not apply.

More fundamentally, Army Reg. 635–40 (2006) does not absolve the Army of its failure to follow its own regulations and refer Mr. LaBonte for disability separation processing long before his misconduct, much less his court-martial proceedings. Army Reg. 40–501 ¶ 3–3(d) (2003) requires that physicians who identify soldiers with certain conditions should initiate disability evaluation "at the time of identification." Such specified conditions include migraine headaches manifested by frequent incapacitating attacks, neurological conditions which result in residual persistent severe headaches, disorders with psychotic features, mood disorders, anxiety disorders, and adjustment disorders. Army Reg. 40–501 ¶¶ 3–30(g), 3–31, 3–32, 3–33 (2003). When a plaintiff alleges that the military did not follow its own governing regulations, this Court has jurisdiction to review military decisions. *See, e.g.*, *Roth v. United States*, 378 F.3d 1371, 1385 (Fed. Cir. 2004) (holding that this Court has jurisdiction to hear a claim for the retroactive correction of a veteran's record premised on the military's violation of its own regulations). The Army had a duty to refer Mr. LaBonte for a disability evaluation, and its *later* prosecution of Mr. LaBonte does not immunize the Army from its prior failure to refer him "at the time of identification."

In *Watson*, the plaintiff brought a Tucker Act claim for disability retirement pay, alleging that he had been diagnosed with optic nerve atrophy and optic neuritis—conditions for which Army Reg. 40–501 (2005) mandates referral for disability retirement evaluation—over a year prior to being charged under the UCMJ and discharged. 113 Fed. Cl. at 618–19. When the ABCMR denied an initial request to correct his records, it based its decision on Army Reg. 635–40 ¶ 4–3 (2006), which specified that a soldier could not be referred for disability evaluation when an action

18

had been started which authorized a characterization of service of under Other Than Honorable conditions. *Id.* at 640 n.20. However, this Court held that Army Reg. 635–40 was *not* applicable to the case because the Army was required by its own regulations to initiate a MEB more than a year prior to the conduct that caused the plaintiff to be charged under the UCMJ. *Id.* Because the plaintiff *should* have been referred to the MEB in October 2006, Army Reg. 635–40's restrictions on a soldier being referred for, or continuing, the MEB process while charged under the UCMJ did not apply because he was not charged until the end of 2007, and his claim was based on the Army's failure to conduct a MEB in October 2006. *Id.*

Like the plaintiff in *Watson*, who was charged under the UCMJ for missing movement after refusing to deploy to Iraq, 113 Fed. Cl. at 624, Mr. LaBonte was charged and referred to a court-martial for violation of the UCMJ for desertion by going AWOL to avoid deployment to Iraq. AR265. While the plaintiff in *Watson* ultimately elected to be administratively separated in lieu of a court-martial, 113 Fed. Cl. at 625, the Government in that case made a nearly identical argument to the one they make in the case at bar: that Army Reg. 635–40 ¶ 4–3 precluded the defendant from being retroactively medical retired because it did not allow a soldier to be "referred for, or continue, physical disability evaluation processing" when subject to separation under Other Than Honorable conditions.[4] *Id.* at 640 n.20. As in *Watson*, the restrictions in Army Reg. 635–40 ¶ 4–1 (2006) do not apply to Mr. LaBonte because his claim is premised on the fact that the Army was required by its own regulations to conduct a MEB when it became aware of his symptoms of TBI and PTSD in 2004. Compl. ¶¶ 7–8, 25–39; Army Reg. 40–501 ¶¶ 3–30(g), 3–31, 3–32, 3–33 (2003). That is, Mr. LaBonte argues that the Army did not comply with its own governing regulations *prior to* his charge and referral to a court-martial. Compl. ¶¶ 7–8. As such, this Court

---

[4] ¶ 4–3 is largely parallel to ¶ 4–1, but concerns administrative separation.

should determine, as it did in *Watson*, that the strictures of Army Reg. 635–40 (2006) do not apply in this case because the Army failed to comply with its own regulations by not processing Mr. LaBonte through a MEB in 2004. *Cf.* 113 Fed. Cl. at 640 n.20. The Army simply may not ignore manifest evidence of a soldier's combat injuries, refuse to treat him or refer him to a MEB, court-martial him instead—then later claim that its failure to properly care for the wounded soldier is excused by the *post hoc* court-martial. Neither Army Reg. 635–40 (2006) nor any other law requires this result.

