IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

18-1784C
(Judge Hertling)

---

ROBERT J. LABONTE, JR.,
Plaintiff,

v.

THE UNITED STATES,
Defendant.

---

PLAINTIFF'S RESPONSE AND CROSS-MOTION FOR JUDGMENT ON THE
ADMINISTRATIVE RECORD

---

Julia Coppelman, Law Student Intern
Sam Davis, Law Student Intern
John Super, Law Student Intern
Renée A. Burbank, Supervising Attorney
Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
P.O. Box 209090
New Haven, CT 06520-9090
Tel: (203) 432-4800
michael.wishnie@ylsclinics.org

October 25, 2019                    *Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

JUDGMENT ON THE ADMINISTRATIVE RECORD ............................................... 1

QUESTION PRESENTED............................................................................................ 1

STATEMENT OF THE CASE...................................................................................... 2

FACTS AND PROCEEDINGS .................................................................................... 4

    I.     Service History .................................................................................................4

    II.    Medical Evaluations and Administrative Appeals ...................................5

SUMMARY OF ARGUMENT ..................................................................................... 8

ARGUMENT ................................................................................................................ 9

    I.     Standard of Review ..........................................................................................9

    II.    The ABCMR's decision fails the "substantial evidence" rule because it ignores and mischaracterizes competent evidence that contradicts its conclusion. .............10

         A.     The ABCMR ignored evidence demonstrating that Mr. LaBonte suffered from multiple potentially unfitting conditions prior to his discharge. ..........11

             1.    The ABCMR ignored indications of PTSD, TBI, and other conditions in Mr. LaBonte's pre-discharge records that were confirmed by its own physicians. .......................................................12

             2.    The ABCMR ignored post-discharge expert medical opinions concluding that Mr. LaBonte suffered from PTSD and TBI prior to his discharge. ...................................................................................17

         B.     The ABCMR relied on factual misstatements to justify its conclusions........20

         C.     Dr. Doane acted in bad faith in disposing of Mr. LaBonte's claim. .............26

    III.   The ABCMR's decision fails the "substantial evidence" rule because it rests on the Army's unlawful failure to follow its own regulations.....................................30

         A.     The Army's failure to follow its own regulations denied Mr. LaBonte an accurate medical record and timely evaluation for disability retirement. ......30

         B.     The ABCMR's decision drew an impermissible inference from the Army's failures to follow its own procedures. .............................................35

    IV.   The ABCMR deprived Mr. LaBonte of his right to Due Process by denying him the Army's standard procedure for evaluating medical retirement eligibility.........37

    V.    This Court should order Mr. LaBonte medically retired because the record evidence can only support that conclusion. ..........................................................38

CONCLUSION ........................................................................................................... 39

# TABLE OF AUTHORITIES

**Cases**

*Bateson v. United States*,
48 Fed. Cl. 162 (2000) ................................................................................... 27

*Beckham v. United States*,
392 F.2d 619 (Ct. Cl. 1968) ............................................................... 11, 12, 38

*Cinderella Career & Finishing Sch., Inc. v. F.T.C.*,
425 F.2d 583 (D.C. Cir. 1970) ...................................................................... 29

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ...................................................................................... 27

*Clements v. Airport Authority of Washoe County*,
69 F.3d 321 (9th Cir. 1995) .......................................................................... 29

*Cushman v. Shinseki*,
576 F.3d 1290 (Fed. Cir. 2009) ..................................................................... 37

*Dayley v. United States*,
180 Ct. Cl. 1136 (1967) ........................................................................... 16, 19

*Easley v. United States*,
31 Fed. Cl. 129 (1994) ............................................................................. 11, 15

*Ferrell v. United States*,
23 Cl. Ct. 562 (1991) ............................................................ 9, 10, 19, 36, 38

*Frizelle v. Slater*,
111 F.3d 172 (D.C. Cir. 1997) ...................................................................... 21

*Hatmaker v. United States*,
117 Fed. Cl. 560 (2014) ................................................................................. 23

*Heisig v. United States*,
719 F.2d 1153 (Fed. Cir. 1983) ..................................................... 8, 9, 11, 13

*Horan v. Astrue*,
350 F. App'x 483 (2d Cir. 2009) ................................................................ 8, 20

*Huang v. Gonzales*,
453 F.3d 132 (2nd Cir. 2005) ........................................................................ 29

*Jennings v. Merit Sys. Prot. Bd.*,
59 F.3d 159 (Fed. Cir. 1995) ......................................................................... 10

*Jordan v. United States,*
205 Ct. Cl. 65 (1974)................................................................................. 16, 17, 18

*Larson v. Dep't of the Army,*
260 F.3d 1350 (Fed. Cir. 2001)............................................................................ 20

*Latecoere Int'l, Inc. v. United States Dep't of Navy,*
19 F.3d 1342 (11th Cir. 1994) ........................................................................27, 28

*Marshall v. Jerrico, Inc.,*
446 U.S. 238 (1980) ............................................................................................ 29

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ............................................................................................ 37

*Mendez v. U.S.,*
103 Fed. Cl. 370 (2015)....................................................................................... 25

*Powers v. United States,*
176 Ct. Cl. 388 (1966)......................................................................................... 19

*Roth v. United States,*
378 F.3d 1371 (Fed. Cir. 2004).............................................................................. 9

*Six v. United States,*
79 Fed. Cl. 581 (2007).......................................................................................... 20

*Stuart v. United States,*
108 Fed. Cl. 458 (2013).............................................................................8, 31, 36

*United States ex rel. Accardi v. Shaughnessy,*
347 U.S. 260 (1954) .....................................................................................8, 37, 38

*Van Cleave v. United States,*
70 Fed. Cl. 674 (2006)................................................................. 8, 9, 11, 27, 28

*Verbeck v. United States,*
89 Fed. Cl. 47 (2009)....................................................................................9, 13, 14

*Verbeck v. United States,*
97 Fed. Cl. 443 (2011)..................................................................................17, 21

*Versaci v. United States,*
185 Ct. Cl. 672 (1968)......................................................................................... 17

*Walters v. United States*,
175 Ct. Cl. 215 (1966)..................................................................................... 19

*Ward v. United States*,
133 Fed. Cl. 418 (2017)...............................................................................16, 37

*Watson v. United States*,
113 Fed. Cl. 615 (2013).................................................................................... 23

*Watson v. United States*,
No. 12-785C, 2015 WL 4914966, at *3 (Fed. Cl. Aug. 17, 2015) ............................ 39

*Wollman v. United States*,
116 Fed. Cl. 419, 429 (2014).........................................................................15, 16

*Woodard v. United States*,
167 Ct. Cl. 306, 306 (1964) .............................................................................. 38

**Statutes**
28 U.S.C. 1491(a)(2) (2018)........................................................................9, 10, 38

**Constitutional Provisions**
U.S. Const. amend. V. ..................................................................................... 37

**Regulations**
32 C.F.R. § 3.12 (2019).................................................................................... 27

**Rules**
RCFC 52.1 ...................................................................................................... 1

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

ROBERT J. LABONTE,

      Plaintiff,

    v.

THE UNITED STATES,

      Defendant.

No. 18-1784C
(Judge Hertling)

### PLAINTIFF'S RESPONSE AND CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Pursuant to RCFC 52.1, Mr. LaBonte respectfully requests that the Court grant judgment on the administrative record in his favor, order him medically retired, and grant him all appropriate back pay and retirement benefits to which he is entitled. Alternatively, Mr. LaBonte respectfully requests that the Court order a remand instructing the Army to reinstate him into the Disability Evaluation System process at the stage he reached prior to the Army's abrupt termination of his processing, by submitting his completed Narrative Summary to an "Approval Authority" to determine if a Medical Evaluation Board should be convened and directing that the "Approval Authority" be an Army physician other than Dr. Eric L. Doane.

### QUESTION PRESENTED

1.      Should the Court grant Mr. LaBonte judgment on the administrative record because the decision by the Army Board for Correction of Military Records to deny him medical retirement, or even the full processing through the Disability Evaluation System that he would have received in 2004 had the Army followed its own laws and procedures, was arbitrary and capricious, unsupported by substantial evidence, contrary to law, and an abuse of discretion?

## STATEMENT OF THE CASE

In 2018, following a decade-long fight to obtain the medical care and benefits he earned as an Iraq combat veteran, the Army appeared to grant Robert LaBonte, Jr. a fair opportunity to receive the medical retirement status to which he is entitled. During his disability evaluation system ("DES") process, military and civilian medical professionals assessed Mr. LaBonte and found that he had experienced a traumatic brain injury ("TBI"), post-traumatic stress disorder ("PTSD"), major depressive disorder, and generalized anxiety disorder during his deployment to Iraq in 2004. Despite these conclusions, an agency official with little relevant medical training and no expertise on these conditions abruptly terminated Mr. LaBonte's DES process. The Army Board for Correction of Military Records ("ABCMR" or "Board") adopted this official's determination without analysis, denying Mr. LaBonte's claim in full. The Board's decision was arbitrary and capricious, unsupported by substantial evidence, and made in bad faith. This Court must rectify it and grant Mr. LaBonte his long overdue medical retirement status.

Ever since Mr. LaBonte incurred his injuries beginning in 2004, the Army has consistently failed to document and properly treat them, in violation of its own policies and procedures. The Army did not respond to Mr. LaBonte's repeated requests for medical assistance, nor did it recognize his clear symptoms of PTSD, TBI, and related conditions. Instead, the Army misdiagnosed Mr. LaBonte, failed to refer him for the medical treatment he desperately needed, and ordered him to redeploy to Iraq. These failures caused Mr. LaBonte to go Absent Without Leave ("AWOL"), which led the Army to separate him with a Bad Conduct Discharge through a special court-martial. The Army Discharge Review Board acknowledged this series of errors when it upgraded Mr. LaBonte's discharge to General, Under Honorable Conditions, recognizing that his PTSD and other medical conditions mitigated his offense. Still, Mr. LaBonte has suffered from serious medical conditions for years without access to the health

care and benefits he needs, or the medical retirement pay to which he was entitled.