Mr. LaBonte not only "became eligible" for disability processing in 2004, but referral for disability processing was *required* in 2004 by Army Reg. 40–501 (2003). The Army's failure to follow that regulation, and its failure to properly treat Mr. LaBonte, is not then excused by Army Reg. 635–40 ¶ 4–1 (2006) merely because the Army initiated a court-martial. The Government cites *Moyer v. United States*, 41 Fed. Cl. 324 (1998), *aff'd*, 190 F.3d 1314 (Fed. Cir. 1999), in which the Tucker Act claim of a former Army officer was dismissed for want of jurisdiction because Army Reg. 635–40 ¶ 4–1 precluded continued disability processing for soldiers charged under the UCMJ. Def.'s Mot. to Dismiss at 23–24. The plaintiff in *Moyer* alleged that he sought medical evaluation of an injury in December 1990, at the same time that he came under investigation for a violation of the UCMJ. 190 F.3d at 1316. He submitted his resignation in lieu of being subjected to a court-martial and was discharged in June 1991. *Id*. He claimed that Army Reg. 635–40 required the Army to complete the medical discharge review prior to separating him. *Id*. at 1321. The Court found that he separated pursuant to UCMJ action and therefore Army Reg. 635–40 ¶ 4–1's restriction on participating in the disability evaluation process applied to him. *Id*. The Court accordingly lacked jurisdiction as he was never eligible for disability retirement. *Id*.

But this case is not like *Moyer*. There, the Army could not have been aware of the plaintiff's purported disabilities until after the investigation had begun and Army Reg. 635–40 ¶ 4–1 already prohibited disability processing. *Moyer*, 41 Fed. Cl. at 326. Here, by contrast, Mr. LaBonte became eligible for disability retirement evaluation nearly *two years* before his misconduct, let alone before any investigation or UCMJ action commenced. Compl. ¶¶ 26–32, 39, 55. In February 2004, Mr. LaBonte fell thirty feet from a guard tower in Iraq and was found lying on the ground, unconscious and bleeding from his head. *Id.* ¶¶ 25–26. He was treated for an injury at an Army medical aid center, which would later be confirmed to have been a TBI. AR200–01. In June 2004, he was (erroneously) diagnosed with an adjustment disorder, based on symptoms that would later be determined to be the result of PTSD. AR107 ¶ 15(f). These conditions required the Army to initiate a MEB evaluation to determine if Mr. LaBonte was eligible for disability retirement. Army Reg. 40–501 ¶¶ 3–30(g), 3–31, 3–32, 3–33 (2003). Later, at Fort Hood, Mr. LaBonte affirmatively requested care and was denied meaningful treatment. Compl. ¶¶ 36–39. The Army's multi-year failure to evaluate him for disability retirement is what Mr. LaBonte challenges and is why this case is like *Watson*, not *Moyer*. The Army's failure to treat Mr. LaBonte in accordance with its own regulations forms the basis for this Court's jurisdiction over his claim and Army Reg. 635–40 (2006) does nothing to undermine that jurisdiction.

### 4. This Court Possesses Ancillary Jurisdiction Over Mr. LaBonte's Due Process Claim

This Court has jurisdiction to hear Mr. LaBonte's claim that the Army violated his Due Process rights by prematurely terminating the DES process and prohibiting him from accessing the standard DES or MEB appeal procedures. This Court has ancillary jurisdiction over a constitutional claim when jurisdiction has been previously established over a related Tucker Act claim. *Lechliter v. United States*, 70 Fed. Cl. 536, 544 (2006); *Holley*, 124 F.3d at 1466. Here,

Mr. LaBonte's Tucker Act claim is closely associated with his Due Process claim and thus, because this Court has jurisdiction over the former, it has jurisdiction over the latter. *See, e.g., Exnicios v. United States*, 140 Fed. Cl. 339, 382–83 (2018) (holding that this Court had jurisdiction over Due Process claims associated with a claim under the Military Pay Act). Both Mr. LaBonte's Tucker Act claim and his Due Process claim concern the termination of the DES process based on the Doane memorandum. Like the plaintiff in *Holley*, who challenged his discharge under both the Constitution and the Military Pay Act, Mr. LaBonte contests the termination of his DES process on constitutional and statutory grounds, and this Court has jurisdiction over both claims. *Cf. Exnicios*, 77 Fed. Cl. at 382–83 (discussing *Holley*, 124 F.3d at 1466).