More than a decade after he was discharged, the ABCMR denied Mr. LaBonte's petition for retroactive medical retirement status. Disagreeing with the Board's decision, Deputy Assistant Secretary for the Army ("DASA") Francine Blackmon found sufficient evidence to grant further relief and directed the Office of the Surgeon General to determine whether Mr. LaBonte should have been medically retired based on his combat injuries. The Army began Mr. LaBonte's DES process, and two Army health care providers concluded that he failed to meet medical retention standards in 2004 for PTSD, TBI, major depressive disorder, and generalized anxiety disorder—all incurred during his deployment to Iraq. But Dr. Eric L. Doane unilaterally halted Mr. LaBonte's DES process. Dr. Doane's order ignored the unanimous conclusions of Army medical examiners and numerous other medical records documenting Mr. LaBonte's conditions. His memorandum was rife with factual errors and omissions. Yet on June 21, 2018, the ABCMR adopted Dr. Doane's flawed report in full and denied Mr. LaBonte's claim.

The Board's decision ignored and misstated facts in the administrative record and adopted the legally deficient memorandum that Dr. Doane produced in bad faith. The Army cannot evade responsibility for its own unlawful failures by hiding behind the consequences of those actions today. Competent evidence in both Mr. LaBonte's in-service and post-service medical records demonstrates that he suffered from multiple conditions that rendered him eligible for medical retirement prior to his discharge. Dr. Doane and the ABCMR ignore this evidence entirely. This Court should grant Mr. LaBonte the medical retirement status for which he has long been eligible. At a minimum, this Court should order the Army to complete Mr. LaBonte's DES process in accordance with all legal requirements, and to bar Dr. Doane's further participation.

## FACTS AND PROCEEDINGS

### I.    Service History

Mr. LaBonte enlisted in the Army in November 2002, when he was 18 years old. AR18.
He was inspired to become a military police officer by his father, a police officer in Connecticut.
*Id.* In September 2003, Mr. LaBonte deployed to Tikrit, Iraq. *Id.* During his deployment, Mr.
LaBonte engaged in firefights with enemy combatants, manned guard towers, watched over
prisoners of war, and served off-base as a turret gunner. AR18-19. While deployed in 2004, Mr.
LaBonte fell from a 30-foot guard tower. AR813-21. A fellow soldier found him unconscious at
the base of the tower, bleeding from his head. *Id.* Yet the Army failed to follow its own
procedures and never documented Mr. LaBonte's injuries. AR69; AR800-01. Prior to his
discharge, Mr. LaBonte never received appropriate treatment for the TBI caused by this fall, or
for the other conditions he developed while serving in a combat zone, including PTSD, major
depressive disorder, and generalized anxiety disorder. AR60-61; AR869-73.

Upon his return from Iraq, Mr. LaBonte quickly sought help for his symptoms—which
included mental distress, anxiety, disrupted sleep, and panic attacks—from both his chain of
command and the Fort Hood Mental Health Clinic. AR802-08; *see also* AR769-89; AR2067. Mr.
LaBonte's superiors referred him to an Army Chaplain, but not a physician. AR657-58. Mr.
LaBonte sought treatment at the Mental Health Clinic, where the "intake specialist" noted his
symptoms, but—lacking the training or authority to diagnose mental health conditions—
nonetheless misdiagnosed him with an adjustment disorder. AR802-12; AR60-67; AR1362-63.
The Mental Health Clinic did not inform Mr. LaBonte or anyone in his chain of command of this
diagnosis and did not schedule any follow-up care or monitoring. AR803-04. At no point did the
Army refer Mr. LaBonte to the DES, despite its awareness of Mr. LaBonte's severe, service-
incurred symptoms. AR793-812.

In 2004, Mr. LaBonte's new unit was ordered to deploy to Iraq. AR804. Mr. LaBonte immediately informed his new supervisors that he was not prepared, physically or mentally, to redeploy. AR804-12. But the Army again failed to refer Mr. LaBonte for further evaluation or medical treatment. *Id.* Instead, Mr. LaBonte's chain of command ordered him to redeploy. *Id.* As his second deployment approached, Mr. LaBonte's symptoms worsened. Following an emergency visit to his parents' home for his grandfather's funeral, Mr. LaBonte was unable to board his return flight to Texas, where he was scheduled to deploy. *Id.* Instead, he went AWOL for six months, returning to his parents' house in Connecticut. In 2006, Mr. LaBonte returned to Fort Hood voluntarily. He pled guilty to a charge of desertion in a court-martial proceeding and was released from the Army with a Bad Conduct Discharge.

## II.    Medical Evaluations and Administrative Appeals

Following his discharge, Mr. LaBonte continued to struggle with the untreated symptoms of his PTSD, TBI, and related conditions. In 2012, at his father's urging, Mr. LaBonte sought treatment from a clinical psychologist, who diagnosed him with PTSD that began during his service in Iraq. AR1361-62. This psychologist determined that, based on the symptoms he reported to the "intake specialist," Mr. LaBonte should have been referred for diagnosis and treatment at Fort Hood in 2004. *Id*. Two years later, in March 2014, Mr. LaBonte was again evaluated, this time by a psychiatrist. AR759-68. The psychiatrist also diagnosed Mr. LaBonte with PTSD that began during his service in Iraq. *Id.* In August 2015, an experienced neurologist examined Mr. LaBonte and diagnosed him with a TBI caused by his fall from the guard tower in 2004. AR117; AR184-90. In 2014, the ADRB finally upgraded Mr. LaBonte's discharge status to General, Under Honorable Conditions, and recognized Mr. LaBonte's PTSD as a mitigating factor for his misconduct. AR118; *see also* AR639. In 2015, Mr. LaBonte asked the ABCMR to retroactively grant him medical retirement status, by reason of his permanent disability for

PTSD, TBI, and depression, incurred during his service and prior to the events leading to his Bad Conduct Discharge. AR145-83.

The ABCMR denied Mr. LaBonte's petition in October 2017. However, after reviewing the Board's findings, conclusions, and recommendations, Deputy Assistant Secretary of the Army (Review Boards) Francine Blackmon concluded that "there [wa]s sufficient evidence to grant additional relief." AR11-12. The ABCMR directed the Office of the Surgeon General "to determine if [Mr. LaBonte] should have been retired or discharged by reason of physical disability through the Integrated Disability Evaluation System ("IDES")." *Id.*

The Army began Mr. LaBonte's DES processing by assigning him a PEB Liaison Officer ("PEBLO"). At the PEBLO's request, Mr. LaBonte provided the Surgeon General with detailed post-discharge medical records. AR1795-96. Two Army-assigned physicians evaluated Mr. LaBonte as part of a Medical Evaluation Board ("MEB"). AR60-67. Both concluded that Mr. LaBonte's PTSD, TBI, depression, and anxiety had been caused by his active duty service beginning in the immediate aftermath of his 2004 deployment to Iraq. *Id.* They unanimously agreed that Mr. LaBonte was "not deployable" at that time because his conditions failed to meet medical retention standards. *Id.* These proceedings were summarized in Mr. LaBonte's Narrative Summary ("NARSUM"). *Id.*

Following the MEB evaluation, the PEBLO requested approval from Dr. Eric L. Doane, a Senior MEB Physician at Fort Gordon, Georgia. In May 2018, Dr. Doane issued a report (the "Doane Memorandum") declaring that Mr. LaBonte had not been eligible for disability processing at the time of his separation from the Army. AR68-70. The Doane Memorandum was deeply flawed. It purported to deny MEB review of Mr. LaBonte's case, despite the fact that the MEB process was already underway. *Id.* It asserted that "at the time of his separation, Mr.

LaBonte did not have indications of disabling PTSD and he did not have any symptoms of TBI"

and that "[h]e was in good health with no physical limitations," a conclusion that was

contradicted by multiple medical reports in Mr. LaBonte's record which Dr. Doane failed to

consider. *Id.* Dr. Doane justified his conclusion with a selective and misleading summary of Mr.

LaBonte's record that was filled with material errors. It included unwarranted attacks on Mr.

LaBonte's credibility and the credibility and competence of the military medical evaluation

system, strongly suggesting that Dr. Doane acted in bad faith in reviewing Mr. LaBonte's case.

Despite the substantive and procedural errors in the Doane Memorandum, the ABCMR adopted

it in a June 21, 2018 decision. The ABCMR did not provide any rationale for denying Mr.

LaBonte's claim beyond that stated in the Doane Memorandum. Further, the ABCMR denied

Mr. LaBonte the right to submit a rebuttal and request an impartial medical review. AR71. Both

rights are expressly granted by Army Regulations. Army Reg. 635-40, ¶¶ 4-1 to 4-26 (2006);

Army Reg. 40-400 ¶¶ 7-1 to 7-24 (2014) (governing MEB procedures).

The June 2018 ABCMR decision was the first denial of Mr. LaBonte's claim to disability

evaluation processing, and it marked the first time a competent military board had issued a final

decision denying his claim for retroactive medical retirement status. AR71. The ABCMR denied

Mr. LaBonte's timely request for reconsideration on September 7, 2018. AR1. Mr. LaBonte filed

this complaint on November 20, 2018, arguing that the ABCMR's denial of his claim was

arbitrary and capricious, in bad faith, unsupported by substantial evidence, and a violation of the

Due Process Clause of the Fifth Amendment. ECF No. 1.[1]

---

[1] This Court possesses jurisdiction over Mr. LaBonte's claim. Further, Mr. LaBonte is not
currently subject to any of the conditions that disqualify a servicemember from receiving
medical retirement, and his claim is timely. For a full discussion of this Court's jurisdiction, see
ECF No. 1 at 2-3, 21, 24; ECF No. 36 at 11-22.

## SUMMARY OF ARGUMENT

The Court should reverse the ABCMR's decision because the decision fails to meet this Court's standards of review on both substantive and procedural grounds. *See Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983).