However, this Court does not have independent jurisdiction over Mr. LaBonte's Due Process claim. A Due Process claim does not require the payment of money and thus does not create a cause of action under the Tucker Act. *Smith v. United States*, 709 F.3d 1114, 1116 (Fed. Cir. 2013). Therefore, if this Court rules that it does not have jurisdiction over Mr. LaBonte's claims for money damages, it should dismiss his Due Process claim without prejudice to allow it to be heard in a competent court. *See, e.g., Anderson v. United States*, 111 Fed. Cl. 572, 591–92 (2013); *Filipiczyk v. United States*, 88 Fed. Cl. 776, 788 (2009); *McNeil v. United States*, 78 Fed. Cl. 211, 239 (2007).

## II.    Motion to Complete and Supplement the Administrative Record

Mr. LaBonte moves for an order that the Government complete and supplement the administrative record and respectfully requests that this Court defer the Government's motion for judgment on the administrative record until it has a full and complete record before it.

### A.  Standard of Review

When the Government moves for judgment on the administrative record pursuant to RCFC 52.1(c), this Court needs to have before it all of the "information upon which the agency relied

22

when it made its decision as well as any documentation revealing the agency's decision-making process." *Montana Fish, Wildlife, & Parks Found. v. United States*, 91 Fed. Cl. 434, 440–41 (2010); *accord Kerr Contractors, Inc. v. United States*, 89 Fed. Cl. 312, 335 (2009), *aff'd*, 374 F. App'x 979 (Fed. Cir. 2010). In other words, a motion for judgment on the administrative record "must be resolved by reference to the administrative record, *as properly supplemented* . . . ." *Lab. Corp. of Am. v. United States*, 108 Fed. Cl. 549, 556 (2012) (emphasis added); *accord Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) ("Proceeding under [a motion for judgment on the administrative record] merely restricts the evidence to the agency record, *as may be supplemented* . . . ." (emphasis added)); *Fulcra Worldwide, L.L.C. v. United States*, 97 Fed. Cl. 523, 541 (2011) (adjudicating the parties' cross-motions for judgment on the administrative record based on the record "as supplemented").

To this end, there are two types of augmentation of an administrative record: completion and supplementation. "Completion" of the administrative record refers to when "an agency omits information that was generated and considered by the agency," in which case that information is considered "properly part of the administrative record" and is therefore admissible. *Smith v. United States*, 114 Fed. Cl. 691, 695 (2014), *aff'd*, 611 F. App'x 1000 (Fed. Cir. 2015) (permitting inclusion of a document that the Government conceded had been "inadvertently excluded" and "normally [would] be included" in the record); *Linc Gov't Servs., L.L.C. v. United States*, 95 Fed. Cl. 155, 158 (2010). "Supplementation" refers to the augmentation of the record with materials not generated by the agency and not necessarily relied on in its decision. This Court will permit supplementation of the agency record only "when it is necessary for a full and complete understanding of the issues," *Sonoran Tech. & Prof'l Servs., L.L.C. v. United States*, 132 Fed. Cl.

644, 648 (2017)—i.e., where *not* doing so would "preclude[] effective judicial review." *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000).

By permitting supplementation, a court has already by definition found omission of the additional information to "preclude[] effective judicial review." *Murakami*, 46 Fed. Cl. at 735. A court must therefore decide the issue of record supplementation before it can proceed to a motion for judgment on the administrative record. *See Price Gordon Servs. v. United States*, 139 Fed. Cl. 27, 49 (2018) ("Before addressing the merits of plaintiff's protest, the court must resolve plaintiff's motion for supplementation of the administrative record . . . ."). It is for this reason that, in the particular context of military pay disputes, this Court has managed cases so as to enable it to resolve issues of record supplementation before turning to motions for judgment on the administrative record. *See, e.g., Baude v. United States*, 137 Fed. Cl. 441, 445 (2018). Thus, in *Fuentes v. United States*, No. 10–861C, 2012 WL 1650748 (Fed. Cl. May 11, 2012) at *1, this Court "stayed the briefing on the motions" for judgment on the administrative record to allow the plaintiff to file a motion to supplement the administrative record with the evidence on which he wished to rely.