First, the Board ignored and mischaracterized competent evidence that contradicted its own conclusion. The ABCMR ignored Mr. LaBonte's indications and diagnoses of PTSD, TBI, and other medical conditions, documented in his pre-discharge records and confirmed by post-discharge medical opinions by Army, Veterans Administration ("VA"), and civilian medical professionals. Further, the Board's reliance on an agency opinion rife with factual errors and omissions is itself unlawful, *see Horan v. Astrue*, 350 F. App'x 483, 484–85 (2d Cir. 2009), and suggests that the denial of Mr. LaBonte's backpay and retroactive medical retirement was made in bad faith. *See Van Cleave v. United States*, 70 Fed. Cl. 674, 678–79 (2006).

Second, the ABCMR's decision rests on the Army's unlawful failure to follow its own regulations. This failure, unacknowledged by the Board, denied Mr. LaBonte an accurate contemporaneous medical record and disability retirement evaluation. Further, the Board draws an impermissible negative inference from the lack of a conclusive diagnosis in Mr. LaBonte's in-service medical records, even though these limited records resulted from the Army's procedural failures. *See Stuart v. United States*, 108 Fed. Cl. 458, 470 (2013). By categorically denying Mr. LaBonte fair process both during and after his military service, the Board's decision deprived him of a constitutionally protected property right in violation of the Due Process Clause of the Fifth Amendment. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). This Court can and should order Mr. LaBonte medically retired. This conclusion is the only one possible based on a thorough and dispassionate review of Mr. LaBonte's record. At a minimum,

this Court should remand Mr. LaBonte's case to resume his DES process at the stage he reached

prior to Dr. Doane's unilateral termination, and bar Dr. Doane from further participation. 28

U.S.C. 1491(a)(2) (2018); *see also Ferrell v. United States*, 23 Cl. Ct. 562, 572 (1991).

## ARGUMENT

### I.    Standard of Review

This Court examines the ABCMR's administrative decisions to determine if the action

was "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to

law, regulation, or mandatory published procedure of a substantive nature by which [the

complainant] has been seriously prejudiced." *Heisig*, 719 F.2d at 1156 (noting that this standard

is "broadly referred to as the 'substantial evidence' rule"). Although the Court is not a "super

correction board," judicial review is necessary to ensure that the ABCMR "examine[s] relevant

data and articulate[s] satisfactory explanations for [its] decisions," as required by law. *Van

Cleave*, 70 Fed. Cl. at 678–79 (2006) (quotations omitted).

This Court may find the Board's decision arbitrary and capricious if it "fails to consider

an important aspect of a problem, offers an explanation for its decision that runs counter to the

evidence before the board, or is so implausible that it could not be ascribed to a difference in

view or the product of agency expertise." *Id.* at 679. "When a correction board fails to correct an

injustice clearly presented in the record before it, it is acting in violation of its mandate." *Id.*

(citing *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004)) (holding that failure to meet

"substantial evidence" rule supersedes the presumption of regularity of military records and good

faith of government officials); *see also Verbeck v. United States*, 89 Fed. Cl. 47 (2009) ("[T]he

deferential standard of review owed to the Board's decisions does not excuse the Board from

considering all of the relevant evidence and proffering an explanation that establishes a rational

connection between the facts found and the choice made.") (internal quotations omitted).

## II.   The ABCMR's decision fails the "substantial evidence" rule because it ignores and mischaracterizes competent evidence that contradicts its conclusion.

The ABCMR's decision to deny Mr. LaBonte medical retirement status rested exclusively on a legally insufficient memorandum that disregarded important aspects of, and is directly contradicted by, the administrative record. As a result, the Board's decision is arbitrary, capricious, and unsupported by substantial evidence, and this Court must reverse it. The Board's decision fails the "substantial evidence" rule for at least three reasons, each of which provides sufficient grounds for this Court to grant judgment on the administrative record to Mr. LaBonte.

First, the Board failed to consider three categories of competent medical evidence that strongly support Mr. LaBonte's claim for medical retirement and undermine the Board's decision to deny it. Second, the Board's justifications for denying Mr. LaBonte's claim rely on significant factual errors and misstatements. Third, the ABCMR's uncritical adoption of Dr. Doane's legally insufficient memorandum, which launches unsupported attacks on Mr. LaBonte's credibility and departs so wholly from the record as to suggest prejudgment of his case, indicates that the Board's decision was infected with bad faith.

The Board's conclusion rests on a highly selective, misleading, and incomplete review of the evidence. A fair reading of Mr. LaBonte's administrative record establishes that no "reasonable mind [could] accept [the evidence in the record] as adequate to support a conclusion" that he was fit for duty at the time of his discharge. *Jennings v. Merit Sys. Prot. Bd.*, 59 F.3d 159, 160 (Fed. Cir. 1995). Further, this Court is statutorily empowered to place Mr. LaBonte in the "appropriate . . . retirement status" when so doing is necessary to "provide an entire remedy and to complete the relief afforded by the judgment[.]" 28 U.S.C. 1491(a)(2). *See also Ferrell*, 23 Cl. Ct. at 572 (directing the corrections board "to correct plaintiff's military

records to reflect a disability discharge . . .").

Thus, it is appropriate for this Court to reverse the Board's decision and grant Mr.

LaBonte medical retirement. If the Court declines to order that Mr. LaBonte be medically

discharged, it should remand Mr. LaBonte's case for further DES processing with a different

Approval Authority, one not tainted by the bad faith that produced the erroneous and unlawful

decision in the record here. Ordering that Dr. Doane not participate further in Mr. LaBonte's

DES proceeding is necessary to provide Mr. LaBonte the opportunity to obtain the relief he is

due.

### A.  The ABCMR ignored evidence demonstrating that Mr. LaBonte suffered from multiple potentially unfitting conditions prior to his discharge.

The ABCMR's decision is unsupported by substantial evidence because it fails to meet

the requirement that "*all* of the competent evidence must be considered, whether original or

supplemental." *Heisig*, 719 F.2d at 1157 (emphasis in the original). At a minimum, to survive

this Court's review, the ABCMR must consider both the evidence that supports its conclusion

and the evidence that contradicts it, and the Board must explain its reasons for arriving at one

reasonable conclusion over another. *See Van Cleave*, 70 Fed. Cl. at 679 (a decisionmaker "must

examine relevant data and articulate satisfactory explanations for their decisions" and make

"rational connections between the facts found and the choices made"). The Board must also

"explain the relationship between the medical facts and the standards contained in the

regulations." *Easley v. United States*, 31 Fed. Cl. 129, 133 (1994). That means the ABCMR must

independently evaluate Mr. LaBonte's medical facts against the standards delineating which

medical conditions require a finding that the soldier failed to meet retention standards prior to his

discharge. *Cf. Beckham v. United States*, 392 F.2d 619, 622 (Ct. Cl. 1968) ("[W]e note with

dismay that none of the Naval Boards commented upon or even referred to the regulation of the

Navy that established the standards by which fitness or unfitness for active Naval service was to be determined."). Yet the ABCMR's decision examined neither the medical facts nor the governing medical standards. Instead, the ABCMR adopted the Doane Memorandum without further analysis, seemingly "as if [the DES and the Board] were not controlled by any legal standard of fitness, and as if determination of [plaintiff's fitness] was within their unlimited discretion." *Id.*

The Board failed to meet this Court's standard of review. Mr. LaBonte presented overwhelming evidence establishing that he suffered from multiple conditions that rendered him eligible for medical retirement prior to his discharge. But the Board ignored it. This evidence falls into two general categories: (1) military records, including *in-service* Army records such as Mr. LaBonte's reports of symptoms of PTSD, TBI, depression, and anxiety and his requests for treatment, and *post-service* medical opinions by Army physicians during his truncated DES process; and (2) civilian records, including evaluations by VA and independent physicians who examined Mr. LaBonte after his discharge and concluded that he began suffering from multiple conditions rendering him eligible for medical retirement to prior to his discharge. Each category of evidence contains credible, relevant records that, appropriately considered, contradict the ABCMR's stated conclusions. Because the ABCMR failed to consider any of this evidence, its decision must be overturned.

      1.   *The ABCMR ignored indications of PTSD, TBI, and other conditions in Mr. LaBonte's pre-discharge records that were confirmed by its own physicians.*

The ABCMR cannot justify its refusal to medically retire Mr. LaBonte. It does so only by ignoring ample evidence in the administrative record establishing that Mr. LaBonte suffered from multiple conditions that rendered him eligible for medical retirement. The Doane Memorandum, which the ABCMR adopted in full, incorrectly claimed that Mr. LaBonte had no

symptoms of TBI or disabling PTSD at the time of his separation. AR77. This ignores

Mr. LaBonte's contemporaneous reports of symptoms of PTSD, TBI, depression, anxiety, and

other medical conditions. In contrast to Dr. Doane's conclusion that Mr. LaBonte "was in good

health with no physical limitations[,]" *id.*, the record instead shows that Mr. LaBonte suffered

indications and symptoms of PTSD and TBI prior to discharge, and symptoms of other

conditions that rendered him eligible for medical retirement. For example:

- In 2004 at Fort Hood, Mr. LaBonte sought help from his chain of command, reporting that he suffered from significant mental distress because of his traumatic experiences in Iraq. In response, Mr. LaBonte's leadership told him to "toughen up" or to go see the Army chaplain—who could not, and did not, provide any medical treatment or referral. *See, e.g.*, AR657-58;

- On June 30, 2004, after his superiors failed to address his complaints, Mr. LaBonte sought help from an Army mental health specialist at Fort Hood. AR488. Mr. LaBonte stated that—in his words—"I can't take being here or in the military any longer" and that he hoped his chain of command would "realize[] I need to be chaptered [sic] out of the Army ASAP." *Id*. He reported symptoms including "poor disrupted sleep, decreased appetite, excessive anxiety, rapid breathing, rapid heartbeat, crying a lot, difficult[y] control[ling] worry, decreased ability to have fun, sadness, rage, anxiety, [and] hopeless[ness]." AR490;

- On October 23, 2006, an Army physician performed a physical examination of Mr. LaBonte as part of his pre-confinement medical processing at AMC Darnall-Hood. AR2067. Mr. LaBonte reported symptoms including "fever, chills, visual change, sore throat, chest pain, sputum, abdominal pain, vomiting, dysuria, hematuria, rash, headache, depression" and another neurological symptom that is indecipherable in the record. *Id*.