### B. The Administrative Record Must Be Completed and Supplemented Prior to Completing the Parties' Briefing

This case challenges the Army's rejection of Mr. LaBonte's claim for medical retirement status and the corresponding back pay and retirement pay based on that status. Mr. LaBonte asserts that the administrative record as provided by the Government omits both: (1) material that the Army actually considered in denying Mr. LaBonte's application for medical retirement, requiring completion of the administrative record; and (2) material that the Army *should* have considered in making its decision, requiring supplementation of the administrative record. The administrative record also fails to provide this Court with the information necessary to resolve Mr. LaBonte's

allegations of bad faith, further necessitating supplementation. Without these records, Mr. LaBonte cannot fully respond to the Government's motion for judgment on the administrative record. This Court should therefore order the Government to produce the omitted documents to complete and supplement the administrative record prior to Mr. LaBonte responding to the Government's motion for judgment on the administrative record. In particular, Mr. LaBonte respectfully requests that the Court order the Government to complete and supplement the administrative record to include the following:

1.   Mr. LaBonte's digital service medical records from January 2004 to March 2008;

2. the complete set of letters and files Mr. LaBonte sent to his PEB Liaison Officer for consideration by the Army in its decision, including the photograph of Mr. LaBonte taken shortly after his fall from the guard tower in Iraq, in color and clearly showing his head injury (a copy of the photograph is attached to this motion as Ex. 1);[5]

3. email correspondence dated April 4, 2018, between the PEB Liaison Officer and Dr. Doane and email correspondence dated June 19, 2018, between the PEB Liaison Officer, David Cleland, Donna Reed, and Sherrie Moreira (attached to this motion as Ex. 2), Pl.'s App. at 2; and

4. email correspondence dated April 30, 2018, between the PEB Liaison Officer and Colleen Campbell and email correspondence dated May 4, 2018, between the PEB Liaison Officer, Bobbie Brooker, and Colleen Campbell (attached to this motion as Ex. 3), Pl.'s App. at 7.

Plaintiff also respectfully requests that this Court order a deposition of Dr. Doane.

Mr. LaBonte's digital service medical records from January 2004 to the date of his discharge (March 11, 2008) have been cited in multiple agency opinions underlying the decision to deny his medical retirement application, showing that they were actually considered by the agency in its decision-making process. The administrative record should therefore be completed

---

[5] The Government included a copy of this photograph in the administrative record, but in black and white and with degraded image quality. Mr. LaBonte requests Ex. 1 in Plaintiff's Appendix ("Pl.'s App.") at 1 be included in the administrative record to more accurately reflect the material before the agency.

to include the full set of these records. The set of files provided to Mr. LaBonte's PEB Liaison Officer, including the original photograph of his severe head injury, were before the agency at the time of its decision and should have been considered; the administrative record should therefore be completed or supplemented to include these files. Finally, Mr. LaBonte alleges that Dr. Doane operated in bad faith when he cursorily halted Mr. LaBonte's MEB even after three other Army physicians found that Mr. LaBonte's case should proceed to the PEB. Therefore, the administrative record should be supplemented with additional evidence, such as relevant email correspondence and the deposition testimony of Dr. Doane, to enable this Court to evaluate Mr. LaBonte's claim of bad faith.

### C. Mr. LaBonte's Digital Service Medical Records from January 2004 to March 2008 Were Improperly Omitted from the Administrative Record

Both the Doane memorandum and the MEB's Narrative Summary refer to medical records that are not in the administrative record filed by the Government. Because the Army relied on Mr. LaBonte's digital service medical records from January 2004 to March 2008 in denying his application for medical retirement but omitted them from the administrative record, this Court should order completion of the administrative record to include these medical records. When an agency omits information that was generated and considered by the agency, that information is properly part of the administrative record, and the record should be completed. *Smith*, 114 Fed. Cl. at 695.