The ABCMR cannot lawfully ignore evidence that does not conform to its own conclusions. *See*

*Heisig*, 719 F.2d at 1157 (holding decision unlawful where decisionmaker fails to consider "*all*

of the competent evidence . . . whether or not it supports the challenged conclusion") (emphasis

in the original). Yet the Board failed to acknowledge this evidence at all.

Any decision which fails to engage competent, contradictory medical evidence is

inherently unlawful. This Court explained this principle in *Verbeck*, 89 Fed. Cl. at 68-69, where

it overturned a correction board's decision denying a plaintiff's claim for medical retirement. In

*Verbeck*, a nurse practitioner in the Public Health Service ("PHS") Commissioned Corps challenged the PHS's decision to terminate her for performance reasons rather than grant her disability separation based on qualifying medical conditions. *Id.* at 56. The court overturned the correction board's decision as unsupported by substantial evidence because the initial PHS physician report was "more equivocal" than the board acknowledged. *Id.* at 58. Because there "was evidence before the board of a medical condition which arose during the course of service[,]" the board's failure to "acknowledge[] [an] impairment [when] the available evidence uniformly shows the existence of some impairment" meant that its "evaluation of [plaintiff's] medical condition was flawed." *Id.* at 70. As in *Verbeck*, the Board decision Mr. LaBonte challenges cannot stand, because it failed to duly consider competent evidence supporting his central claim.

Worse, the ABCMR decision not only ignored contradictory evidence, it also cherry-picked record evidence by presenting only pieces that support its own conclusion. For example, the ABCMR noted that Mr. LaBonte did seek a mental health evaluation in 2004, and that he was ultimately diagnosed with adjustment disorder. AR69. However, the ABCMR does not acknowledge the symptoms Mr. LaBonte reported during that mental health intake, although these symptoms are found in the same medical record that states Mr. LaBonte's adjustment disorder diagnosis. *Id.* Similarly, the Doane Memorandum stated only that "[a]s part of the confinement process, new inmates must undergo a complete physical examination. Once again, Mr. LaBonte was cleared for confinement." AR78. It failed to note that the same physical examination record explicitly stated that Mr. LaBonte reported a range of symptoms indicating PTSD, TBI, depression, anxiety, and other potentially unfitting conditions. AR2067.

Further, the ABCMR ignored its own medical officers' conclusions, based on their

independent medical examinations and review of the same medical history the Doane

Memorandum failed to consider, that Mr. LaBonte suffered from multiple conditions rendering

him eligible for medical retirement. In the course of Mr. LaBonte's DES processing, multiple

Army physicians examined Mr. LaBonte and reviewed his extensive medical record. These

physicians unanimously concluded that Mr. LaBonte failed to meet medical retention standards:

- On March 14, 2018, MEB physician Labib N. Labib, DO conducted an "Initial
  Evaluation of Residuals of Traumatic Brain Injury (I-TBI) Disability Benefits
  Questionnaire." Dr. Labib concluded that "[b]ased on the fact that he had a head trauma
  with LOC [loss of consciousness] and was exposed to multiple mortar blasts at close
  range and had AOC [alteration of consciousness] but no structural brain damage, it is at
  least as likely as not that he suffered mild traumatic brain injury." AR46-53;

- On March 29, 2018, MEB Physician Kheukiay Chitopheng, PhD, LCSW, BCDA
  conducted a "Review Post Traumatic Stress Disorder (PTSD) Disability Benefits
  Questionnaire." Dr. Chitopheng concluded that "[Mr. LaBonte] was experiencing PTSD,
  Depression, Anxiety and mTBI symptoms post his deployment from Iraq in 2004" and
  that "[t]hese symptoms interred [sic] with his sleep, appetite, concentration, focus,
  energy, and ability to perform his duties." AR54-59;

- On April 2, 2018, MEB physician Dr. Labib produced an "IDES Physical Disability
  Evaluation System West Point NARSUM ["Narrative Summary"]," concluding that Mr.
  LaBonte failed to meet retention standards for "post-traumatic stress disorder,
  generalized anxiety disorder, major depressive disorder (recurrent, moderate), and m-TBI
  with residuals of migraine headache and cognitive impairment." AR60-77. This
  NARSUM formed the basis Mr. LaBonte's "MEB Packet," which states that Mr.
  LaBonte failed to meet medical retention standards for four conditions and is signed by
  Dr. Labib and Dr. Joseph Marasia, PhD, ABPP, Psychologist. AR1935.

Every DES medical examiner who evaluated Mr. LaBonte disagreed with the Doane

Memorandum's assertion that "Mr. LaBonte did not require disability processing at the time of

separation from Active Duty service." AR77. Yet the Doane Memorandum, and the ABCMR,

ignored these conclusions without so much as "point[ing] to any physician's statement in the

record that expresses an opinion as to plaintiff's [condition] . . . that is contrary to the opinion"

expressed by these examiners. *Easley*, 31 Fed. Cl. at 134. This failure to engage evidence

produced in medical examinations initiated by the ABCMR is unlawful. *Cf. Wollman v. United*

*States*, 116 Fed. Cl. 419, 429 (2014) (correction boards do not have "the right to ignore . . . the Army's previously undisputed medical findings and conclusions regarding the cause of [a medical condition]"). In particular, the ABCMR cannot lawfully ignore the findings and conclusions stated in Mr. LaBonte's NARSUM—"the heart of the disability evaluation system." *Ward v. United States*, 133 Fed. Cl. 418, 421 (2017).

The ABCMR ignored this post-discharge evidence even though it is more credible than the Doane Memorandum. In contrast to Dr. Doane, who never personally examined Mr. LaBonte and who had no training or expertise in any mental health or neurological field or sub-field, ECF No. 1 ¶ 74-75, the physicians who conducted Mr. LaBonte's post-discharge examinations had personally examined Mr. LaBonte and had training and expertise in specialties relevant to his medical conditions. *See* AR60-67; AR68-73; AR1935. Evidence produced by medical examiners who "are personally familiar with the individual whose condition is under inquiry" is "obviously . . . far preferable to those who did not have that opportunity and who rely on an incomplete knowledge of the written record." *Dayley v. United States*, 180 Ct. Cl. 1136, 1147-48 (1967). Evidence produced by medical examiners with specialized expertise in a field encompassing an applicant's medical issues is particularly credible. *Cf. Ward*, 133 Fed. Cl. at 429 (faulting the ABCMR for relying on a dentist's opinion rather than a gastroenterologist's in resolving medical dispute over plaintiff's severe gastroesophageal reflux). The Board provided no justification for crediting one inexpert medical opinion based on a paper review over the contradictory opinions produced by expert medical examiners who personally examined Mr. LaBonte.

The ABCMR's conclusory assertion that it conducted a "thorough review of Mr. LaBonte's available medical records," AR77, fails to justify its finding. *See Jordan v. United States*, 205 Ct. Cl. 65, 81-82 (1974) (concluding that Board did not consider all of the evidence

even though it "formally recites that [its decisions] are based upon all of the evidence"). Instead, this "failure to consider evidence of significant impairment," arrived at only because the ABCMR "ignored the evaluation done by [other physicians] which indicated that [the applicant] was suffering from a variety of ongoing mental and physical health difficulties which impaired [] functioning," renders the ABCMR's decision not supported by substantial evidence. *Verbeck v. United States*, 97 Fed. Cl. 443, 449 (2011); *see also Versaci v. United States*, 185 Ct. Cl. 672, 691 (1968) (holding that a decision which "mak[es] it impossible to determine what weight was given to the evidence . . . cannot be sustained") (internal citations omitted).

> ### 2. The ABCMR ignored post-discharge expert medical opinions concluding that Mr. LaBonte suffered from PTSD and TBI prior to his discharge.

Records and reports that the Army itself produced are sufficient, on their own, for this Court to overturn the Board's decision. But Mr. LaBonte's post-discharge expert medical opinions, which the ABCMR also ignored, provide further evidence that its decision is flawed. One of Mr. LaBonte's central contentions is that the Army misdiagnosed and neglected to treat medical conditions he incurred during his Army service. Multiple reports by physicians who examined Mr. LaBonte and his Army medical records after separation support this claim. These physicians concluded that he suffered from numerous potentially unfitting impairments prior to his discharge that the Army ignored, misdiagnosed, and failed to properly treat. The ABCMR failed to acknowledge or examine this evidence, which includes:

- A 2014 report by a clinical psychologist who treated Mr. LaBonte for six psychotherapy sessions. AR873. This psychologist concluded that the "Mental Health Intake Questionnaire undertaken at Fort Hood on June 30, 2004 . . . indicates that [Mr. LaBonte] was presenting with significant symptoms of depression and anxiety . . . [and] may have been a threat to himself[.]" *Id.* He further stated that "it sounds clear that [Mr. LaBonte] was, at the time of the evaluation, seriously depressed and anxious, and that there may have been a history of suicidal thinking. Such a clinical presentation should be taken very seriously; as it reflects a highly compromised Individual who has shown the potential to be a danger to himself." *Id.*;

- A 2014 report by an experienced clinical psychiatrist, who examined Mr. LaBonte in-person and reviewed his entire medical history. AR191-99. This psychiatrist concluded that Mr. LaBonte suffered from "residual symptoms of Major Depressive Disorder and [] active symptoms of Posttraumatic Stress Disorder[,]" as well as "medical symptoms of new-onset cluster headaches and ringing in the ears . . . [that] strongly suggest TBI." AR198. The psychiatrist stated that "[g]iven that Mr. LaBonte's symptoms were worst in 2005 and worse in 2004 than now, and that he met criteria for both [major depressive disorder] and PTSD until one year ago, it is highly likely that he had both Disorders when he presented to the chaplain and then the Fort Hood Mental Health Clinic in 2004, and that these illnesses were not addressed. . . . Mr. LaBonte did not receive appropriate treatment at the time of his presentation [at the Fort Hood Mental Health Clinic], for the items he endorsed [e.g., the symptoms he reported] indicated potentially serious psychopathology, and he was not referred." *Id.*;

- A 2015 report by an expert neurologist who examined Mr. LaBonte and concluded that he "clearly suffered a severe concussive injury at the same time [as his 2004 fall] and immediately following his head trauma when he first regained consciousness and has suffered with headaches ever since." AR187. This neurologist based his TBI diagnosis on both clinical observation of Mr. LaBonte's "impaired motor activity . . . [and] clinical evidence of brain dysfunction" as well as "subtle signs of damage on certain neurological findings of his exam[.]" AR188;

- The ABCMR's October 19, 2017 decision, which included a "medical advisory opinion" obtained from the Army Review Boards Agency ("ARBA") Psychiatrist. AR105. The ARBA Psychiatrist noted that "the lack of documentation of PTSD symptoms in his military records . . . does not necessarily indicate he did not have PTSD." AR107. Instead, the psychiatrist concluded that "based on the symptoms documented during his mental health intake, it is clear the applicant was suffering from a diagnosis more severe than adjustment disorder, most likely PTSD." *Id.*;

- Repeated VA determinations that Mr. LaBonte suffered from service-connected TBI arising from his fall in Tikrit, Iraq. *See e.g.*, AR363 (VA decision of December 23, 2014 recognizing "that based on the facts that you had an inservice (sic) head trauma with loss of consciousness and were also exposed to multiple mortar blasts at close range and had alteration of consciousness . . . it is at least as likely as not that you suffered a mild traumatic brain injury (TBI). Therefore, service connection is established for [TBI]").