Prior to January 2004, the Army used a handwritten Service Treatment Records system to document medical conditions and treatment. The Army began implementation of the Armed Forces Health Longitudinal Technology Application (AHLTA) system, an electronic medical records system, in January 2004, in the middle of Mr. LaBonte's service. *Armed Forces Health Longitudinal Technology Application (AHLTA)*, Health.mil (Nov. 16, 2015),

https://health.mil/Reference-Center/Glossary-Terms/2015/11/16/Armed-Forces-Health-Longitudinal-Technology-Application. In January 2014, the Army completed rollout of another electronic medical records system, the Health Artifact and Image Management Solution (HAIMS), which aggregates prior handwritten and electronic records into one unified electronically available health record. Def. Health Agency, HAIMS: Health Artifact and Image Management Solution (2018), https://health.mil/Reference-Center/Fact-Sheets/2019/04/05/HAIMS-Fact-Sheet.

The administrative record provided by the Government appears to include only Mr. LaBonte's handwritten Service Treatment Records. AR538–635, 1366–1470 (the latest medical record, dated July 13, 2005, is at AR 1371). However, Dr. Doane explicitly refers in his memorandum to Mr. LaBonte's "treat[ment] for occasional acute minor illnesses" that Mr. LaBonte allegedly received "[d]uring all of his confinement period." AR69. Medical documentation from this four-month period—which began in November 2006, AR1176, 1184—does not appear in the administrative record. Similarly, the Narrative Summary, which concluded that Mr. LaBonte was not deployable due to numerous medical conditions, expressly notes that the doctors considered Mr. LaBonte's "AHLTA Notes," "AHLTA print," and "HAIMS," AR60, none of which are included in the administrative record.

All of these health records omitted from the administrative record were "generated" and, as Dr. Doane made clear in his memorandum, "considered by the agency" in its decisions regarding Mr. LaBonte's medical retirement. *See Smith*, 114 Fed. Cl. at 695; *Linc Gov't Servs.*, 95 Fed. Cl. at 158. They therefore are "properly part of the administrative record" and as a result are "admissible" in this case. *See Smith*, 114 Fed. Cl. at 695; *Linc Gov't Servs.*, 95 Fed. Cl. at 158. Mr. LaBonte cannot adequately respond to the Government's arguments or fully demonstrate why the ABCMR's decision was arbitrary and capricious without access to the documents on which

the Army states that its decision relied. This Court should order the Government to produce these records to complete the administrative record.

### D. The Medical Record Files Sent to Mr. LaBonte's PEB Liaison Officer Were Improperly Omitted from the Administrative Record

This Court should also permit the medical documentation that Mr. LaBonte sent to his PEB Liaison Officer to be included in the administrative record because Mr. LaBonte submitted the documentation to the agency during the pendency of his appeal. Thus, they were part of the record before the agency, whether the agency relied on them or not, and should be included as part of the administrative record. Unlike Mr. LaBonte's AHLTA and HAIMS medical records, these additional medical records are not expressly cited by the Government. Thus, it is impossible to tell whether they were *actually* considered by the agency. However, at a minimum, because these records were before the agency at the time of its decision, this Court should include them as "supplementation" of the administrative record because they were available to the agency "at the time it made its decision," *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 82 Fed. Cl. 757, 765 (2008), and "should have been reviewed," *Allied Tech. Grp., Inc. v. United States*, 92 Fed. Cl. 226, 231 (2010). Including these documents in the record "is necessary for a full and complete understanding of the issues." *Sonoran Tech.*, 132 Fed. Cl. at 648.

Mr. LaBonte provided a series of post-separation medical records and documents both to the ABCMR, as part of his application, and to the Office of the Surgeon General for consideration in the Integrated DES process, at his PEB Liaison Officer's request. These documents included contemporaneous and post-service treatment records, letters sent by Mr. LaBonte through counsel addressing Dr. Doane's questions, and the color photograph taken of Mr. LaBonte shortly after his severe head injury, later diagnosed as his TBI. These files, which contained extensive evidence of Mr. LaBonte's PTSD and TBI, were therefore readily "available" to the Army "at the time it made

its decision" regarding Mr. LaBonte's medical retirement claim, *see Alabama Aircraft*, 82 Fed. Cl. at 765, and "should have been reviewed" in considering Mr. LaBonte's claim, *see Allied Tech.*, 92 Fed. Cl. at 231. However, the ABCMR's decision, and the Doane memorandum on which the ABCMR relied, failed to reference these documents, and indeed came to conclusions completely contradicted by the documents currently omitted from the administrative record. For example, Dr. Doane erroneously asserted that Mr. LaBonte "was in good health with no physical limitations" throughout his military service. AR68. This claim is directly contradicted by the numerous letters and documents sent by Mr. LaBonte's counsel to the PEB Liaison Officer explaining the timeline of Mr. LaBonte's PTSD and TBI and the reasons for the absence of contemporaneous service medical records indicating his injuries. This Court should therefore order completion or supplementation of the record with all of the files that Mr. LaBonte sent to his PEB Liaison Officer through counsel and that were before the Army when it made its decision regarding his medical retirement claim.