The ABCMR's failure to engage with *any* of the post-discharge evidence in Mr.

LaBonte's record is untenable. In fact, the Board must consider post-discharge medical evidence

when the underlying medical record is conflicting and complex. *See Jordan*, 205 Ct. Cl. at 72

(evidence that plaintiff had a medical condition, when the ABCMR concluded that he did not,

"should have put the [ABCMR] on notice of the importance . . . of considering the applicant's

medical condition *subsequent* to his discharge, and the professional evaluation and treatment

thereof, in its determination of fitness for duty as of the date of discharge.") (emphasis in the

original). Courts have repeatedly affirmed that it is appropriate to make a disability

determination by examining post-discharge medical evidence. *See, e.g.*, *Ferrell*, 23 Cl. Ct. at 571

(holding PEB determination arbitrary, capricious, and unsupported by substantial evidence where

it failed to examine post-discharge evidence, which was particularly relevant because "the

examination at the time of release [from active duty] was perfunctory"). Post-discharge medical

records "may be decisive if [they] can establish that plaintiff's incapacity while in service was

substantially more serious than suspected and that previous diagnoses were inadequate or

incorrect." *Walters v. United States*, 175 Ct. Cl. 215, 225 (1966). By ignoring post-discharge

evidence in a circumstance in which its consideration was required, the Board rendered its own

decision unlawful.

Further, this Court has held that VA medical records have probative value and should be

considered by correction boards making retroactive disability determinations. *See Dayley*, 180

Ct. Cl. at 1143 ("While not binding on the Army in a disability retirement proceeding, the action

of the Veterans Administration is entitled to some consideration and weight . . . ."); *Powers v.

United States*, 176 Ct. Cl. 388, 399 (1966) (holding that "it must be concluded [] that plaintiff

proved that he was permanently incapacitated for general military service at the time of his

release" in part based on "the findings of the physicians and specialists of the Veterans

Administration who gave plaintiff his first psychiatric and neurological examinations . . ."). The

ABCMR appears to agree that VA evidence is probative and admissible, at least when that

evidence supports its own conclusions. It relied upon an (erroneous) account of a VA medical

conclusion to dispute the severity of Mr. LaBonte's injuries. AR78. However, when similar

evidence supported Mr. LaBonte's claims, the ABCMR fell silent. There is no legal principle

that enables the ABCMR to consider VA evidence that supports its conclusions while ignoring

VA evidence that calls it into question. As a result, the Board's decision must be reversed.

### B.  The ABCMR relied on factual misstatements to justify its conclusions.

The ABCMR decision adopted the Doane Memorandum in full, which concluded that

"Mr. LaBonte did not require disability processing at the time of separation from Active Duty."

AR77-79. This conclusion rested on a selective review of the record evidence that distorted both

Mr. LaBonte's claims and the underlying facts. It relied on numerous, significant factual

misstatements to justify the Doane Memorandum's wrongful conclusions. The ABCMR's

decision therefore fails the "substantial evidence" rule because these statements are proved false

by reference to evidence in the record before the Board at the time of its decision. *See, e.g.*,

*Horan*, 350 F. App'x at 85 (holding that when an agency determination is "based largely on . . .

factual errors, we cannot say it is supported by substantial evidence"); *Larson v. Dep't of the

Army*, 260 F.3d 1350, 1356 (Fed. Cir. 2001) (overturning agency decision as not supported by

substantial evidence "in light of . . . factual errors and [the agency's] incomplete treatment of . . .

the record").

This Court has recognized that even "minor factual errors . . . could make it appear as

though the Board did not give plaintiff's application the attention it deserved." *Six v. United

States*, 79 Fed. Cl. 581, 589 (2007). But the Doane Memorandum's mischaracterizations, upon

which the ABCMR relied, are more than "minor factual errors." Here, Dr. Doane's numerous

errors are central to the ABCMR's decision to deny Mr. LaBonte's claim. They distort and evade

arguments central to Mr. LaBonte's case, diminish the severity of his medical conditions, and

attempt to cast doubt upon his credibility. The Board's reliance on these factual errors is arbitrary

and capricious. Stripped of these errors, the ABCMR's overall conclusion cannot be supported

by substantial evidence.

The ABCMR's decision fundamentally mischaracterized Mr. LaBonte's arguments and then failed to account for the actual arguments he raised, rendering it unlawful. When an agency "does not respond to a plaintiff's facially non-frivolous arguments," it inevitably "fail[s] to grapple with . . . a substantial issue[.]" *Verbeck*, 97 Fed. Cl. at 460 (internal citations omitted). The ABCMR's failure to consider Mr. LaBonte's actual arguments renders its decision unlawful. *See id.* ("Even the narrow judicial review this court exercises over [Board] decisions compels the court to vacate a decision that fail[s] to address a potentially meritorious argument raised by [a] plaintiff.") (internal quotations omitted); *see also Frizelle v. Slater*, 111 F.3d 172, 177 (D.C. Cir. 1997) (holding a correction board's decision arbitrary and capricious because it "did not respond to two of [claimant's] arguments, which do not appear to be frivolous on their face and could affect the [c]ourt's ultimate disposition"). Accordingly, the ABCMR's decision cannot stand.

The Doane Memorandum stated that "Mr. LaBonte and his legal team contend that because Mr. LaBonte currently has a 90% rating by the Veteran's Administration [sic], he must therefore have been unfit for duty at the time of separation March 2008." AR77. This is incorrect: Mr. LaBonte does not and has never argued that he is entitled to medical retirement pay merely because of his VA rating. Mr. LaBonte instead argues that he suffered from unfitting conditions prior to his separation which, properly diagnosed by the Army, would have triggered referral for DES processing upon separation and an ultimate finding that he was unfit for continued service and eligible for medical retirement. *See* AR1795 (PEBLO forwarding memorandum prepared by Mr. LaBonte's counsel to Dr. Doane); AR1798. Mr. LaBonte recognizes that the VA procedure for determining whether a veteran is eligible for disability benefits and the Army procedure for determining whether a veteran is eligible for medical

retirement are distinct. Accordingly, Mr. LaBonte cited to medical records and conclusions related to his VA disability rating only to shed light on his medical condition prior to his separation from the Army, an approach this Court has repeatedly endorsed.

Even if the Doane Memorandum's characterization of Mr. LaBonte's argument were accurate, and it is not, the ABCMR decision remains unlawful for at least two additional reasons. First, the Doane Memorandum impermissibly relied upon multiple erroneous misstatements in an effort to undermine Mr. LaBonte's argument and minimize the significance of Mr. LaBonte's VA evidence. Dr. Doane stated that Mr. LaBonte has a 90% disability rating. AR77. This is false: the VA has rated Mr. LaBonte as 100% disabled. AR124 ("Your overall or combined rating is 100% effective November 20, 2012."). Dr. Doane stated that "the scar that Mr. LaBonte allegedly received from his fall [is] the same scar the VA currently rates him service connected at 10% [and] was also noted in his 2002 MEPS induction physical examination." This is incorrect: as the VA noted in a 2014 examination, Mr. LaBonte's scar "is consistent with head injury and there is no notation of scar existing upon entrance or prior to service or prior to head injury." AR487.

The Doane Memorandum further erred by mischaracterizing Mr. LaBonte's pre-discharge medical history. It made sweeping proclamations categorically excluding the possibility that Mr. LaBonte suffered *any* impairments as a soldier, let alone disabling conditions. AR77 ("I can without hesitation conclude that at the time of his separation, Mr. LaBonte did not have indications of disabling PTSD and he did not have any symptoms of TBI. The record shows just the opposite. He was in good health with no physical limitations."). This is incorrect. At a minimum, Mr. LaBonte had been diagnosed with an adjustment order prior to his separation, as Dr. Doane acknowledged. *Id.* An individual with an adjustment disorder is not "in

good health with no physical limitations." *Id.*

More importantly, Dr. Doane was able to state that Mr. LaBonte "did not have indications of disabling PTSD" or "any symptoms of TBI" only by ignoring documented indications and symptoms of both, as recognized by multiple components of the military disability system and recounted above. The Doane Memorandum's conclusion that Mr. LaBonte suffered *no* indications or symptoms of PTSD or TBI is untenable and cannot survive even a cursory review of the underlying record. *See Watson v. United States*, 113 Fed. Cl. 615, 637–38 (2013).  (overturning board decision because its finding that "there was no evidence that shows the applicant was diagnosed with [an unfitting condition] . . . is unsupported by substantial evidence" given that there were indications of condition in the applicant's medical record). The ABCMR cannot disclaim its responsibility to make an independent disability determination when confronted with evidence that contradicts the Army's incorrect conclusion that Mr. LaBonte was fit for duty. *Cf. Hatmaker v. United States*, 117 Fed. Cl. 560, 572 (2014) (rejecting PDBR conclusion that claimant's condition was not severe enough to warrant increased disability rating where it "made no reference" to "several reports in the record" documenting more severe symptoms). Because the ABCMR failed to acknowledge, let alone examine, the indications and symptoms Mr. LaBonte reported, its decision is unsupported by substantial evidence.