### E. Email Messages Between Mr. LaBonte's PEB Liaison Officer and Dr. Eric L. Doane Clearly Show Dr. Doane's Personal Bias

Because Dr. Doane's abrupt termination of Mr. LaBonte's application raises questions about the rationality of that decision, and extra-record material establishes the pretextual and biased nature of Dr. Doane's decision-making, supplementation of the administrative record "is necessary for a full and complete understanding of" Mr. LaBonte's claim that Dr. Doane operated in bad faith. *Sonoran Tech.*, 132 Fed. Cl. at 648. Denying this motion to supplement would "preclude[] effective judicial review," *Murakami*, 46 Fed. Cl. at 735, because judicial review limited to the administrative record "cannot be effective when . . . 'a plaintiff has made a strong showing of bad faith or improper behavior which creates serious doubts about the integrity of the administrative action.'" *Kennedy v. United States*, 140 Fed. Cl. 506, 517–18 (2018) (quoting

*Stanton v. United States*, 111 Fed. Cl. 263, 266 (2013)). This is because "[evidence of bad faith] . . . *by its very nature* would not be found in an agency record." *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343 (2004) (emphasis added).

The Doane memorandum is "record evidence" that establishes the required "prima facie case which raises a substantial question about the rationality" of his decision. *See Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1340 (Fed. Cir. 2001); *accord Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1323 n.2 (Fed. Cir. 2003). Dr. Doane concluded that "Mr. LaBonte did not have indications of disabling PTSD and he did not have any symptoms of TBI. [His medical] record shows just the opposite. He was in good health with no physical limitations." AR68. Furthermore, Dr. Doane concluded, "Mr. LaBonte and his legal team report that he suffered a 30 foot fall and subsequent head bump and now has residual TBI. There is no documentation of this event . . . ." AR69. This is completely false and contradicted by the record. Indeed, in direct contrast to Dr. Doane's conclusions, the MEB's Narrative Summary upon which (among other documents) Dr. Doane purportedly based his decision, found that Mr. LaBonte had PTSD, generalized anxiety disorder, major depressive disorder, and TBI, and that these multiple diagnoses all failed to meet the Army's standards of retention, rendering him "not deployable" at the time of his separation. AR60–67. Dr. Doane failed to even reference the Narrative Summary in his memorandum, much less explain his analysis of how he found its conclusions to be outweighed by other evidence.

Dr. Doane's conduct steps far outside the principle that a mere "conflict in evidence . . . will not sustain plaintiff's burden" to overcome the presumption of regularity so long as the agency "weigh[s] that evidence critically and rationally." *See Hatmaker v. United States*, 136 Fed. Cl. 454, 460 (2018), *reconsideration denied*, 138 Fed. Cl. 471 (2018) (finding adequate an agency decision

that "thoroughly . . . considered the totality of the medical records"). Dr. Doane failed to weigh the evidence presented by or referenced in the Narrative Summary—which directly conflicted with his findings—at all. He claimed evidence did not exist that clearly did. Dr. Doane's failure to explain his abrupt reversal of the Narrative Summary's findings constitutes "conduct that is hard to explain absent bad faith." *See Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 226 (2004).

Furthermore, the "extra-record material" proffered here—the email messages between Mr. LaBonte's PEB Liaison Officer and Dr. Doane—clearly "indicate . . . personal animus or bias on the part of" Dr. Doane and thus "indicat[e] that the agency's explanation is pretextual." *See Madison Servs., Inc. v. United States*, 92 Fed. Cl. 120, 130 (2010); *accord Kalvar Corp. v. United States*, 543 F.2d 1298, 1302 (Ct. Cl. 1976) (claim of bad faith must allege conduct "tantamount to . . . malice or conspiracy . . . [or] animus toward the plaintiff"). The emails indicate Dr. Doane's bias and the pretextual nature of his conclusions in three ways.