The Doane Memorandum also relies on two major factual errors in an attempt to diminish the severity of Mr. LaBonte's conditions. First, contrary to the Doane Memorandum's assertions, the record establishes that the Army failed to provide Mr. LaBonte with critical medical examinations as required by law. Dr. Doane stated that Mr. LaBonte received a "complete medical examination" including both a "mental evaluation and a medical evaluation" while he

was "undergoing chapter separation" in 2007. AR78. According to Dr. Doane, an examination

dated June 22, 2007, performed at the Carl R. Darnell Medical Center in Fort Hood, Texas, both

confirms that the Army followed its legal requirement to provide Mr. LaBonte with a medical

examination and demonstrates that Mr. LaBonte did not have any "serious behavioral health or

other mental conditions . . . [that] would have required further evaluation and appropriate

disability processing . . . at that time." AR79. Yet Mr. LaBonte could not have received an

examination on June 22, 2007: he had already returned home to Connecticut by that time.

AR1472 (Mr. LaBonte's DD214 showing the dates of "excess leave" accrued after his release

from confinement). The only document in the administrative record recounting the June 22, 2007

"examination" makes clear that whatever did occur on June 22, 2007, it was not a medical

examination. The document contains nothing more than confirmation that Mr. LaBonte was seen

by a mental health intake specialist at Fort Hood on June 30, 2004. AR1388-1401. The document

is signed by a "supervisor" but the signature block for "therapist" is blank. *Id.* Mr. LaBonte's

signature is nowhere to be found, *id.*, which is not surprising, given that he was not present.

AR1472. From this "examination," Dr. Doane somehow concluded that Army medical

professionals thoroughly examined Mr. LaBonte and issued him a clean bill of health prior to his

discharge.

Second, the Doane Memorandum stated that "when Mr. LaBonte left the military in

March of 2008, he was still DEERS/Tricare eligible until August 2010. That is, he had eligibility

to return to any military treatment facility or use his Tricare benefit, for treatment for any

condition he may have developed since leaving Active Duty." AR79. This is incorrect. Dr.

Doane's contention appears to be based on a document stating that Mr. LaBonte was

DEERS/Tricare eligible from February 1, 2008 until August 24, 2010. AR2057. Yet the line

directly above that one states, "NO HEALTH CARE COVERAGE PLAN (TRANSFER

RECORDS ONLY)". *Id.* (capitalization in the original). In fact, Mr. LaBonte was ineligible for

these benefits because he was separated under a special court martial and given a Bad Conduct

Discharge. *See* 32 CFR § 3.12 (2019); *see also Transitional Assistance Management Program*,

TRICARE, ("Sponsors and eligible family members may be covered by TAMP if the sponsor

is . . . [i]nvoluntarily separated from active duty under honorable conditions[.]"),

https://tricare.mil/Plans/SpecialPrograms/TAMP. Thus, the Doane Memorandum relied on a

document that states that Mr. LaBonte did not have health care coverage to conclude that Mr.

LaBonte's failure to seek medical care in the years immediately after his discharge established

that he "was not in need of any healthcare during this period[.]" AR79. In truth, Mr. LaBonte

was suffering during this time precisely because his medical conditions remained undiagnosed

and untreated, in part because Mr. LaBonte was barred from accessing health care through

military or VA benefits due to his Bad Conduct Discharge.

This Court has previously held that it is impermissible for military officials to draw

unfavorable inferences from a servicemember's alleged failure to take advantage of a benefit to

which he or she did not actually have access. *See Mendez v. United States*, 103 Fed. Cl. 370

(2015) (overturning Marine Corps decision to discharge plaintiff when one justification for

decision—the reviewing officer's claim that the plaintiff failed to advise Marine in his command

of a TRICARE medical benefit—was later proven false). This same principle controls the instant

case. Dr. Doane drew an unlawful inference contradicted by the record and the law. Because this

inference was central to the ABCMR's reasoning, this error is sufficient to render the entire

decision unlawful.

Finally, the Doane Memorandum made additional factual misstatements in an apparent

attempt to undermine Mr. LaBonte's credibility. The ABCMR again impermissibly accepted them. Dr. Doane stated that "[t]here is no documentation of" Mr. LaBonte's fall from a guard tower in Tikrit, Iraq. AR78. This is incorrect. In a sworn affidavit, one of Mr. LaBonte's fellow soldiers documented finding Mr. LaBonte unconscious in a pool of his own blood at the base of a guard tower. AR217-18. In another affidavit, a different soldier recalled hearing about Mr. LaBonte's injury and seeing him shortly thereafter—Mr. LaBonte "had a huge gash on his forehead that was stitched up." AR249. In another affidavit, Mr. LaBonte's father reported receiving an email from his son the day after his fall stating that he had been injured. AR828-30. Mr. LaBonte's father also described discussing the incident with his son via telephone a few days later, and recounted the dramatic physical and personality differences his son displayed in the aftermath of his fall, including sudden mood swings, crippling headaches, constant ringing in his ears, and blurred vision. *Id.* This fall and Mr. LaBonte's attendant injuries have been repeatedly recognized by Army and VA decisionmakers and form the basis of Mr. LaBonte's service-connected mTBI disability rating. AR363. The ABCMR did not explain why it refused to accept this documentation. It simply ignored it, consistent with its pattern of disregarding facts that do not support its own conclusions. This Court should not allow the Board to distort facts and should reverse its decision.

### C. Dr. Doane acted in bad faith in disposing of Mr. LaBonte's claim.

In addition to the Doane Memorandum's numerous legal deficiencies, Dr. Doane's email communications with other individuals involved in Mr. LaBonte's DES process reveal blatant disregard for fundamental norms of neutral, fact-based analysis. The Doane Memorandum's conclusory reasoning, containing attacks on Mr. LaBonte's credibility and that of Army and VA administrative processes, combined with agency email communications indicating that Dr. Doane prejudged Mr. LaBonte's case, "create[] serious doubts about the integrity of the

administrative action." *Bateson v. United States*, 48 Fed. Cl. 162, 165 (2000). Dr. Doane's bad

faith deprived Mr. LaBonte of "fair and honest consideration of" his claim and provides another

ground for overturning the ABCMR's decision as an "arbitrary and capricious action." *Latecoere*

*Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994). Dr. Doane's

conduct is precisely the kind of "bias" or "animus" that the bad faith standard prohibits. *See Van*

*Cleave*, 70 Fed. Cl. at 685. The Doane Memorandum and Dr. Doane's email communications

demonstrate that he failed to comport with legal principles of fair analysis that ensure due

process in administrative proceedings. *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401

U.S. 402, 420 (1971). Thus, this Court should reverse the ABCMR decision. Should it opt

instead to remand, such action must include instructions barring Dr. Doane from further

participation in adjudicating Mr. LaBonte's case.

The Doane Memorandum's errors and conclusory assertions appear to be an attempt to

"justify [the decisionmaker's] notions of plaintiff's lack of credibility[.]" *Van Cleave*, 70 Fed. Cl.

at 685. It is indisputable that the record before Dr. Doane contained evidence indicating that Mr.

LaBonte suffered conditions that may have rendered him medically ineligible for active duty

prior to his discharge. Otherwise, there would have been no reason for DASA Blackmon to refer

Mr. LaBonte to the OTSG for further review. Yet "[r]ather than showing how [his] findings

could be read in concert with the facts of the case," Dr. Doane "launch[ed] personal attacks on

plaintiff's character and credibility" which the ABCMR did nothing to dispute. *Id.* at 679.

Dr. Doane inexplicably questioned whether Mr. LaBonte ever fell out of a guard tower in

Tikrit, Iraq. AR79. He wrote that "Mr. LaBonte and his legal team report that he suffered a 30

foot fall and *subsequent head bump*" but that "[t]here is *no documentation* of this event, *nor does*

*Mr. LaBonte have any memory of the event*." *Id.* (emphasis added). This framing demonstrates

Dr. Doane's apparent belief that Mr. LaBonte has invented a non-existent or minor event to bolster an unjustified claim—a belief which he fails to substantiate. It is unclear how Mr. LaBonte's inability to remember a fall that caused a TBI is, according to Dr. Doane, evidence that the event did not occur, given that memory loss is consistent with incurring a TBI from a fall. It is improper to characterize a fall that caused Mr. LaBonte to sustain a TBI and left him unconscious in a pool of his own blood as a "head bump." And Mr. LaBonte does not dispute that the treatment he received after his fall was irregular—the Army's failure to follow its own procedures is a central part of his claim. Evidence in the record establishes that conditions in Tikrit, Iraq at the time of the fall were extremely chaotic, that there was a stigma associated with seeking treatment for mental health issues, and that the Army failed to understand the severity of head injuries at this time. *See* AR252 ("[O]ur leaders knew nothing about [PTSD] or [TBI]. . . . There was, however, a huge stigma against soldiers who had mental health problems or sought mental health treatment."). Accordingly, Dr. Doane's "skeptical evaluation" of Mr. LaBonte's claims is both "internally inconsistent and frivolous" and "so absurd as to suggest animus." *Van Cleave*, 70 Fed. Cl. at 685; *see also Latecoere Int'l, Inc.*, 19 F.3d at 1365. (holding that an Assistant Director within the Office of the Secretary of the Navy acted in bad faith when he "refused to sign off on" the "uniform recommendations" of Naval officials without providing a rational explanation for his choice to do so).

Second, in e-mail communications sent to other members of the DES process, Dr. Doane also attacked the integrity of the system of which he is a part. In response to being informed that DASA Blackmon had directed the OTSG to determine if Mr. LaBonte should have been medically retired, Dr. Doane replied, "this is amazing," and stated that he was "still not convinced we are being forced to do [DES] processing on him." AR1906. When the PEBLO

responded with the text of DASA Blackmon's referral, Dr. Doane replied that "[c]learly [a referral to the DES] was NOT warranted" and stated that Mr. LaBonte "cannot come back years later after receiving VA ratings and now demand that he should have been put through the MEB." AR1793. Yet it is not Mr. LaBonte's "demand" that triggered referral to the OTSG and brought the case before Dr. Doane: it was DASA Blackmon's decision, based upon the relevant law and a review of Mr. LaBonte's record and asserted claims.