*First*, included in these emails is a reference by a MEB staff member to an apparent nickname of Dr. Doane used by other Army personnel: "Dr. Eric Doane (Denies Everything)." Pl.'s App. at 5. The staff person was a member of the Soldiers' MEB Counsel office, which provides legal guidance to soldiers going through the DES. *Id.* She requested assistance from her colleagues in determining what documents pertaining to Mr. LaBonte's case could be released to his counsel. *Id.* In summarizing her problem, she wrote: "The current issue is, Dr. Eric Doane (Denies Everything), at Gordon, made a decision that [Mr. LaBonte's] PTSD did not impact his decision making at the time of separation and no Med Board referral was warranted. . . . If you could please . . . let [the PEB Liaison Officer] know . . . what she can release to [Mr. LaBonte's

counsel] or to [Mr. LaBonte] . . . we would really appreciate it." *Id.* This nickname indicates that Dr. Doane has a reputation throughout the agency of denying claims on dubious grounds.

*Second*, emails from Dr. Doane contain multiple disparaging comments that show his reluctance to follow proper Army procedure and evaluate Mr. LaBonte's claim in good faith. For example, Dr. Doane complained that Mr. LaBonte "cannot come back years later after receiving VA ratings and now demand that he should have been put through the MEB," Pl.'s App. at 2, despite Secretary Blackmon having ordered just that. He also summarily declared  that "I will definitely be denying the requirement for a MEB at the time he was discharged," Pl.'s App. at 8, and that "[t]here is clearly no basis for this soldier requiring a MEB prior to his separation," Pl.'s App. at 7, despite findings to the contrary by both the ABCMR, AR37 ("[T]he applicant's behavioral health conditions were not duly considered during medical separation processing. The [Army Review Boards Agency] Psychiatrist recommends the applicant's record be referred to the Integrated [DES] for consideration of medical disability/retirement."), and Secretary Blackmon, AR11–12 ("I find there is sufficient evidence to grant additional relief. . . . I direct that the applicant's case be referred to the Office of the Surgeon General to determine if he should have been retired or discharged by reason of physical disability through [Integrated DES].").

*Third*, and finally, Dr. Doane insisted on interpreting these referrals as requests that he determine *whether* Mr. LaBonte should have received a MEB in the first place, rather than that he, as the approving authority, complete the evaluation process of which the first step was a MEB. He wrote, for instance, that "[t]he ABCMR . . . was sent to your [Integrated DES] to determine whether [Physical DES] processing WAS WARRENTED [sic] at the time of separation. Clearly it was NOT warranted." Pl.'s App. at 2. However, according to the Army's own regulations, Secretary Blackmon's order that the Office of the Surgeon General "determine if [Mr. LaBonte]

should have been retired" *required* that a MEB be performed. Per Army Reg. 40–501 ¶ 3–4 (2006), "[i]t is critical that MEBs are complete and reflect all of the soldier's medical problems and physical limitations. *The PEB* will make the determination of fitness or unfitness" (emphasis added). Only the PEB could make the decision whether Mr. LaBonte should have been retired; to reach that step, Mr. LaBonte first needed a "complete" MEB. *Id.* Dr. Doane's unilateral termination of Mr. LaBonte's process left Mr. LaBonte with no avenue of appeal, despite the fact that the Narrative Summary had already been compiled.

### F.  The Court Should Order a Deposition of Dr. Eric L. Doane to Explain His Basis for Deciding to Abruptly Terminate Mr. LaBonte's Claim

Depositions are rare in military pay cases, but one is necessary here. The Supreme Court has recently reiterated the "narrow exception to the general rule against inquiring into 'the mental processes of administrative decisionmakers'"—i.e., "[o]n a 'strong showing of bad faith or improper behavior,' such an inquiry may be warranted and may justify extra-record discovery." *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2573–74 (2019) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (*Overton Park*)). Due to Dr. Doane's failure to explain his abrupt reversal of the findings in the Narrative Summary, or even to acknowledge that they conflicted with his recommendations, as well as the evidence that Dr. Doane may act in bad faith to categorically deny claims regardless of their merit, "further explanation is necessary to determine if the agency acted arbitrarily and capriciously." *Impresa*, 238 F.3d at 1338 (quoting *Overton Park*, 401 U.S. at 410 (1971)). When the face of the record is so lacking in its explanation of an agency's decision that a court cannot meaningfully review it, even deferentially, the court "may require the administrative officials who participated in the decision to give testimony explaining their action." *Id.*