This email correspondence also strongly suggests that Dr. Doane pre-judged Mr. LaBonte's claims. Agency decisionmakers may be disqualified from adjudicating proceedings if they prejudge specific facts at issue in those proceedings, or otherwise fail to provide impartial review. *See, e.g.*, *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The requirement of neutrality has been jealously guarded by this Court."); *Huang v. Gonzales,* 453 F.3d 132 (2nd Cir. 2005) (vacating and remanding decision by Immigration Judge who demonstrated "apparent bias and hostility" toward petitioner); *Clements v. Airport Authority of Washoe County*, 69 F.3d 321, 333 (9th Cir. 1995) ("A biased proceeding is not a procedurally adequate one."); *Cinderella Career & Finishing Sch., Inc. v. F.T.C.*, 425 F.2d 583, 590 (D.C. Cir. 1970) (ordering disqualification of adjudicator who made statements "giv[ing] the appearance that he has already prejudged the case and that the ultimate determination of the merits will move in predestined grooves"). Dr. Doane's initial messages of disbelief when asked to approve Mr. LaBonte's referral to the MEB—coupled with the cursory review of Mr. LaBonte's record featured in his memorandum—indicate that Dr. Doane had made up his mind before he even had a chance to review Mr. LaBonte's lengthy, complex record. AR2265 (Dr. Doane stating that he "cannot sign" Mr. LaBonte's medical board packet less than eighteen hours after receiving it from the PEBLO).

29

Dr. Doane's penchant for denying servicemembers' claims regardless of their substance is apparently well known to his colleagues, who refer to him as "Dr. Doane (Denies Everything)." AR2365. The ABCMR's decision rests on an unreasoned memorandum produced by a disbelieving physician who prejudged Mr. LaBonte's claim. Such a decision cannot stand. Should this Court choose to remand this case for further proceedings, this evidence of bad faith is sufficient to preclude Dr. Doane from further participation in Mr. LaBonte's DES processing.

### III.   The ABCMR's decision fails the "substantial evidence" rule because it rests on the Army's unlawful failure to follow its own regulations.

To the extent Mr. LaBonte's record lacks Army-produced contemporaneous documentation of medical conditions rendering Mr. LaBonte eligible for retirement, this absence resulted directly from the Army's failure to follow its own regulations. The ABCMR cannot rely on an evidentiary gap caused by the Army's own unlawful actions to deny Mr. LaBonte's claim. Because the Army consistently failed to follow its own regulations—starting on the day Mr. LaBonte fell off the guard tower in Tikrit, Iraq in 2004 and continuing through Dr. Doane's abrupt termination of Mr. LaBonte's DES processing in 2018—it repeatedly deprived Mr. LaBonte of a fair opportunity to have his conditions evaluated for medical retirement. It denied Mr. LaBonte the ability to develop the kind of medical evidence, contemporaneous with his active duty military service, that the ABCMR (erroneously) stated is required for Mr. LaBonte to prove his claim. The Board's circular reasoning undermines its conclusions and cannot be sustained.

### A.   The Army's failure to follow its own regulations denied Mr. LaBonte an accurate medical record and timely evaluation for disability retirement.

The Army has had at least four opportunities to follow its own regulations and provide Mr. LaBonte an accurate and thorough medical and psychological assessment. The Army failed Mr. LaBonte each time. First, in February 2004, the Army failed to accurately document and

treat Mr. LaBonte's serious injuries, including his TBI, following his fall from a guard tower in

Tikrit, Iraq. Second, the Army did not follow its own regulations from 2004 to 2007 by failing to

conduct a Post-Deployment Health Reassessment, and by failing to refer Mr. LaBonte for

monitoring, treatment, or disability evaluation despite numerous warnings signs and Mr.

LaBonte's repeated attempts to seek help. Third, the Army failed to provide Mr. LaBonte a

separation physical, which is required for any soldier being involuntarily separated from the

Army. Lastly, the Army failed to provide Mr. LaBonte a full and fair disability evaluation when

Dr. Doane and the ABCMR abruptly terminated his DES process. Without this Court's

intervention, Mr. LaBonte will bear the full cost of the Army's failure to abide by its own

procedures and regulations.

First, the Army failed to follow its own regulations in 2004 when Mr. LaBonte was

injured in Iraq. Mr. LaBonte fell from the 30-foot guard tower he was manning in a period of

heavy fighting in Tikrit. AR814-21. His fall should have triggered an immediate medical

response, as the Army's Personnel Policy Guidance ("PPG") for Overseas Contingency

Operations required, and that response should have been documented. Department of the Army

Personnel Policy Guidance for Overseas Contingency Operations, Part 7-2(i) ("All episodes of

health care will be documented in the individual's permanent or deployment health record while

participating in contingency operations [in accordance with Army Regulation] 40-66"; *see also*

*Stuart*, 108 Fed. Cl. at 466 (acknowledging this portion of the PPG applied to injured soldiers in

Iraq in 2005); Army Reg. 40-66, Part 3-12 (describing the details to be recorded for all battle and

nonbattle injuries, including: 1) the nature of the injury; 2) the parts of the body affected; 3) how

the injury occurred; and 4) the date and location of the injury). It did not. The affidavit submitted

by fellow soldier Brandon DeLaune, Mr. LaBonte's service-connected facial scar, and Mr.

LaBonte's post-service civilian, VA, and Army medical evaluations, all confirm that Mr. LaBonte sustained a major injury when he fell from that guard tower. If Mr. LaBonte's injury had been documented and treated as was required, he would have immediately received the medical assessments and treatment he needed. Had the Army followed these requirements, it would have found Mr. LaBonte eligible for medical retirement upon his return from Iraq in 2004.

Instead, when Mr. LaBonte returned from Iraq in April 2004, the Army failed him again. When a servicemember returns from an overseas contingency operation, the Army is required to conduct a Post-Deployment Health Reassessment ("PDHRA") "to identify deployment-related health issues early before they develop into more serious issues." AR1157-62 (PDHRA description and requirements). There is no record of the Army ever conducting a PDHRA for Mr. LaBonte, let alone one within the three- to six-months of return required by Army regulations. *Id.* Had the Army conducted a PDHRA for Mr. LaBonte in the latter half of 2004, he would have received the medical and psychological assessments and treatment he needed, and he would have been medically retired.

Second, during this same period, the Army also failed to follow its own regulations by failing to refer Mr. LaBonte for disability evaluation for the conditions he incurred in Iraq, despite numerous warning signs and Mr. LaBonte's repeated efforts to seek help. The Army Physical Disability Evaluation System (PDES) is the process through which medical separation determinations are made. As Army Regulation 635-40, Part 2-9 states, "[w]hen a commander believes a Soldier is unable to perform the duties of their office, grade, rank, or rating because of physical disability, the commander will refer the Solder to the responsible [Medical Treatment Facility] for evaluation." But Mr. LaBonte's chain of command refused to refer him for disability evaluation, despite his repeated requests for medical and psychological help. *See* AR1733-49;

AR1799-1807; 1850-61. Mr. LaBonte's June 30, 2004 report of symptoms were sufficient for a command referral. AR2087-97. Had Mr. LaBonte been properly examined during his service, as required by law, he would have been diagnosed, treated, and discharged before he went AWOL. AR1798; *see also* Army Reg. 40–501 ¶¶ 3–30(g), 3–31, 3–32, 3–33 (2003) (describing requirements for mandatory referrals for disability processing).

Third, the Army violated its own regulations yet again when it failed to provide Mr. LaBonte a separation physical within one year of his discharge on March 31, 2008. Army Reg. 635-200 Ch. 1, Sec. VI, 1-32; Army Reg. 40-501, Ch. 8-24 (requiring a separation physical under various chapters, and if requested by the separating servicemember); Army Reg. 40-501 Part 8-24 (requiring a Separation Health Assessment within twelve months of discharge). Because the Army required separation physicals to be conducted *within one year of separation*, Mr. LaBonte's pre-confinement physical—which occurred on October 23, 2006, more than a year before he was separated—did not qualify. Further, Mr. LaBonte reported numerous symptoms that should have triggered, at a minimum, a more thorough evaluation than the cursory pre-confinement physical the Army performed. AR2064-72.

The evaluations that the ABCMR alleged occurred in 2007, AR78, are also insufficient to constitute a separation health assessment because, as discussed above, Mr. LaBonte *could not have been present* for either "examination." Mr. LaBonte was already out of confinement and living with his father by March 2007, at least two months before these alleged evaluations took place. AR1471. The June 22, 2007 form merely refers to Mr. LaBonte's psychological healthcare history and says nothing about his mental or physical health as of June 22, 2007. AR1388, AR2149 (June 22, 2007 "evaluation"). Similarly, the only other potential "evaluation" that possibly occurred in this time period much more likely occurred four years previously in 2003.

AR2059. Indeed, the first date on that evaluation form is May 24, 2003, and Mr. LaBonte's age

is recorded as 18 years—his actual age on May 24, 2003. *Id.* None of these documents establish

that the Army conducted the meaningful separation health assessment required by law. Instead,

the Army failed to follow its own regulations, and Mr. LaBonte continues to suffer the

consequences.

Finally, the Army failed to follow its own regulations when it terminated Mr. LaBonte's

DES process prematurely, without cause, and without the standard rights of appeal provided to

soldiers undergoing DES processing. *See* Army Reg. 635-40, 4-13; Army Reg. 40-400 Ch. 7

(MEB governing procedures). The DES Process consists of two main parts, as described in

Department of Defense Instruction 1332.18. First, the Army convenes a Medical Evaluation

Board to determine whether the soldier is unfit to return to duty. If the Soldier disagrees with the

MEB's findings, then he can request an impartial medical review and submit a rebuttal of the

MEB findings. Second, the Army convenes an informal Physical Evaluation Board to review the

MEB's findings and determine if the solider can perform military duties. If the soldier disagrees

with the informal PEB's findings, he can request a formal PEB, which will review the informal

PEB's findings, provide the soldier with counseling and case management services, and provide

a final disposition of the soldier's claim.