33

While "remand to the agency is the preferred course" to obtain such an explanation, when the "decision at issue is not the decision of the agency or agency head, but the decision of . . . an individual within the agency," remanding to an agency as large as the "Department of Defense or one of its constituent agencies" for explanation of that individual's decision is "unduly cumbersome." *Id.* at 1338–39. Instead, the Court may order deposition of that individual member of the agency, confined strictly to the grounds for their conclusion. *Id.* at 1339. This is particularly common in cases where the plaintiff alleges bad faith on the part of the agency. *See, e.g.*, *Int'l Res. Recovery, Inc. v. United States*, 61 Fed. Cl. 38, 43 (2004) (permitting depositions where plaintiff's allegations of bad faith and bias were "sufficiently well grounded to warrant supplementation"); *J.C.N. Const. Co., Inc. v. United States*, 60 Fed. Cl. 400, 404 n.8 (2004), *aff'd*, 122 F. App'x 514 (Fed. Cir. 2005) (permitting plaintiff to conduct depositions in support of allegations of bad faith supported by "documentary evidence"); *Cybertech Grp., Inc. v. United States*, 48 Fed. Cl. 638, 651 (2001) ("permitt[ing] plaintiff to take five depositions and engage in limited discovery" in support of allegations of agency bad faith). Courts have likewise ordered depositions to elucidate agency decision-making in other areas of administrative law when the face of the record is insufficient to permit review. *See, e.g.*, *The Few, The Proud, The Forgotten v. Dep't of Veterans Affairs*, 254 F. Supp. 3d 341 (D. Conn. 2017) (ordering deposition of agency officials to establish adequacy of records searches in FOIA litigation); *Eberg v. Dep't of Def.*, 193 F. Supp. 3d 95 (D. Conn. 2016) (same); *El Badrawi v. Dep't of Homeland Sec.*, 583 F. Supp. 2d 285 (D. Conn. 2008) (same).

Moreover, a deposition of Dr. Doane would assist this Court in framing the appropriate relief in the event that Mr. LaBonte prevails. In *Watson*, counsel for both the plaintiff and the Government agreed that the plaintiff would only be justly processed if his case was considered by

a "fresh set of eyes." 2015 WL 4914966 at * 3. This Court agreed, and accordingly directed that "the Secretary of the Army shall refer this matter to a MEB not located at the Fort Gordon, GA Army installation"—the installation to which Dr. Doane is assigned, where the plaintiff in *Watson* was initially processed. *Id.*

Because Mr. LaBonte has alleged, grounded in evidence, that Dr. Doane operated in bad faith in terminating his claim without addressing or expressly weighing conflicting evidence, and because it is impossible to tell on the face of the Doane memorandum how he reached his conclusions in the face of substantial conflicting evidence, this Court should order his deposition to determine whether he acted in bad faith.

## CONCLUSION

Mr. LaBonte respectfully requests that this Court deny the Government's motion to dismiss, as this Court does have jurisdiction over his claims. Mr. LaBonte also respectfully requests that this Court stay consideration of the Government's motion for judgment on the administrative record and grant his motion to complete and supplement the administrative record.


Dated: July 17, 2019                          Respectfully submitted,

                                              By: /s/ Michael J. Wishnie

                                              Sebastian Bates, Law Student Intern
                                              Matthew D. Handley, Law Student Intern
                                              Diana Lee, Law Graduate Intern
                                              Catherine E. McCarthy, Law Graduate Intern
                                              Jared M. Quigley, Law Student Intern
                                              Renée A. Burbank, Supervising Attorney
                                              Michael J. Wishnie, Supervising Attorney
                                              Veterans Legal Services Clinic
                                              Jerome N. Frank Legal Services Organization
                                              P.O. Box 209090
                                              New Haven, CT 06520-9090
                                              Tel: (203) 432-4800
                                              Fax: (203) 432-1426
                                              renee.burbank@ylsclinics.org
                                              michael.wishnie@ylsclinics.org

                                              *Counsel for Plaintiff*