The Army commenced Mr. LaBonte's DES process on instruction from the DASA. The

Army assigned Mr. LaBonte a PEBLO. This only occurs *after* a soldier is enrolled in the DES

process. Army Reg. 635-40, Chap 4-10 ("A PEBLO will be assigned to the Soldier to . . .

[c]ontact the Soldier to provide them with a general overview of the DES process [and] . . .

[n]otify the unit commander of the Soldier's *enrollment in the DES*.") (emphasis added). The

Army convened an MEB, and required Mr. LaBonte to undergo medical evaluations by MEB

physicians, who in turn drafted the NARSUM. AR60-67. No Department of Defense Instruction or Army Regulation grants one MEB physician the authority to halt the MEB process without allowing the soldier to request an impartial medical review and submit a rebuttal. The Army itself recognized by its statements and actions that Mr. LaBonte had entered the DES process and thus possessed a right of appeal. *See* Army Reg. 635-40 ("MEBs will be composed of two or more physician members. One of the MEB members will prepare the NARSUM of the Soldier's medical conditions."); *id.* ("If the MEB members disagree on the case, the MTF commander or designee may appoint an additional voting member to review the proposed findings and provide the majority position."); *see also* AR1908-10. When Dr. Doane terminated the MEB process unilaterally, and when the ABCMR adopted his conclusions in full without further explanation, the Board deprived Mr. LaBonte of his right to a full and fair DES process. Had the Army completed this process—or followed its own regulations during Mr. LaBonte's Army service— Mr. LaBonte already be medically retired today.

### B.  The ABCMR's decision drew an impermissible inference from the Army's failures to follow its own procedures.

The ABCMR impermissibly used the Army's failure to follow its own policies and procedures to justify denying Mr. LaBonte's claim. It did so by drawing an improper inference, asserting that because the Army did not diagnose Mr. LaBonte with a medical condition rendering him eligible for medical retirement during his service, he was presumptively fit at the time of his discharge. This impermissible inference was central to the ABCMR's decision. Dr. Doane's initial reaction to receiving Mr. LaBonte's NARSUM from the PEBLO is illuminating: Dr. Doane stated that because there was "nothing in AHLTA [the Armed Forces Health Longitudinal Technology Application]," a digital repository of servicemembers' medical records, then "[c]learly [DES processing] is NOT warranted." AR1793. In fact, AHLTA

contained ample evidence sufficient to initiate a DES process—Dr. Doane ignored the multiple times Mr. LaBonte demonstrated or reported symptoms of PTSD, TBI, depression, anxiety and other conditions during his Army service.

Even if Dr. Doane were correct that there was "nothing in AHLTA," which he is not, the ABCMR cannot rely on that absence to justify denying Mr. LaBonte's claim because the Army was itself responsible for that evidentiary vacuum. *See Stuart*, 108 Fed. Cl. at 470 ("The Court will not speculate that Plaintiff met retention standards when he was discharged merely because the Army's failure to follow its procedures resulted in a lack of evidence to the contrary."); *see also Ferrell,* 23 Cl. Ct. at 570 (rejecting the government's argument that the absence of evidence in the plaintiff's medical records created a presumption that he was fit for service at the time plaintiff was discharged). To the extent that there is a "dearth of evidence" in Mr. LaBonte's pre-discharge medical record, it is "Defendant, not Plaintiff, that is the cause[.]" *Stuart*, 108 Fed. Cl. at 470. For the ABCMR to "deny Plaintiff's claim for lack of proof that he was unfit at the time of discharge would reward Defendant for failing to perform and document required medical evaluations and would unfairly impose an impossible evidentiary burden on Plaintiff." *Id.*

In fact, the dissonance between Mr. LaBonte's medical record—which establishes that he suffered from multiple conditions that caused him to fail to meet medical retention standards— and the Army's contemporaneous conclusion that he was fit for service should have led the ABCMR to adopt the opposite presumption—that Mr. LaBonte was eligible for medical retirement. This stark contrast between the Army's official conclusions and the contravening consensus medical opinion is precisely the kind of "dispute" or "dichotomy of medical opinion" that raises "reasonable doubt requiring either that further clinical investigation be conducted, or, absent the ability to garner additional evidence, that such doubt be resolved in favor of the

Soldier." *Ward*, 133 Fed. Cl. at 430–31. Only by ignoring the Army's repeated failures to abide by its own regulations in handling Mr. LaBonte's medical impairments—and by ignoring its own duty to resolve reasonable doubt in favor of Mr. LaBonte—can the ABCMR justify denying Mr. LaBonte's claim.

**IV.    The ABCMR deprived Mr. LaBonte of his right to Due Process by denying him the Army's standard procedure for evaluating medical retirement eligibility.**

After more than a decade, DASA Blackmon finally offered the Army an opportunity to correct its errors when she directed Mr. LaBonte for DES processing. The OTSG properly understood that directive as requiring the Army to convene an MEB. The decision to then terminate this DES process, without affording Mr. LaBonte his standard right to appeal or right to request an impartial medical review, violated the Army's own regulations and deprived Mr. LaBonte of a fair and orderly adjudicatory proceeding.

This decision rendered the Board's determination an unconstitutional violation of the Due Process Clause. U.S. Const. amend. V.  Military disability retirement status and its corresponding benefits constitute a statutorily granted property interest within the meaning of the Fifth Amendment. *See Mathews v. Eldridge*, 424 U.S. 319 (1976); *Cushman v. Shinseki*, 576 F.3d 1290, 1296 (Fed. Cir. 2009) (holding that veterans' "entitlement to benefits is a property interest protected by the Due Process Clause of the Fifth Amendment"). Procedural due process requires notice and an opportunity to be heard prior to deprivation of life, liberty, or property. *See Mathews*, 424 U.S. at 902. The interested individual must have the opportunity to proceed through an administrative process. *Id.* at 343-344 (holding that although the decision to terminate disability benefits did not require an administrative hearing, "the decision . . . will turn, in most cases, upon 'routine, standard, and unbiased medical reports by physician specialists," and such a medical evaluation was required for due process (internal citations omitted)); *see also ex rel.*

*Accardi*, 347 U.S. at 268 (requiring agency to conduct individualized hearing to give petitioner "opportunity to try" to prove claim, which ensures that he is *"afforded that due process required by the regulations in such proceedings."*). By denying Mr. LaBonte access to the standard right to appeal any adverse decision in his DES process, the ABCMR denied him Due Process. This Court must intervene to correct the mistakes that have left Mr. LaBonte suffering for far too long.

**V.      This Court should order Mr. LaBonte medically retired because the record evidence can only support that conclusion.**

Under the Army's regulations, Mr. LaBonte is eligible for medical retirement as a result of the injuries he sustained in Tikrit, Iraq in 2004. *See* Army Reg. 40-501, Chap. 3 (2006) (stating standards for medically unfitting conditions); Army Reg. 635-40 (detailing DES process). Read in concert with these standards, the Administrative Record in this case can only support the conclusion that Mr. LaBonte should have been medically retired prior to his separation from the Army in 2008. This Court possesses the authority to grant Mr. LaBonte backpay and medical retirement. *See* 28 U.S.C. 1491(a)(2) ("To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing . . . placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States."); *see also Ferrell,* 23 Cl. Ct. at 572 (ordering Air Force Board for Correction of Military Records to AFBCMR to "correct plaintiff's military records to reflect a disability discharge"); *Beckham*, 392 F.2d at 626 (holding that plaintiff is entitled to disability retirement pay and entering judgment to that effect); *Woodard v. United States*, 167 Ct. Cl. 306, 306 (1964) (directing military to provide retroactive disability retirement pay). In this case, the record is clear, and this Court should exercise its authority. If the Court does not take this action, it must,

at a minimum, order that Mr. LaBonte finally receive the full and fair DES processing afforded by DASA Blackmon's referral and that the Army consider Mr. LaBonte's record in its entirety, including his post-service medical and psychological evaluations.

If the Court determines that a remand is required, Mr. LaBonte respectfully requests that he be reentered into the DES process where he stood prior to Dr. Doane's abrupt intervention—at the MEB Approval Authority stage, after completion of his initial medical evaluations and production of the NARSUM. To ensure Mr. LaBonte receives a fair process, he must be provided unbiased review by a new Approval Authority. *Cf. Watson v. United States*, No. 12-785C, 2015 WL 4914966, at *3 (Fed. Cl. Aug. 17, 2015) (remanding for "an MEB not located at the Fort Gordon, GA Army installation," where plaintiff was initially processed due to concerns about the Fort Gordon Approval Authority's handling of plaintiff's case). Because his unsubstantiated memorandum is infected with bad faith, Dr. Doane can no longer provide the fair and neutral review that agency decisionmaking demands.

## CONCLUSION

A young Mr. LaBonte joined the Army as a military police officer, eager to follow in his father's footsteps. He served his country and developed significant PTSD, TBI, depression, and anxiety as a result. For too long, the Army has failed to provide Mr. LaBonte the medical retirement he earned through his service. The Court should correct this failure in ruling on the Administrative Record by granting Mr. LaBonte back pay and retroactive military retirement, or alternatively, by ordering to Army to complete Mr. LaBonte's disability evaluation process without bias.

Dated: October 25, 2019

Respectfully submitted,

/s/ Michael J. Wishnie

Julia M. Coppelman, Law Student Intern
Sam Davis, Law Student Intern
John Super, Law Student Intern
Renée A. Burbank, Supervising Attorney
Michael J. Wishnie, Supervising Attorney
Veterans Legal Services Clinic
Jerome N. Frank Legal Services Organization
Yale Law School[*]
P.O. Box 209090
New Haven, CT 06520-9090
t. (203) 432-4800
f. (203) 432-1426
renee.burbank@ylsclinics.org
michael.wishnie@ylsclinics.org
Attorneys for Plaintiff

---

[*] This brief does not purport to represent the views of Yale Law School, if any.