**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

_____

ROBERT J. LABONTE,               :

                       :

       PLAINTIFF,          :

                       :           **18-1784C**

      v.                  :      **(Judge Hertling)**

                       :

THE UNITED STATES,       :

                       :

       DEFENDANT.      :

_____

# SUPPLEMENTAL ADMINISTRATIVE RECORD

# PAGES
# 2376 - 2485

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **ROBERT J. LABONTE,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 18-1784C |
| | ) | (Judge Hertling) |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## INDEX TO THIRD SUPPLEMENTAL ADMINITRATIVE RECORD

| **Document Name/Description** | **Page** |
|---|---|
| Letter from Director, Army Board for Correction of Military Records (ABCMR) to Mr. Robert J. Labonte, Reference: Decision on AR2018001156, April 29, 2020 | 2369 |
| Memorandum from ABCMR to Army Review Board Agency (ARBA), Case Management Division, Reference: Decision on AR20180011561, April 29, 2020 | 2370 |
| ABCMR Record of Proceedings, April 29, 2020 | 2371 |
| Response letter from Mr. LaBonte's counsel, Ms. Renee Burbank to ARBA, Reference: Advisory Opinion from OTSG, April 20, 2020 | 2415 |
| E-Messages from ARBA  to Mr. LaBonte's counsel MS. Renee Burbank, Reference: Advisory Opinion from OTSG, April  7, 2020 | 2428 |
| Letter from ARBA to Mr. Robert J. Labonte, Reference:  In your case the board received an advisory opinion from the Office of the Surgeon General.  Your application has been placed on hold for 30 days to allow you the opportunity to submit comments on the advisory opinion April 7, 2020 | 2430 |

1

| **Document Name/Description** | **Page** |
|---|---|
| Memorandum from OTSG for ABCMR, Reference: Advisory Opinion concerning Robert J. LaBonte Jr., April 3, 2020 | 2431 |
| Memorandum for Record, April 1, 2020 | 2432 |
| Memorandum from ARBA for Office of the Surgeon, Reference: Mr. Robert J. Labonte Jr., application request please furnish a comprehensive advisory opinion, January 17, 2020 | 2433 |
| Order, United States Court of Federal Claims, Robert J. LaBonte Jr. v. United States, No. 18-1874C, December 3, 2019 | 2435 |
| Complaint, United States Court of Federal Claims, Robert J. LaBonte Jr., v. United States, No. 18-1874C, November 30, 2018 | 2437 |
| Letter from Robert J. Labonte Sr. to the Deputy Assistant Secretary of Army (Review Boards), reference the ABCMR Decision pertaining to Robert J. Labonte Jr., October 15, 2018 | 2463 |

# United States of America



## DEPARTMENT OF THE ARMY

| | |
|---|---|
| Washington, DC | 4 June 2020 |
| PLACE | DATE |

I HEREBY CERTIFY that the attached constitute true and accurate copies of files pertaining to Robert J. LaBonte Jr., a former member of the United States Army.  Copies of documents from the Army Review Boards Agency, Army Board for Correction of Military Records (ABCMR) are maintained in Arlington, Virginia; a copy of the Army Military Human Resource Record (AMHRR), is maintained by the U.S. Army Human Resources Command located at Fort Knox, Kentucky.  The original personnel records and copies of other records are in the official temporary custody of the Military Personnel Litigation Branch, Litigation Division, Office of the Judge Advocate General of the Army.

GOWEL.JOHN.JOS   Digitally signed by
EPH.1014211060   GOWEL.JOHN.JOSEPH.1014211060
Date: 2020.06.05 11:14:15 -04'00'

JOHN J. GOWEL
Lieutenant Colonel, U.S. Army
Chief, Military Personnel Litigation Branch

Supplemental Administrative Record - Pages 002369 002485

I HEREBY CERTIFY that Lieutenant Colonel John J. Gowel, who signed the foregoing certificate, is the Chief, Military Personnel Litigation Branch, Litigation Division, Office of the Judge Advocate General of the Army, and that full faith and credit should be given to his certification.

IN TESTIMONY WHEREOF I, ___Kathleen S. Miller___

The Administrative Assistant to the Secretary of the Army, have hereunto caused the seal of the Department of the Army to be affixed this ___4th___ day of

___June___ ___2020___

By ___EMANUEL.JACQUELIN___   Digitally signed by
   ___E.LUCIA.1026566106___   EMANUEL.JACQUELINE.LUCIA.1026
                             566106
                             Date: 2020.06.05 14:03:09 -04'00'
*Administrative Assistant.*

**JACQUELINE L. EMANUEL**
**Colonel, U.S. Army**
**Chief, Litigation Division**

DA FORM 4, FEB 1998        EDITION OF 1 MAR 66 IS OBSOLETE        APD PE-v1.10



**DEPARTMENT OF THE ARMY**
ARMY BOARD FOR CORRECTION OF MILITARY RECORDS
251 18TH STREET SOUTH, SUITE 385
ARLINGTON, VA  22202-3531

April 29, 2020

AR20180011561, LaBonte, Robert J.

Mr. Robert J. LaBonte Jr
*Redacted PII*

Dear Mr. LaBonte:

Pursuant to your request for reconsideration of the Army Board for Correction of Military Records (ABCMR) Docket Number AR20160000403, which was considered and denied by the Board on 19 October 2017.  I regret to inform you that the Board denied your request for relief. A copy of the Board's Record of Proceedings which explains the Board's reasons for denying your request is enclosed.

The decision in your case is final and final action has been directed in this matter under the provisions of Section 1552 of Title 10, United States Code and Army Regulation 15-185.

Sincerely,

X _____

Dennis Dingle
Director
Signed by: DINGLE.DENNIS.WILLIAM *Redacted PII*

Enclosure

Printed on ♻ Recycled Paper



**DEPARTMENT OF THE ARMY**
ARMY BOARD FOR CORRECTION OF MILITARY RECORDS
251 18TH STREET SOUTH, SUITE 385
ARLINGTON, VA  22202-3531

SAMR-RBA                                                                              29 April 2020

MEMORANDUM FOR Army Review Boards Agency, Case Management Division,
251 18th Street South, Suite 385, Arlington, VA 22202-3531

SUBJECT:  Army Board for Correction of Military Records Record of Proceedings
for LaBonte, Robert J., SSN ~~Redacted PII~~ AR20180011561

The application submitted by the individual concerned has been denied by the Army
Board for Correction of Military Records.

BY ORDER OF THE SECRETARY OF THE ARMY:

Encl                                                            X _____
                                                               Dennis Dingle
                                                               Director
                                                               Signed by: DINGLE.DENNIS.WILLIAM ~~Redacted PII~~

CF:
( ) OMPF

Printed on ♲ Recycled Paper

<u>ARMY BOARD FOR CORRECTION OF MILITARY RECORDS</u>

<u>RECORD OF PROCEEDINGS</u>

IN THE CASE OF:  LaBonte, Robert J.

BOARD DATE:  29 April 2020

DOCKET NUMBER:  AR20180011561

<u>APPLICANT REQUESTS:</u>  the following through Counsel:

- reconsideration of his prior request for physical disability retirement with a disability rating of at least 80 percent
- approval of all benefits, allowances, and back-pay associated with retroactive physical disability retirement
- payment of his legal fees

<u>APPLICANT'S SUPPORTING DOCUMENTS CONSIDERED BY THE BOARD:</u>

- United States Court of Federal Claims, Case Number 18-1784C, Remand, filed 3 December 2019
- United States Court of Federal Claims, Complaint, Case Number 18-1784C, filed November 2018
- U.S. Department of the Army, Administrative Record Index, dated 18 March 2019, containing in excess of 92 documents on numbered pages 000001 – 001770
- U.S. Department of the Army, Administrative Record Index, dated 26 September 2019, containing in excess of 29 documents on numbered pages 001771-002264
- U.S. Department of the Army, Administrative Record Index, dated 4 October 2019, containing in excess of 20 documents on numbered pages 002265-002368

<u>FACTS:</u>

1.  This case comes before the Army Board for Correction of Military Records (ABCMR) on remand and stay of proceedings ordered by the U.S. Court of Federal Claims and issued by the Court on 3 December 2019 in Civil Action Number 18-1784C.  In support of this order, the Court states the following:

   a.  The Court held oral arguments on the pending motions on 3 December 2019. For the reasons set out orally on the record of the hearing, except as to one claim, the complaint is dismissed for want of jurisdiction due to the applicant's conviction by court-martial.

1

ABCMR Record of Proceedings (cont)                    AR20180011561

   b.  With respect the applicant's claim he should have been considered for medical retirement before being convicted by a court-martial, the Court preliminarily finds it has jurisdiction because the ABCMR considered this claim on the merits.  In the event the case returns after remand, the Court will allow the defendant, the Army, to reassert its jurisdictional defense to this claim.

   c.  Because the ABCMR relied on a medical opinion that failed to consider medical evidence as required by Title 10, U.S. Code, section 1552 (h)(2)(B), its decision to reject the applicant's claim for medical retirement is contrary to law.

   d.  Accordingly, a decision on the cross-motions for judgment on the administrative record is deferred on this one claim.  The decision of the ABCMR to reject the claim for medical retirement is vacated and the case is remanded to the ABCMR for a period not to exceed 4 months, until 26 March 2020, so the ABCMR may obtain a further medical opinion that considered the medical evidence as required by law and thereafter resolve the applicant's claim.  The parties shall file a Joint Status Report within 14 days of the decision of the ABCMR on remand, advising as to what further proceedings may be necessary and proposing a schedule for them.  The case is stayed during the pendency of the proceedings on remand and until further order of the Court.

2.  Incorporated herein by reference are military records which were summarized in the previous consideration of the applicant's case by the Army Board for Correction of Military Records (ABCMR) in Docket Number AR20160000403 on 19 October 2017.

3.  Counsel states:

   a.  The applicant is a U.S. Army veteran who served his country honorably from 2003 to 2008, at the height of the Iraq war.  He joined the Army, pledging to fight for his country when he was 18 years old.  While in Iraq, he participated in heavy combat and witnessed gruesome violence.  In 2004, he fell 30 feet from a guard tower, where a fellow Soldier found him unconscious with his head bleeding profusely.  Because of his service, the applicant suffered a traumatic brain injury (TBI), post-traumatic stress disorder (PTSD), and other debilitating injuries.

   b.  After his return home from Iraq, the applicant unsuccessfully sought help from superiors in his chain of command and from military mental health resources.  The Army should have recognized his service-connected injuries and granted him a medical retirement.  Instead, as a result of misconduct arising from his undiagnosed, untreated TBI and PTSD, the Army court-martialed the applicant and separated him with a bad conduct discharge (BCD).

   c.  Nearly a decade later, the ADRB upgraded the applicant's discharge to general, under honorable conditions; however, that upgrade did not do enough.  The applicant

2

was denied access to retirement pay and associated health benefits. Therefore, in 2015, the applicant applied to the ABCMR to correct his record to show medical retirement vice discharge due to court-martial. As a result, the Deputy Assistant Secretary of the Army (Review Boards) directed the Office of the Surgeon General (OTSG) to determine if the applicant should have been retired or discharged by reason of physical disability through the Integrated Disability Evaluation System (IDES).

d. Subsequently, the Army began processing the applicant through the DES. The applicant submitted medical records and other evidence documenting his pre-discharge health conditions. Two Army physicians examined him and both concluded he met the threshold for medical retirement. But rather than completing the DES process, the Army abruptly terminated it. The ABCMR reversed course and simply denied the applicant's claim, basing its decision on the cursory and incorrect opinion of a single, unqualified Army physician, whom Army personnel themselves referred to as "[Dr.] D____ (Denies Everything)."

e. The Army's rejection of the applicant's claim for medical retirement status was arbitrary, capricious, unsupported by the evidence, contrary to the Army's own rules, and in violation of the Due Process Clause of the Fifth Amendment. The applicant respectfully asks the Court to hold the Army's decision unlawful, grant his medical retirement, and award him the back-pay to which he is entitled.

f. The Secretary of each military branch may retire a service member with disability retirement pay upon determining the service member is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay. The Department of Defense established the DES to determine if the service member is unfit for further military service due to a medical condition or physical defect, per Department of Defense Instruction (DoDI) 1332.18 and Department of Defense Memorandum (DoDM) 1332.18. The Army guidance pertaining to this system is contained in Army Regulation 635-40 (Disability Evaluation for Retention, Retirement, or Separation) and Army Regulation 40-501 (Standards of Medical Fitness). The DES process consists of three main steps, the Medical Evaluation Board (MEB), the Physical Evaluation Board (PEB) and final disposition by the Secretary.

g. The MEB is comprised of two or more physicians. One physician serves as the MEB approving authority, who must have detailed knowledge of regulations pertaining to standards of medical fitness and disability separation processing. When an MEB is considering a psychiatric diagnosis, such as PTSD, the MEB will include a psychiatrist or clinical psychologist with a doctoral degree in psychology, who may also substitute for the second MEB physician member. A member of the MEB also prepares a NARSUM of the Soldier's history, present status and medical conditions, which is the heart of the MEB. After the Board has made its decision, it will recommend the case file be forwarded to a PEB for a fitness determination when the MEB finds that one or more

002373

of a Soldier's medical conditions individually or collectively do not meet medical retention standards.  Upon receiving the MEB's decision, the Soldier may elect to concur with the MEB decision, request an impartial medial review by a physician independent of the MEB, or submit a written rebuttal of the MEB findings.

   h.  Following the MEB, the second step of the DES process is a PEB.  Upon referral from the MEB, all cases are initially adjudicated by an Informal PEB (IPEB).  The IPEB determines the Soldier's fitness for purposes of retention, separation, or retirement for disability based on a documentary review of the Soldier's case file.  A Soldier wo disagrees with the IPEB's findings may appeal by requesting a Formal PEB or submitting a written rebuttal.  The final step in the DES process is a final disposition by the Secretary of the Military department concerned.  This disposition constitutes the final decision as to whether or not the Soldier is eligible to be retired or discharged by reason of physical disability.

   i.  Around November 2002, the applicant enlisted in the Army at the age of 18 in the military occupational specialty (MOS) 95B (Military Police (MP)), where he hoped to fulfill his dream of becoming a police officer like his father while protecting his country and continuing a family tradition of military service.  He completed basic combat training (BCT) at Fort Leonard Wood, MO and was initially stationed at Fort Hood, TX.  He excelled during training, becoming a squad leader and representing his unit as the guidon carrier and carrying the phase banner at graduation.

   j.  In September 2003, he deployed to Tikrit, Iraq where he had two main duties on Forward Operating Base (FOB) Ironhorse, to provide security on patrols as a turret gunner on an unarmored Humvee and to serve as a prison guard at a containment facility.  In Tikrit, he manned the guard towers and watched over enemy prisoners of war at the containment facility, where he was a frequent target of mortar, small arms fire, and rocket attacks.

   k.  As a turret gunner, the applicant's unit traveled outside the FOB Ironhorse gate almost every day.  The enemy frequently targeted the applicant and his unit, which engaged in several firefights with insurgent groups.  Their vehicles often encountered improvised explosive devices (IEDs), which severely injured his fellow Soldiers and Iraqi civilians.

   l.  On or about 23 January 2004, the applicant witnessed a disturbing death.  He was guarding a convoy when a man stepped out in front of the convoy's trucks, was hit by a truck, and flew through the air.  The convoy stopped and the applicant saw the man lying in a puddle of water with a confused look on his face.  The man's head then suddenly started gushing blood, which the wind picked up and sprayed everywhere.  The person in charge of the convoy feared the man had killed himself so the convoy

002374

would stop and expose itself to attack.  He therefore ordered the convoy to move out without helping the man.

m.  On or about 6 February 2004, near the end of his deployment, the applicant fell from a 30-foot guard tower.  He lost consciousness and has no memory of what caused his fall.  His friend and fellow MP, B_____ D_____ , found him face down and unconscious in a pool of blood near the base of the tower.  B_____ D_____, a trained medic, helped rouse the applicant and, at the order of a noncommissioned officer (NCO), helped him to the bathroom.  B_____ D_____, was surprised by the amount of blood from the applicant's injuries and took a photograph to document his facial gash and extreme bleeding.  Shortly afterward, the applicant began rambling incoherently and B_____ D_____ took him to the FOB Ironhorse medical aid center.

n.  At the medical aid center, the applicant received stitches, but no other medical treatment.  Sergeant (SGT) J_____ M_____ stated he saw the applicant both before and after the fall and noticed the new gash on his face.  The applicant explained to him he had fallen from the guard tower.  The applicant also sent an America Online (AOL) message to his family to let them know about the injury.  Apart from the photo taken by B_____ D_____, SGT M_____'s statements, the applicant's AOL message and numerous photos of the applicant taken before and after the fall, his official military treatment records contain no documentation of his fall or treatment at the aid station.

o.  Following his head injury, the applicant became markedly more depressed and anxious.  He had significant difficulty sleeping, experienced constant nightmares, and woke up throughout the night panicking.  As a result of his fall, the applicant also began to experience back pain and severe headaches.  Army medics provided him over-the-counter painkillers and he began taking 16 to 20 painkillers daily.

p.  The applicant's combat tour ended on or about 5 April 2004.  Between April and June 2004, when he returned to Fort Hood, TX, he repeatedly told his chain of command about the symptoms he was experiencing, including increased mental distress due to the traumatic events he witnessed in Iraq.  He explained that he felt both physically and mentally unable to continue serving.

q.  He shared his concerns with his company commander, Captain (CPT) M_____, his platoon sergeant, SGT M_____, and several other NCOs.  The applicant's parents also called SGT M_____ and other members of their son's chain of command several times to plead with the Army to provide their son with the medical attention he needed.  His chain of command told him to toughen up and to tell his parents to stop calling.  Instead of referring him for evaluation and treatment, his chain of command sent him to speak with a Chaplain.  The applicant explained to the Chaplain that he did not feel he was able to continue serving.  The Chaplain likewise did not refer him for medical care.

5

ABCMR Record of Proceedings (cont)                    AR20180011561

   r.  After his return to Fort Hood, TX, he believed he could not handle life in the Army
any longer.  On two separate occasions around June 2004, he drove his car off base,
each time for only a few hours.  The second time, he missed formation and an NCO
called him, promising that he would receive help if he returned to base.  Instead, when
the applicant returned to base, CPT M_____ placed him on barracks restriction and
threatened he could be executed for being absent without leave (AWOL).

   s.  On 30 June 2004, shortly after his barracks restriction ended, the applicant
sought help at the Fort Hood Mental Health clinic during walk-in hours.  On the clinic's
intake form, the applicant noted he was experiencing poor and disrupted sleep,
excessive anxiety, rapid breathing, rapid heartbeat, decreased appetite, frequent crying,
racing thoughts, and difficulty controlling worry.  He wrote he was seeking help because
he was depressed and could not take military life away from home.  He answered the
form's question about what result he desired from his clinic visit by writing he wanted his
chain of command to realize he needed to be separated from the Army immediately.
Specialist (SPC) J_____ K_____, an enlisted mental health specialist, evaluated the
applicant and his notes state the applicant was feeling anxious, getting only 5-hours of
restless sleep, had decreased appetite, and felt hopeless and trapped about his
situation in the military.

   t.  In 2004, his unit disbanded and he joined a new unit that was deploying to Iraq.
He immediately told his new chain of command he was not physically or mentally ready
to deploy for a second time, reporting severe symptoms including panic attacks.  His
new chain of command did not refer him for medical evaluation and informed him he
would have to deploy again.

   u.  Shortly before his unit's scheduled deployment in November 2005, the applicant
went home to Connecticut on emergency leave for his grandfather's funeral.  When he
arrived at the airport to board his return flight to TX, he found himself unable to return to
his impending deployment and instead remained at his parents' home for about 6
months.  In May 2006, after he was able to bring himself to return to base, he sought
help from the new chain of command at Fort Hood; however like his previous chains of
command, they did not refer him for evaluation or treatment.

   v.  Instead, on 9 June 2006, he received nonjudicial punishment (NJP) under Article
15 of the Uniform Code of Military Justice (UCMJ) for being AWOL, wherein his rank
was reduced to private first class (PFC).  He was also instructed to prepare for
deployment.  On 11 September 2006, over 3 months after the applicant had returned to
base, Major (MAJ) P_____ W_____ charged him with desertion, despite his previous NJP.

   w.  The applicant's court-martial took place on 23 October 2006.  At that time, he
continued to suffer from symptoms of his undiagnosed and untreated PTSD,
depression, and TBI.  He followed the advice provided to him by the defense counsel

002376

and pled guilty to the charge and highlighted marital problems as the main source of his stress. He was sentenced to reduction in rank/grade to private/E-1, forfeiture of $849 pay per month for 4 months, 4 months confinement at Fort Sill, OK, and a BCD. The BCD made him ineligible for Department of Veterans Affairs (VA) and nearly all other post-service care and benefits.

x. After his Army separation, he struggled with the symptoms of his undiagnosed PTSD and TBI and the stigmatizing effects of his BCD. He was unable to retain employment because his debilitating symptoms made it difficult for him to perform basic professional tasks. He repeatedly made impulsive financial and personal decisions that were entirely out of character with his pre-service personality. His relationship with his family and his then-wife deteriorated as he increasingly withdrew from the outside world.

y. Because the Army repeatedly told him he was healthy, the applicant convinced himself there was no medical cause for his distress. This added to his sense of despair and belief he was weak for being unable to cope with the war. Even if he had sought medical help, it would have been difficult for him to obtain because of the BCD. He did not have access to medical benefits, to include Tricare, that help transition traumatized veterans back into civilian life.

z. After continuing to suffer, in 2012, his father convince him to see Dr. M____ H____, a clinical psychologist in Glastonbury, CT. Dr. H____ diagnosed the applicant with service-connected PTSD. Dr. H____ also evaluated the intake form and notes from the applicant's visit to the Fort Hood Mental Health Clinic in June 2004 and concluded that at the time of this visit the applicant was a highly compromised individual who should have been referred for treatment as well as an evaluation for psychiatric medication.

aa. In March 2014, Dr. B____ L____, Assistant Clinical Professor of Psychiatry at Yale University School of Medicine and the director of the Violence and Health Study Group at Yale University, evaluated the applicant and diagnosed him with service-connected PTSD. In August 2015, Dr. S____ R____, a neurologist with over 25 years of experience, evaluated the applicant and diagnosed him with a TBI. Dr. R____ conclude the applicant suffered a severe concussive injury and at least a moderate TBI when he fell from the guard tower. He explained that the applicant's motor activity was impaired because his central nervous system was damaged by the fall. His left hemisphere showed subtle signs of damage from his TBI and that his severe, persistent migraine headaches were causally related to the original TBI caused by the fall from the guard tower.

bb. After being diagnosed with PTSD the applicant began to come to terms with the extent to which his medical conditions had contributed to his struggles both in the Army and after his discharge. At the encouragement of his father, the applicant sought formal

002377

review of his service history and post-discharge benefits.  In January 2014, the VA determined the applicant's service was honorable for the purpose of obtaining VA benefits and relied in part on the symptoms he reported during his visit to the Fort Hood Mental Health Clinic in 2004.  The VA determined the applicant's service-connected disabilities were PTSD, TBI, depression, headaches, back pain, tinnitus, painful scar, and ulcers.

cc.  In September 2014, the applicant applied to the ADRB and his discharge was upgraded his discharge to general, under honorable conditions.  The ADRB concluded the overall length and quality of his service, combat tour in Iraq, and PTSD were mitigating factors for his misconduct.  The ADRB further concluded that if he had a diagnosis of PTSD and TBI this would have been mitigating at his court-martial and would have led to a more lenient sentence.

dd.  On 17 November 2015, the applied to the ABCMR requesting retroactive honorable physical disability retirement, removal of reference to court-martial on his DD Form 214 (Certificate of Release or Discharge from Active Duty), and addition of his service accomplishments to his DD Form 214.

ee.  On 29 September 2016, the VA increased his combined service-connected disability rating to 100 percent, based on ratings of 70 percent for PTSD, 70 percent for TBI, 50 percent for headaches, 20 percent for gastric ulcers, 20 percent for convergence insufficiency with accommodative disorder and photosensitivity, and 10 percent for disfigurement of forehead scar.

ff.  On 19 October 2017, the ABCMR granted the applicant partial relief.  His DD Form 214 was corrected to reflect his military accomplishments, including awards and education, but his character of service was not upgraded nor was reference to court-martial conviction removed.  As to his request for physical disability retirement, the ABCMR concluded that based on the applicant's post-service medical evidence, he may have met the criteria for referral to the DES at the time of his separation.  On 27 November 2017, the Deputy Assistant Secretary of the Army (Review Boards) directed the referral of the applicant's case to the OTSG to determine if he should have been retired or discharged by reason of physical disability through the IDES.

gg.  Although he was referred to the IDES, he was processed through the legacy DES because Army regulations provide that the legacy process will be used for Army veterans referred by the ABCMR.  Unlike the IDES, the DES uses military instead of VA physicians to evaluate fitness for military duty at the time of separation and does not interact with the VA system.

hh.  After the applicant's referral to the DES process, the applicant was assigned a Physical Evaluation Board Officer (PEBLO), Ms. V____ R____, with the West Point

002378

ABCMR Record of Proceedings (cont)                                          AR20180011561

Keller Army Community Hospital.  In an email, the PEBLO explained the applicant had been referred to their officer for a MEB as part of the ABCMR decision and she requested the applicant provide a memorandum describing his extensive post-separation medical records.

    ii.  As part of the DES, the applicant was evaluated by two Army medical providers, MAJ K____ C____, a licensed clinical social worker and activated U.S. Army Reservist at West Point, NY, and Dr. L____ L____, and MEB physical at West Point, NY.  MAJ C____ concluded after evaluation on 20 March 2018, that the applicant was experiencing PTSD, depression, anxiety, and mild (m) TBI symptoms after his deployment from Iraq in 2004 and these symptoms interfered with his sleep, appetite, concentration, focus, energy, and ability to perform his duties.  MAJ C___ also noted no family history of mental health issues and the applicant did not exhibit these symptoms prior to Iraq deployment in 2003.  On 2 April 2018, Dr. L____ evaluated the applicant and completed his MEB NARSUM, which states the applicant's PTSD, generalized anxiety disorder, major depressive disorder and TBI did not meet medical retention standards at the time of his separation from the Army and that he was not deployable outside the U.S.

    jj.  The applicant's DA Form 3947 (MEB Proceedings) was partially completed on 2 April 2018, stating the applicant's PTSD, generalized anxiety disorder, and mTBI were service-connected and did not meet the retention standards of Army Regulation 40-501 at the time of his separation.  Consistent with Army Regulation 635-40, paragraph 4-11 (a)(2), the form was signed by the provider who completed the NARSUM, Dr. L____ and Dr. J____ M____, a clinical psychologist with a doctoral degree in psychology.  The form also lists Colonel (COL) L____ D___ of West Point, NY as the MEB Approval Authority.

    kk.  On 3 April 2018, the PEBLO contacted Dr. E____ D____, the Senior MEB Physician at Ford Gordon, GA, asking him to sign the applicant's MEB as the approval authority.  The PEBLO contacted Dr. E____ D____ despite the fact the applicant's MEB was being processed at West Point and his DA Form 3947 properly lists COL D____ as the West Point approval authority.

    ll.  Dr. E____ D____ graduated from Kansas City University of Medicine and Biosciences, College of Osteopathic Medicine in 1983 and completed a residency in Family Practice at Fort Belvoir, VA, in 1986.  Dr. D____ is a family medicine specialist.  According to the Georgia Composite State Board of Medical examiners, Dr. D____ reports he does not hold certifications from any mental health or neurological field or sub-specialty.

    mm.  Dr. D____ responded to the PEBLO on 4 April 2018 stating he cannot sign the DA form 3947 as the ABCMR directed the determination of whether DES processing

002379

was warranted at the time of separation and clearly it was not warranted. He further stated the applicant cannot come back years later after receiving VA ratings and now demand that he should have been put through the MEB. Dr. D____ did not refer to the NARSUM, the applicant's post-separation medical records or the order to refer the applicant to the IDES process.

nn. In response, and at the PEBLO's request, the applicant's Counsel sent a letter explaining that after returning from Iraq, the applicant repeatedly sought help from his superiors and the Fort Hood Mental Health Clinic, but that the Army failed to properly diagnose or treat his injuries while he was in service. The PEBLO forwarded this letter to Dr. D____ on 12 April 2018, along with the applicant's pre and post discharge medical records, the ABCMR decision and the order to refer him to the IDES. The PEBLO also stated she attached an email form J___O_ F____, DES Consultant at the OTSG directing them to do the MEB. After receipt, Dr. D____ replied that was amazing and added he was still not convinced they were being forced to do DES processing on the applicant, to which the PEBLO responded she understood the directive to require the conducting of an MEB.

oo. On 20 April 2018, C____ C____ Chief of Patient Administration Branch for Keller Army Community Hospital wrote to Dr. D____ and the PEBLO stating if there was still an issue with signing the MEB to let her know and they would have COL D____ do the review. Dr. D____ responded there is clearly no basis for the applicant requiring an MEB prior to his separation. The applicant's MEB Counsel referred to Dr. D____ as Dr. E____ D____ (Denies Everything)."

pp. On 7 May 2018, the PEBLO told the applicant she had spoken with the OTSG and that Dr. D____ would not be permitted to not sign the MEB, although he could disagree with the NARSUM, the board was going to proceed like any other board and can't just be stopped/not signed by the approving authority. On 15 May 2018, Dr. D____ sent a memorandum to Ms. C____ at Keller Army Community Hospital denying the applicant an MEB, even though the MEB had already begun and the NARSUM had been completed. On 21 May 2018, the PEBLO informed the applicant that Dr. D____ had unilaterally denied the applicant access to the MEB and informed him he would not be permitted to appeal this decision through the regular DES channels.

qq. The Dr. D____ memorandum fails to reference any of the evidence provided by the applicant or produced by the Army during its review of his case, including medical examinations conducted by the Army, VA and independent physicians, the NARSUM, contemporaneous communications documenting his symptoms during his time in service, sworn affidavits by members of his family and colleagues, and determinations that he suffers from service-connected PTSD or TBI.

rr.  Dr. D_____'s memorandum also contains numerous significant factual errors.  For example it states the applicant contents he should have been found unfit for duty at the time of separation in March 2008 because he currently has a 90 percent disability rating from the VA.  This is incorrect, as the applicant has a 100 percent VA disability rating, and it was never argued he is entitled to a disability rating simply because of his VA rating.  Dr. D_____ also states the applicant was in good health with no physical limitations throughout his time in the Army, but the Army diagnosed him with adjustment disorder in 2004 based on symptoms he reported to the Fort Hood Mental Health Intake physician.  Although this erroneous diagnosis failed to identify his PTSD, it demonstrates he was not in good health.

ss.  Dr. D_____ also claims there is no documentation of the applicant's fall from the guard tower or subsequent head bump, but this is also incorrect.  The applicant provided a photograph of him bleeding profusely from his head on the night he fell from the guard tower and provided sworn affidavits from B_____ D_____ stating he found the applicant unconscious near the guard tower, bleeding profusely and rambling incoherently and SGT J_____ M_____ saying he was the applicant with a stitched up gash on his forehead.  Additionally, his service-connected TBI has no suggested alternative sources for his symptoms other than his fall from the guard tower in Tikrit.

tt.  Dr. D_____ also states the applicant was still Tricare eligible from the time he left the military until August 2010 and because he did not seek treatment for his condition he apparently was not in need of any healthcare during this period, which supports the finding he was not in need of disability processing at the time of separation from the Army.  The applicant was not Tricare eligible upon is separation because he received a BCD as a result of court-martial.

uu.  Dr. D_____ states the scar that the applicant allegedly received from his fall was also noted in his 2002 Military Entrance Processing Station (MEPS) induction physical examination.  This is incorrect because the scar noted on the MEPS induction physical examination is a different scar than the one incurred after his fall from the guard tower in Iraq.  The VA recognized the difference when it rated the applicant's painful scar as service-connected.

vv.  On 21 June 2018, the ABCMR denied the applicant's claim for physical disability retirement.  Because he did not receive the DES processing to which he was entitled at the time of his discharge, the June 2018 decision was the first time any competent military board had denied the claim in a final decision.  In its denial, the ABCMR relied solely on Dr. D_____'s memorandum, which did not cite any of the medical records produced subsequent to the applicant's discharge or any to the contemporaneous records attesting to his symptoms.

002381

ww.  On 9 August 2018, the applicant submitted a request for reconsideration of his prior denial to the ABCMR.  In support of his reconsideration, the applicant submitted extensive medical evidence documenting his pre-discharge PTSD and TBI.  On 7 September 2018, the ABCMR denied his request for reconsideration.

xx.  The ABCMR's decision denying the applicant medical retirement was arbitrary, capricious, unsupported by substantial evidence, contrary to law, and an abuse of discretion.  The decision was arbitrary and capricious because it was not based on substantial evidence.  In adopting and relying solely upon Dr. D____'s memorandum, the Board failed to acknowledge, much less consider, the extensive medical evidence of PTSD, TBI, and other injuries arising from his service.

yy.  Moreover, the Board incorrectly concluded the applicant did not suffer from any physical or psychological impairment before his discharge, despite contemporaneous documentation of his injuries, his improper diagnosis of adjustment disorder at an Army medical facility, and the conclusion of the Deputy Assistant Secretary of the Army (Review Boards) that his service-connected injuries warranted referring him to the DES.  The Board erred by relying upon a highly selective, factually incorrect, and incomplete analysis of the applicant's records.  The ABCMR failed to give due consideration to the applicant's arguments in his request for medical retirement.  By fundamentally mischaracterizing his claim and record of evidence, the Board failed to address his arguments and provide substantial evidence supporting its conclusion that he was not entitled to medical retirement.

zz.  The ABCMR also failed to articulate and apply the legal standards under which the applicant's conditions were evaluated.  The Board did not refer to a single DoD or Army regulation establishing the standards for medical retention and referral to an MEB.  The Army further violated its own procedures in process the applicant's DES referral.  Dr. D____ acted contrary to DoD instructions and Army regulations by unilaterally terminating the DES process.  No DoD instruction or Army regulation grants one MEB physician, acting as approving authority, the authority to halt the MEB process without issuing a decision and allowing an opportunity for an independent medical review and/or rebuttal.

aaa.  Dr. D____ was unqualified to serve as an approving authority as he lacked the required medical training and experience in mental health or neurology.  He did not provide substantial evidence supporting his decision to override the opinions of the multiple expert neurological and mental health professionals who previously evaluated the applicant and found him unfit for military duty.  His actions and statements demonstrate that he acted in bad faith in adjudicating the applicant's claim.  Upon receiving the case, Dr. D____ pre-judged the outcome and immediately expressed his displeasure.  Rather than cooperate in the legally-mandated procedure for processing

002382

medical retirement claims, he expressed his disbelief that the Army had referred the applicant's case to him.

bbb.  The record Dr. D_____ encountered was lengthy and complicated and rather than attempt to resolve this complexity, he failed to so much as consider the evidence in the medical records.  Dr. D_____ dismissed the applicant's claim by implying that he never feel from a guard tower in Iraq.  Dr. D_____ did not engage in a judicious weighing of the evidence.  Instead, he ignored the evidence entirely and arrived at a conclusion based on a reasoning that did not meaningfully engage with the underlying record.  Dr. D_____'s unwillingness to provide fair, honest, and unbiased evaluations is apparently so well known to Army personnel that at least one official has referred to him as "Dr. D___ (Denies Everything)."

ccc.  The Due Process Clause of the Firth Amendment to the U.S. Constitution provides that '[n]o person shall be deprived of life, liberty, or property, without due process of law."  Military disability retirement status and its corresponding benefits are a statutorily granted property interest within the meaning of the Fifth Amendment.  At a minimum, procedural due process requires notice and an opportunity to be heard prior to deprivation of life, liberty, or property.  The Due Process protections of the Fifth Amendment also require that an administrative agency conduct adjudications in a fair and orderly manner.  The Army violated the applicant's Due Process rights by prematurely terminating the DES process and prohibiting the applicant from accessing the DES or MEB appeal procedures, based solely on a cursory, factually erroneous, and legally incorrect memorandum by Dr. D_____, who lacks training and expertise in mental health and neurology and acted in bad faith.

ddd.  The applicant requests the applicant be granted physical disability retirement with a disability rating of at least 80 percent for PTSD and TBI, all associated back-pay and allowances, payment of his legal fees, and any other relief deemed just and proper.

4.  A DD Form 2808 (Report of Medical Examination), dated 14 November 2002, shows the applicant underwent a medical examination on the date of the form for the purpose of enlistment.  Item 37 (Identifying body marks, scars, tattoos) shows the applicant had several tattoos on his body as well as a scar on his forehead.  His prior left knee surgery is also annotated on the form.  He was found qualified for service with a physical profile rating of "1" in all categories.

5.  The applicant enlisted in the Regular Army on 2 April 2003 at the age of 18 and was awarded the MOS 95B.

6.  He deployed in support of Operation Iraqi Freedom with duty in Iraq from 1 October 2003 through 31 March 2004.

002383

ABCMR Record of Proceedings (cont)                                    AR20180011561

7.  Counsel provided copies of instant messaging between the applicant and his parents dated between 21 and 26 January 2004, while he was in Iraq.  The applicant tells of working VIP missions guarding Members of Congress, being picked up to work personnel security detail, and of his NCO asking him if he wanted to go out for Special Forces.  At his mother's prompting if he's eating and sleeping ok and happy, he responds they never eat or sleep and he's not happy.  Among other topics of discussion are the arrest of someone he knows back home, the Super Bowl, his high school wrestling team, his father's gout, looking forward to leaving Iraq in March, and his receipt of various packages from friends and family.

8.  A message from the applicant to his parents, dated 7 February 2004 states, "hey i kinda got hurt last night. ill call and tell u the details on the phone, im all good tho ill live peace the rob"

9.  Counsel provided a photograph of the applicant with blood on his face and hands.  The typed caption under the photograph states:  "Photo above is of [the applicant].  The photo was taken during the early morning hours of February 7, 2004 by fellow MP B_____ D_____.  The photo was taken at a holding facility in Tikrit, Iraq.  Shortly after the photo was taken, he was cleaned and his wound was stitched by medical personnel."

10.  There is no documentation in the applicant's military service or medical records, to include a Line of Duty Investigation, which makes reference to his 30 foot fall from a guard tower or any subsequent medical treatment for his resultant injuries, including stitches or bed rest.

11.  A Fort Hood Mental Health Intake Questionnaire, dated 30 June 2004, shows the applicant was self-referred.  He stated the reason he came in was because the military was causing him problems back home and he couldn't take being there or in the military any longer.  The results he desired from the clinic that day was to have his chain of command realize he needed to be separated out of the Army as soon as possible.

    a.  The psychological assessment shows the applicant checked on the form the behavior that was a problem for him as being recent AWOL and insubordination.

    b.  The applicant checked on the form the current symptoms that apply to him as being poor disrupted sleep, decreased appetite, excessive anxiety, rapid breathing, rapid heartbeat, crying a lot, racing thoughts, difficult to control the worry, decreased ability to have fun.

    c.  The applicant checked on the form the current feelings that applied to him were sadness, anxiety, rage, hopeless.

002384

ABCMR Record of Proceedings (cont)                    AR20180011561

d.  On the form, under "current danger to self or others", the applicant did not check any of the possible categories, which include suicidal thoughts, suicide plan, history of suicidal behavior, history of assaulting others, homicidal thoughts, plan to kill someone, or access to weapons.

12.  A Standard form 600 (Chronological Record of Medical Care), Mental Health Assessment Form shows:

a.  The applicant was a walk-in to the Department of Psychology on 30 June 2004, for a mental health assessment, stating his chief complaint was problems with the military.  He stated his girlfriend got pregnant and since he signed up 1 year ago he hasn't like the Army.  He experienced loss of friends back home and didn't have any friends where he was.  The separation from his pregnant girlfriend was a problem and he was AWOL two different times to go home and be with his girlfriend.  His main problem started two weeks ago.  He denied homicidal or suicidal thoughts.  He stated he was depressed and couldn't take military life away from home.  He was recently AWOL twice, once for 2 days and the second time for 1 day two weeks ago.

b.  He stated his signs and symptoms were anxious mood (felt that he needed to be home), low energy, 5 hours of restless sleep per night, no change in libido (good), decreased appetite (eats maybe 1 or 2 meals per day), felt hopeless and trapped about his situation in the military, had excessive worrying, palpitations, shortness of breath related to anxiety, and denied psychiatric history.

c.  For occupational problems he listed being AWOL twice.  He denied other stressors, violence or abuse and family psychological or medical history.  For his own past medical history he stated knee surgery (presumably his knee surgery while in high school).  He did not reference his fall from the guard tower, headaches, or TBI.  For social history he listed one child on the way and that he had a great relationship with his girlfriend and a good working relationship with the people around him.

d.  The mental status exam showed he was alert and oriented, was cooperative, behavior was within normal limits. His mood was anxious, affect congruent with mood, speech normal, thought process, concentration, insight, reliability, judgement were all deemed good.

e.  His listed diagnosis was adjustment disorder.  His plan did not involve referral, follow-up appointment, admission, or medication.  He was informed of the clinic walk-in hours and after duty hours of emergency services.  It is also annotated under his plan that he was to go to the legal office and ask about different separation chapters he could possibly receive.  He was informed that if he felt the need to come in and see someone that he should call and make an appointment.  The form is stamped with the name Specialist (SPC) J____ K____ 91X (Mental Health Specialist).

002385

ABCMR Record of Proceedings (cont)                          AR20180011561

13. A Department of Psychology, Treatment/Intervention Summary, shows his total amount of sessions was one on 30 June 2004 where he was diagnosed with adjustment disorder.

14. A DA Form 7425 (Readiness and Deployment Checklist), dated 2 November 2005, shows the applicant was deemed a "go" for deployment in all items of the medical category

15. A DD Form 2795 (Pre-Deployment Health Assessment), signed by a medical doctor on 7 November 2005, shows the applicant was examined for the purpose of assessing his state of health before deployment outside of the U.S. in support of military operations and to assist military healthcare providers in identifying and providing present and future medical care to him.

  a. The form shows the applicant annotated the following:

  - he would say his health in general was excellent
  - he had no medical or dental problems
  - he was not currently on a physical profile, or light duty, or undergoing a medical board
  - he had not sought counseling or care for his mental health in the past year
  - he did not have any questions about his health

  b. The examining doctor annotated no referral was indicated and the applicant was deemed deployable.

16. Headquarters, 4th Infantry Division (Mechanized) Orders 313-02, dated 9 November 2005 directed the applicant's unit to proceed on temporary change of station orders from Fort Hood, TX to U.S. Central Command (CENTCOM) deployment in support of Operation Iraqi Freedom effective 28 November 2005 for a period of 365 days.

17. Multiple DA Forms 4187 (Personnel Action) show the following duty status changes pertaining to the applicant:

  - from present for duty (PDY) to AWOL on 16 November 2005
  - from AWOL to dropped from the rolls (DFR) on 17 December 2005

18. A DA Form 458 (Charge Sheet), shows he was charged with desertion on 13 February 2006 in that he quit his unit on 17 December 2005, with the intent of avoiding hazardous duty, namely the preparation for and deployment in support of

002386

ABCMR Record of Proceedings (cont)                    AR20180011561

Operation Iraqi Freedom and remained absent in desertion until, at that time, an unknown date.

19.  An additional DA Form 4187 shows his duty status was again changed from DFR to PDY on 5 June 2006, after his surrender to his unit's Staff Duty desk at Fort Hood, TX.

20.  A DD Form 616 (Report of Return of Absentee) shows the applicant surrendered himself to his military unit at Fort Hood, TX on 5 June 2006, therefore apprehension efforts were terminated.

21.  A second DD Form 458, dated 11 September 2006, shows he was charged on that date with quitting his unit with the intent of shirking deployment to and service in Iraq and remaining absent in desertion from on or about 16 November 2005 through on or about 5 June 2006.

22.  Although Counsel asserts the applicant received NJP under Article 15 of the UCMJ for this period of AWOL and subsequent desertion ending in June 2006 for which charges were preferred against him, there is no evidence of record he accepted NJP for this period of desertion.

23.  On 22 September 2006, the applicant offered to plead guilty to the charges against him with referral of his case to a Special Court-Martial empowered to adjudge a BCD.

24.  On 17 October 2006, the applicant acknowledged being advised by trial counsel of his post-trial and appellate rights in the event he were convicted of a violation of the UCMJ, to include the right to representation by military counsel, to submit matters in his own behalf.

25.  His wife composed an email on 23 October 2006, addressed To Whom It May Concern, which states:

    a.  In response to the charges against her husband, she wanted to defend his actions in hope of a lesser punishment.  In 2004 after his first deployment, her husband came home stressed, anxious, and fearful of a second deployment, As his girlfriend at the time, she tried her hardest to be supportive.  However, when he gave her the news of his second deployment, as a wife it was something she could not handle.  After seeing what he went through the first time he went to Iraq, she was completely against him leaving once again.

    b.  Her persistence that he not go and his commitment to his job caused a great deal of stress on their relationship, to the point where he chose to come home and try to fix the problems between them.  Although his intentions were good, they now hurt him in the long run.  After meeting with a psychologist on a regular basis to help her deal with

17

002387

ABCMR Record of Proceedings (cont)                      AR20180011561

these issues, she realized what her husband's obligations to the Army are hoped he would be able to keep his potion there and fulfill any deployment requirements that may come his way in the future.  Her husband only had the best of intentions at heart and made a fine Soldier despite his one mistake.  It would be hurtful in the long run for the Army to lose such a well-rounded, hard-working individual.

26.  In an undated letter, presumably presented at the time of the applicant's Special Court-Martial, SSG B____ K____ wrote, in pertinent part he had known the applicant for the past 3-4 months and served as his first line supervisor during that time.  Despite being aware that the applicant pled guilty to desertion, it was his opinion the applicant was an outstanding Soldier and had great rehabilitative potential.  He did not have any disciplinary problems with the applicant, he was always respectful, and carried out any task given to him with great motivation.  He felt the applicant had great potential to continue to serve in the Army.

27.  Headquarters, Fort Hood Special Court-Martial Order Number 12, dated 13 April 2007, shows the applicant was arraigned and tried by Special Court Martial on 23 October 2006, where he was charged with, pled guilty to, and found guilty of on or quitting his unit about 16 November 2005, with the intent to shirk important service, namely deployment to and service in Iraq, and did remain so absent in desertion until on or about 5 June 2006.

28.  On 23 October 2006, he was sentenced to reduction to the rank/grade of private/E-1, forfeiture of $849.00 pay per month for 4 months, confinement for 4 months, and discharge from the service with a BCD.

29.  Headquarters, U.S. Army Field Artillery Center and Fort Sill Special Court-Martial Order Number 193, dated 20 December 2007 shows the sentence to reduction to the rank/grade of private/E1, forfeiture of $849.00 pay per month for 4 months, confinement for 4 months and a BCD had been finally affirmed.  That portion of the sentence extending to confinement having been served, and Article 71(c) having been complied with, the BCD would be executed.

30.  The applicant's DD Form 214 shows he was given a BCD as a result of court-martial on 13 March 2008, after having been placed on excess leave from 7 March 2007 through 13 March 2008, which is creditable for all purposes except pay and allowances.  He was credited with 4 years, 1 month, and 14 days of net active service with lost time from 16 November 2005 through 5 June 2006 and 23 October 2006 through 30 January 2007.

31.  The applicant's available service and medical records from this period do not show:

- he was issued a permanent physical profile rating

002388

- he suffered from a medical condition, physical or mental, that affected his ability to perform the duties required by his MOS and/or grade or rendered him unfit for military service

- he was diagnosed with a medical condition that warranted his entry into the Army Physical Disability Evaluation System (PDES)

- he was diagnosed with a condition that failed retention standards and/or was unfitting

32. A letter from the applicant's psychologist, Dr. J. M____ H____, dated 21 December 2012 states:

a. He was writing to offer useful information pertaining to the applicant's upcoming hearing related to eligibility for benefits based on is discharge status. He stated he is a psychologist in private practice and has a specialty in treating PTSD. The applicant was referred to him to assess his psychosocial condition and to offer an informed perspective on his current clinical status. The hearing in question is to deliberate on the applicant's eligibility for VA benefits in light of his BCD.

b. He met with the applicant for an hour-long session on 3 December 2012, while the applicant was laid off from work and he gave a history of having been in Iraq from 2003-2004 as a machine gunner on a Humvee and as an MP overseeing Iraqi prisoners. AS a gunner he felt vulnerable atop the vehicle while driving through populated areas and knew he could be killed at any point. He witnessed death and dismemberment, came under attack by gunfire and mortars, and was in a situation where he had to decide whether to shoot a boy pointing a gun at him. He also sustained a head wound related to duty in a 30-foot guard tower. He does not remember what caused the injury, but he was on duty in the tower and was awoken by B____ D____ on the ground with a gash to his forehead and blood flowing freely. He received stitches, but no further evaluation for sequelae to the head injury, such as concussion or internal brain injury. He reported being disoriented for some time after the fall and having amnesia.

c. His BCD came as a result of going AWOL when told at Fort Hood he would have to deploy to Iraq again, which he could not tolerate. His psychological status was not evaluated at the time and he was told desertion could be grounds for being shot. He ultimately was court-martialed, spent 3 months in military jail, and discharged with a BCD.

d. The psychologist believes the applicant is suffering from PTSD stemming from his experiences in Iraq with possible contribution or exacerbation by his experiences at Fort Hood. He also believes the applicant may have sustains some degree of closed-head injury when he fell from the guard town, the evidence being the head wound, the

002389

loss of consciousness, amnesia, and disorientation.  He suggested the applicant begin psychotherapy to deal with his PTSD and that he may benefit from psychopharmacology for depression, sleep onset difficulties, and anxiety, as well as a neurological evaluation to assess any damage sustained in the fall.

33.  An undated letter from the VA, the applicant was informed that his claim for VA benefits was received on 28 December 2012 and it was determined his military service from 2 April 2003 through 13 March 2008 was considered honorable by the VA and not a bar to VA benefits.  His claim for VA benefits would continue to be processed accordingly.

34.  In January 2013, the applicant applied to the ADRB for upgrade of his BCD to honorable, stating his discharge was inequitable because it was based on one isolated, out-of-character incident that would not have occurred had he received support from his chain of command when he informed them he was not physically or psychologically prepared to deploy again.  On 15 May 2013, the ADRB informed the applicant his request was denied, having determined he was both properly and equitably discharged.

35.  In an updated letter from the psychologist, Dr. J. M____ H____ , dated 7 January 2014, he states:

    a.  He and the applicant met for 6 psychotherapy sessions between 3 December 2012 and 29 March 2013.  He states his review of the Mental Health Intake Questionnaire at Fort Hood, TX, dated 30 June 2004, indicates the applicant was presenting with significant symptoms of depression and anxiety, including anxious mood, decreased energy and appetite, interrupted sleep, lack of motivation, hopelessness, racing thoughts and inability to control his worry.  There is also an indication that during a prior evaluation he may have been a threat to himself based on the phrase "contracted for safety."  He is most familiar with this term being used when a patient has suicidal impulses but makes an agreement not to act upon them.

    b.  Overall it sounds as if the applicant was seriously depressed and anxious at the time of the evaluation and there may have been a history of suicidal thinking and should be taken very seriously, as it reflects a highly compromised individual who has shown the potential to be a danger to himself.  It was the opinion of Dr. J. M____ H____ that a person reporting these symptoms should be referred for treatments by a trained mental health professional as well as an evaluation for psychiatric medication to assist with symptom relief.

36.  The applicant underwent a VA Compensation and Pension (C&P) Examination on 9 January 2014.  The C&P Examination Consult shows:

002390

- the applicant was diagnosed with post-traumatic headaches in 2003, for which he was seeking service-connection related to 20-foot fall while stationed in Iraq where he was found unconscious with bleeding head laceration and no memory of the event
- he experienced pulsating or throbbing head pain, nausea, vomiting, light and sound sensitivity affecting his ability to work
- he was diagnosed with a gastric ulcers for which he was seeking service-connection
- he had a painful scar to his forehead, medical to left eyebrow, 2x0.5 cm in length and width for which he was seeking service-connection related to service in Iraq
- his scar was deemed at least as likely related to service while stationed in Iraq since the scar is consistent with a head injury

37.  A VA Rating Decision, dated 20 February 2014, shows the applicant was awarded a service-connected disability rating of 50 percent for PTSD and 10 percent for tinnitus effective 28 December 2012.  Service connection for TBI, face trauma (scar), blurred vision, extreme mood swings, depression, bleeding ulcers, and headaches was denied.

38.  A letter from Dr. B___ L____, Assistant Clinical Professor of Psychiatry, Yale University, dated 17 March 2014, states in pertinent part:

    a.  His letter was written at the request of the applicant's Counsel for a psychiatric evaluation of the applicant in order to determine whether PTSD had a role in his being AWOL, which led to his BCD from the Army.

    b.  He concluded the applicant suffers from residual symptoms of major depressive disorder and active symptoms of PTSD.  His symptoms include depressed mood, diminished interest, difficulty sleeping and poor concentration.  He has also had symptoms of intrusive thoughts and memories, nightmares and physiologic arousal as well as avoidance of stimuli, hypervigilance.  Testing through a PTSD questionnaire corroborated these findings.

    c.  Although definitive evidence of a TBI can only be obtained through brain imaging such as a computerized tomography (CT) or a magnetic resonance imaging (MRI) scan of his brain, the symptoms of new-onset cluster headaches and ringing in the ears following the alleged wound strongly suggest TBI and are not explainable through PTSD.

    d.  Given that the applicant's symptoms were worst in 2005 and worse in 2004 than now, and that me met criteria for major depressive disorder and PTSD until 1 year ago, it is highly likely had had both disorders when he presented to the Chaplain and the Fort Hood Mental Health Clinic and he did not receive appropriate treatment at the time of his presentation for the symptoms he endorsed.  A referral for a full workup might have

002391

revealed he had the said disorders, for which the standard treatment would have been medication and psychotherapy.

   e.  Because one of the symptoms of PTSD is avoidance of stimuli associated with the trauma, it was probably not possible for the applicant to return to Iraq without extreme distress and in this context, his actions of AWOL are entirely consistent with PTSD.  In summary, the applicant has a debilitating psychiatric illness that, at the time of the actions leading to his court-martial and BCD, likely did not allow him full control of his own behavior.

39.  The applicant again applied to the ADRB in April 2014, requesting an upgrade of his BCD to general, under honorable conditions or honorable, stating his discharge was excessively harsh in light of mitigating factors, to include TBI and PTSD.

40.   Among many other documents, in support of his application to the ADRB, the applicant provided numerous affidavits and letters of support from colleagues, friends, and family members, all of which are included for the Board review, some of which are summarized in pertinent part below:

   a.  B___ D____, wrote an affidavit in March 2014, stating he and the applicant deployed to Iraq from Fort Hood together and became pretty good friends.  During their convoy escorts in Iraq they engaged in a number of firefights with different insurgent groups and their vehicles were hit with multiple IEDs.  On 6 February 2004 he was on guard duty at the containment facility when he saw the applicant near the base of another containment facilities' guard towers, lying face down not moving.  He ran over to attend to him and saw a large amount of blood.  As the applicant was unconscious, he gave him a sternal rub to wake him up and upon waking saw he did not know where he was or what happened to cause his injury.  He did not want to move the applicant for fear of a spinal injury, but an NCO ordered him to get the applicant out of the area and cleaned up.  He took the applicant to the bathroom and although he seemed in good spirit and was smiling, there was an extreme amount of blood, which he documented through a photograph.  Soon after the photo, the applicant became incoherent and he too him to a medical aid station where he left him then reported back to guard duty.  After he left him at the medical aid station, the applicant was given stitches or some kind of glue for the large gash on his forehead.  He recalls at the time of the incident he thought the applicant had fallen from the guard tower because they were manned 24/7 and there was no one manning the tower above the applicant, although he did not see him fall or witness any other possible causes for his injury that he can recall.  He did not follow up with the applicant that night after taking him to the aid station because he had to return to guard duty.

   b.  The applicant's father wrote an affidavit in April 2014, stating at the start of his son's deployment, he stayed in regular contact with his parents via instant message,

22

002392

email, or phone call.  ON 23 January 2004, they received a strange and disturbing email from the applicant stating:  "hey whats up??? Hey cool thing happened today we hit a yebbie on a mission with the truck, yeah we were goin down this street and yeb walkes out from around a truck and all of a sudden I see him go flying through the air and a loud noise, I was like dddddddaaaaaammmmm!!!! We stopped an then he was laying in a puddle lookin all confused then his head Just started gushing blood then the wind Picked up and sprayed it everywhere...then he laid in the puddle just turned red...pretty cool stuff huh, alright just telling ya some was sotys ttyl us son THE YOUNGER GREAT ONE."  Within days they talked on the phone about this incident and his son told them the email was sarcastic and that war was hell.  Although he was disturbed by this incident, he was still proud and eager to serve his country and was optimistic for the future as captured in emails from 26 January 2004 where he relayed he got picked up for PSD.  Then on 7 February 2004, they got an email from him stating "hey I kinds got hurt last night ill call and tell u the details on the phone, im all goo tho ill live peace...".  The following day he called to tell them he was injured while on guard duty at the containment facility.  He was working the night shift on a guard tower when a friend found him lying face down and unconscious with his head in a pool of blood, with no memory of what caused his fall or what treatment he received.  Several days later he called again to say his only treatment was aspirin and 24 hours rest and that he was back on guard duty the next night.  Everything changed after his son's TBI and there was a marked difference in both the tone of his voice and his attitude toward his duties and the war.  He called home less frequently and sounded depressed.  Once he returned home his personality was completely different and he began to act strangely with sudden mood swings.  Out of concern for their son, they called his platoon sergeant who refused to help.  Their son returned home for his grandfather's funeral on emergency leave, but did not return back to Fort Hood, because he was not mentally or physically ready to return to combat in Iraq.  That's when they knew he needed to seek help for his TBI and PTSD.

c.  J_____ M_____, wrote an affidavit in May 2014, stating he and the applicant met while deployed to Iraq.  The applicant was an outstanding Soldier, definitely one of the best in their platoon and he excelled throughout their entire deployment.  They worked closely together at the containment facility guard towers.  The guard towers were horribly made; the retaining wall that kept you from falling over was only waist high, making it ineffective.  Although he was not on duty the night the applicant got injured, he clearly remember he got hurt.  The first time he saw the applicant after his injury he had a huge gash on his forehead that was stitched up.  When he asked what happened, he explained how B___ D_____ found him face down in a pool of his own blood near the base of a guard tower.  The gash later formed a large scar on the applicant's forehead.  He's sure this injury caused this scar because he started joking about his new scar after he was injured that because of this scar the applicant could no longer be a member of the Backstreet Boys, as they had a running joke about him looking like a band member.  They had incompetent leaders while deployed who

002393

nothing about TBI or PTSD and there was a huge stigma against Soldiers who had
mental health problems or sought mental health treatment.

   d.  The applicant wrote a lengthy affidavit in August 2014, recounting many
incidents from his Army career.  While deployed to Iraq, he had the most trouble telling
his parents about the firefights he was involved in, so he would joke so as to not worry
them, but the firefights really disturbed him.  One of the most disturbing incidents
occurred on 23 January 2004, when he was guarding a convoy and a man stepped in
front of one of their trucks and he saw him fling through the air.  Their convoy stopped
and he say him lying in a puddle of water, which then turned to blood.  The person in
charge of the convoy ordered them to move out without helping the man because he
thought it was a sort of trap to expose them to attack.  On 7 February 2004, his friend
B____ D____ found him unconscious near the bottom of a containment facility guard
tower in a pool of blood with a 3 inch gash in his forehead.   He has only hazy memories
of what happened and does not remember how long he had been unconscious or what
treatment he received.  All he knew was he had a terrible headache and stiches in his
forehead and returned to guard duty the next night.  Another disturbing experience was
while working as a gunner on a convoy mission he encountered a 10-year old child
pointing a gun at him and did not know what to do.  The convoy eventually drove away,
but he was shaken.  These events changed him and he now experienced constant
nightmares and panic.  He became more depressed back in the U.S. and once he
returned from deployment felt he could not go back to Iraq for a second deployment.
He expressed his feelings and concerns to his chain of command, stating he was not
mentally or physically ready to return to combat it Iraq, but got no help and was told to
deal with it.  He was eventually referred to a Chaplain, but she just said a prayer for him
and sent him on his way.  He did not receive any counseling or treatment for his
problems, even after twice being missing absent from his unit.  He tried to get help by
going to the Mental Health Clinic at Fort Hood on 30 June 2004, and listed all of his
symptoms on the intake form, but nothing ever came of this effort.  His symptoms kept
getting worse as he prepared with his unit for his second deployment and he just felt
exhausted at that point with no help forthcoming.  He was very vocal about his inability
to return to Iraq and did not get on the plane to return to Fort Hood after a period of
emergency leave when his grandfather died.  He was not a deserter, but needed time at
home to mentally and physically recover.  When he voluntarily returned to Fort Hood, he
was told he would redeploy, until he was eventually told he would be brought up on
charges of desertion and discharged via court-martial.  He was in no condition to defend
himself and instead of receiving help he was disciplined.  After his release from
confinement and the Army, his TBI and PTSD symptoms increased and he eventually
became unable to work full-time at his job.  He later sought help, at the urging of his
father, and was diagnosed with PTSD and possible TBI.  He cannot move forward with
his life with a BCD.

002394

ABCMR Record of Proceedings (cont)                                    AR20180011561

41.  A VA Rating Decision, dated 25 July 2014, shows the applicant was awarded a combined service connected disability rating of 60 percent for the following service-connected disabilities:  PTSD rated 50 percent, tinnitus rated 10 percent, and lumbosacral sprain rated 10 percent.  Rated as not service-connected were blurred vision, bleeding ulcers, face trauma (scar), TBI, headaches, depression, and extreme mood swings.

42.  On 8 September 2014, the ADRB determined that clemency was warranted based on the applicant's quality of service, combat service, the strong indication of PTSD and TBI and the applicant's testimony.  The Board voted to grant clemency by upgrading the applicant's characterization of service to general, under honorable conditions.  A change in the reason for discharge is not authorized under the Federal Statute.  The applicant was reissued a new DD Form 214 on 22 November 2014, which shows his character of service as general, under honorable conditions in lieu of BCD and his prior DD Form 214 was voided.

43.  A VA Decision Review Officer Decision, dated 23 December 2014, shows the applicant was granted service connection for TBI, major depressive disorder, recurrent, headaches, PTSD, left eyebrow scar, gastric ulcers and tinnitus with an effective date of 20 November 2012.

44.  The applicant subsequently applied to the ABCMR in 2016 requesting removal of all documents related to his court-martial proceedings, correction of his DD Form 214 to show retirement due to physical disability, honorable characterization of service, restoration of rank, all awards authorized, all military education completed, and his period of foreign service in Iraq.  The applicant was represented by Counsel and submitted numerous documents of support, all of which have been included for Board review.

45.  In the adjudication of his application to the ABCMR, an advisory opinion was received from the ARBA psychiatrist, who reviewed all available documentation.  The advisory opinion stated the only documentation available in his military record of having any behavioral health problems was the Mental Health Intake at Fort Hood.  There is no documentation of any PTSD symptoms in his records, however the lack of documentation of PTSD symptoms in his military records does not necessarily indicate he did not have PTSD.  Based on the symptoms documented in his intake form, it is clear the applicant was suffering from a diagnosis more severe than adjustment disorder and most likely PTSD.  Based on the information available at this time, there is sufficient evidence to state the applicant's PTSD is mitigating for the offense which led to his discharge form the Army, as PTSD id associated with avoidant behaviors such as being AWOL.  It appears the applicant's mental health conditions were not duly considered during his separation processing and it was recommended his record be referred to IDES for consideration of medical disability separation or retirement.

002395

ABCMR Record of Proceedings (cont)                           AR20180011561

46.  The Board considered his application on 19 October 2017 and voted to grant the applicant partial relief.  The Board voted to correct his DD Form 214 to credit him with foreign service, military education and add missing awards.  The board denied his request to show completion of some military education, some awards, an upgrade of service characterization to honorable, removal of all documents related to his court-martial, to change the authority and reason for his separation, and to process his record through the PDES.

47.  A memorandum from the Deputy Assistant Secretary of the Army (Review Boards) to the OTSG, dated 27 November 2017, states:

    a.  She reviewed the Board findings, conclusions, and recommendations from 19 October 2017 and determined there was sufficient evidence to grant additional relief.  Therefore, she directed the applicant's case be referred to the OTSG to determine if he should have been retired or discharged by reason of physical disability through IDES.

    b.  Should a determination be made that the applicant should have been separated under the IDES, these proceedings will serve as the authority to void his separation by court-martial and to issue him the appropriate separation retroactive to his original separation date, with entitlement to all back pay and allowances and/or retired pay.  Less any entitlements already received.

48.  A letter from the ABCMR to the applicant, dated 6 December 2017, advised the applicant his approved Record of Proceedings was forwarded to the OTSG to take action to correct his records and provide him with official notification as soon as the directed correction was made.

49.  An Initial Evaluation of Residuals of TBI - Disability Benefits Questionnaire, signed and dated by West Point, MEB Physician Dr. L_____ L_____, on 14 March 2018, shows:

    a.  The applicant was diagnosed with mTBI with residual of migraine headache.  The applicant complained of mild memory loss, but without objective evidence on testing.  An MRI of the brain taken on 17 November 2014 was unremarkable.  A CT of the head taken on 3 September 2014 shows small to moderate sized left posterior arachnoid cyst, with no acute intracranial hemorrhage, mass, or mass effect.

    b.  It was determined as likely as not that he suffered mTBI, and his headaches were at least as likely as not caused by his mTBI.  His impulsivity, irritability, verbal aggression, attention and memory difficulties were less likely as not related to his mTBI and more likely related to his PTSD.  Difficulties with attention that occur with mTBI tend to improve within months.

002396

50.  A VA Form 21-0960P-3, dated 29 March 2018, and signed by psychologist, Dr. B_____ C_____, Department of Behavioral Health, Kelly Army Community Hospital shows:

a.  The applicant's diagnoses are PTSD, generalized anxiety disorder, major depressive disorder, recurrent, moderate, and has symptoms that appear consistent with mTBI.  A thorough evaluation is needed to differentiate symptoms of PTSD, anxiety, depression and mTBI.  He has occupational and social impairment with deficiencies in most areas such as work, school, family relations, judgment, thinking, and/or mood.

b.  The applicant was experiencing PTSD, depression, anxiety, and mTBI symptoms after his deployment to Iraq in 2004.  These symptoms interfered with his sleep, appetite, concentration, focus, energy, and ability to perform his duties.  He did not exhibit these symptoms prior to deploying to Iraq in 2003.  He continues to struggle with his symptoms of mood variability, poor sleep and appetite, low motivation and energy, poor concentration and focus, and frequent headaches with ringing in his ears

51.  An IDES NARSUM, dated 2 April 2018, completed by West Point MEB Physician, Dr. L_____ L_____ states:

a.  The applicant's diagnoses of PTSD, generalized anxiety disorder, major depressive disorder, recurrent, moderate, and mTBI with residuals of migraine headache and cognitive impairment did not meet medical retention standards.

b.  The applicant has had adequate evaluation for behavioral health and TBI conditions to reliably determine the course of these conditions and it is unlikely that any further interventions for these conditions would have returned him to duties consistent with his rank and MOS.  The onset of his conditions was determined to have been during his deployment to Iraq between October 2003 and March 2004.

52.  Counsel has provided numerous copies of email correspondence between the applicant's assigned PEBLO, Ms. V_____ R_____ and Dr. E_____ D_____, all of which have been provided for the Board's review.

a.  Of most significance are the emails from 3-4 April 2018, which show Ms. V_____ R_____ asked Dr. E_____ D_____ to review and sign the MEB proceedings for the applicant's case.  Dr. E_____ D_____ responded stating the ABCMR Record of Proceedings and aligned documents were sent to her IDES office to determine whether PDES processing was warranted at the time of separation and that clearly it was not warranted.

002397

b.  He further stated there was nothing in AHLTA (the applicant's electronic medical record), with his last AHLTA record being in 2006 and his separation in 2008. He was not on a physical profile and was not on medications.  The applicant cannot come back years later after receiving VA ratings and now demand that he should have been put through an MEB at the time of his discharge.  He would not sign this paperwork as no MEB was required at the time of the applicant's separation.

53.  A memorandum from Dr. E_____ D_____ Senior MEB Physician, Fort Gordon, GA, dated 15 May 2018 states:

a.  The applicant's case was referred to the Dwight D. Eisenhower Army medical Center at Fort Gordon, GA to determine if he should have been retired or discharged by reason of physical disability through IDES prior to his separation from active duty.  After thorough review of the applicant's available medical records, he determined the applicant did not require disability processing at the time of his separation from active duty service.

b.  The applicant and his legal team contend that because he currently has a 90 percent rating by the VA, he must therefore have been unfit for duty at the time of separation in March 2008.  After review of the applicant's medical records, he can without hesitation conclude that he did not have indications of disabling PTSD and he did not have any symptoms of TBI at the time of his separation.  The record shows just the opposite.  He was in good health with no physical limitations.

c.  His medical records shows he did indeed seek mental health evaluation as a walk-in on 30 June 2004, after returning from being AWOL for two days, representing the applicant's second period of AWOL, the first being two weeks earlier for 1 day.  His intake was accomplished by a 41D, Mental Health Specialist.  The applicant was diagnosed with adjustment disorder.  His reported stressors included problems with the military and his girlfriend back home who was pregnant.  He reported his main problem stated about 2 weeks prior to his evaluation.

d.  At the end of the session, among other things, he was counseled that if he felt the need to come in and see someone he could call and make an appointment.  It is clear from the record that although he did not officially leave the Army until 31 March 20028, he never sought psychiatric services again.

e.  In November 2005, the applicant participated in Soldier Readiness Processing (SRP) in preparation for another deployment.  During the course of that SRP, his medical record was reviewed and he was counseled face-to-face by a medical profession.  He indicated he was in excellent health.  He was specifically asked about mental health issues and he indicated he had none and signed the form.  After careful review by the medical community, he was determined deployable.

002398

f.  Rather than deploy again, the applicant again went AWOL and missed his deployment.  In November 2006, he was placed in confinement at Fort Sill, OK.  As part of the confinement process, new inmates must undergo a complete physical examination and the applicant was cleared for confinement.  During all of his confinement period, up until the time he left active duty, he had access to the military health care system.  The record shows during that time he was seen and treated for occasional acute minor illness, but never for behavioral health issues.  He saw no documentation of the applicant's request for any type of help from his chain of command, Chaplain, or the medical community.

g.  The applicant and his legal team report the applicant suffered a 30-foot fall and subsequent head injury and now has residual TBI.  There is no documentation of this event in the applicant's service records and he has no memory of the event.  The alleged treatment and follow-up for this injury also seems peculiar.  The idea that a fellow MP provided sternal rub and the aid station treated the laceration with stitches and no other follow-up was provided is extremely unlikely.  Tikrit, Iraq was a major FOB.  By the legal team's own admission there was a prison as well as a medical treatment facility at Tikrit.  Under usual circumstances, the applicant's fall would have been documented, he would have been seen by a physician and likely held for observation, if not elevated car with advanced emergency capabilities.

e.  Also of not, in most instances, the symptoms of TBI usually improve with time, not worsen, as it seems to have been the case with the applicant.  Furthermore, some 4 years after the fall, the applicant never came to any military clinic complaining of headaches, blurry vision, nausea, etc.  Additionally, he was given a clean bill of health to deploy 1 1/2 years after the fall event.  Finally, the scar the applicant allegedly received from his fall, the same scar the VA rates him as service-connected at 10 percent, was also noted in his 2002 induction physical examination, which notes a 1-inch scar, anterior forehead.  He was also Tricare eligible from his discharge date until August 2010, yet did not return to any military treatment facility or use his Tricare benefit for treatment of his conditions during that period.

54.  A DD Form 215 (Correction to DD Form 214) was issued on 19 June 2018, reflecting the 19 October 2017 Board approved corrections to the applicant's records.

55.  A letter from Senator Blumenthal to the Secretary of the Army, dated 26 July 2018, states he was writing to urge the ABCMR's reconsideration of the denial of the application for medical retirement.  He was concerned that the original review process may not have provided the applicant with an opportunity for a fair hearing and thorough consideration of the underlying causes for his less than honorable discharge.  He asks the ABCMR to give the applicant an opportunity for a fair hearing – his day in court- to

002399

afford him the opportunity to present the facts and reasons why his case should be reconsidered.

56. An ARBA letter, dated 21 June 2018, provided the applicant a copy of the newly issued DD Form 215 and informed him of the request for issuance of medals on his behalf.

57. A letter from the applicant's Counsel, dated 6 August 2018, requested the applicant's reinstatement into the DES for purposes of continued MEB processing. Counsel argued the applicant is legally entitled to the entire DES process because the only plausible interpretation of the Deputy Assistant Secretary of the Army (Review Board's) directive from 27 November 2017, was for the applicant's case to proceed through an entire process and the OTSG must complete the DES process that it started. Moreover, Dr. E_____ D_____ violated the applicant's procedural due process rights to a fair proceeding and Dr. E___ D___ is neither qualified nor authorized to make such a medical determination or halt the DES process.

58. A letter from the Deputy Assistant Secretary of the Army (Review Boards) to the applicant's Counsel, dated 7 September 2018, states she reviewed Counsel's letter thoroughly and understood his concerns. The applicant was granted partial relief in his request for medical separation or retirement. She had directed the OTSG to conduct a review of the applicant's records to determine if DES processing was warranted at the time of his separation. An authorized official representing the OTSG conducted a review of the applicant's records and determined he did not have any medical conditions which failed to meet retention standards at the time of his separation. Based on this determination, there is currently no reason to proceed with further DES process. If he wishes to submit any additional matters not previously considered by the Board, his case will be reconsidered.

59. On 1 April 2020, the Chief, Medical Operations, Kimbrough Ambulatory Care Center (KACC), Fort Meade, MD, provided an advisory opinion which states:

   a. All available documents, to include the U.S. Court of Federal Claims Number 18-1784 and the memorandum written by Dr. E_____ D_____ on 15 May 2008 [this is a typographical error and clearly refers to the 15 May 2018 memorandum discussed above], were reviewed. Per a review of the medical records, there is no documentation to indicate the applicant required disability processing at the time of his separation from the Army.

   b. Regarding his diagnosis of PTSD, the applicant was evaluated by Behavioral Health on 30 June 2004 after returning from his second period of AWOL. He indicated that the military was "causing problems back home for me." His desired result from that visit was to have his chain of command "to realize I need to be chaptered out of the

002400

ABCMR Record of Proceedings (cont)                                      AR20180011561

Army ASAP." He was subsequently given a diagnosis of an adjustment disorder and did not return for treatment. There was no further behavioral health documentation after this visit. The reviewer also did not find any medical records to support a 30-foot fall, to support a diagnosis of TBI.

c. From a review of the available documents, it is clear there is a dearth of medical records available during the applicant's time in service. Therefore, there is no evidence to support the need for disability processing prior to his discharge in 2008. ON 3 April 2002, the OTSG endorsed the opinion provided by the Chief, Medical Operations, KACC, Fort Meade, MD. After reviewing the applicant's case, it has been determined there is no evidence to support the need for disability processing prior to his discharge in 2008.

60. On 6 April 2020, a copy of the advisory opinion was sent to the applicant and his representing Counsel and they were given an opportunity to submit comments. Counsel responded on 20 April 2020, stating:

a. The OTSG opinion is, at best, a cursory review of the applicant's voluminous record. It fails to mention, much less consider, the overwhelming evidence in favor of granting his claim for medical retirement benefits. It also does nothing to address the deficiencies of the previous OTSG medical advisory opinion that the Court of Federal Claims identified in its remand order. Therefore, it would be arbitrary, capricious, and contrary to law for the Board to rely on it. The applicant urges the ABCMR to disregard the OTSG opinion entirely and instead weigh the ample evidence in his favor under the required liberal consideration standard. In addition, although the OTSG opinion does not address the Board's authority to grant the applicant relief, the Board does in fact possess such authority. Based on the evidence and its authority, therefore, the Board should grant the applicant's request for retroactive medical retirement status.

b. Relying on the OTSG opinion would fail to meet the Board's legal standard of review. The OTSG opinion has obvious shortcomings and is an unacceptable basis for ruling on the applicant's claim. The ABCMR should not accord it any deference for at least three reasons. First, the opinion fails to canvass the applicant's full medical record, completely ignoring evidence produced by the Army, the VA, and independent physicians, both before and after his discharge.

c. Second, the OTSG opinion is wrong to assert that there is insufficient evidence establishing that the applicant suffered from PTSD and TBI prior to his discharge from the Army. This conclusion ignores his contemporaneous reports of PTSD symptoms to Army medical examiners and his superiors, as well as post-discharge medical evidence confirming his conditions from Army, VA, and civilian physicians. The OTSG's conclusion on TBI is similarly inadequate because it ignores the multiple third-party affidavits attesting to the applicant's fall and inappropriate lack of treatment,

002401

photographic evidence of his head wound, and the multiple physicians who subsequently confirmed that he suffered a TBI resulting from his fall.

d.  Third, the OTSG opinion implicitly, and wrongfully, concludes that because Army physicians did not diagnose the applicant with any medically unfitting conditions prior to his discharge, he did not suffer from any such conditions.  Although a "presumption of regularity" may typically be appropriate in reviewing military records and decision-making, it does not apply here, given the Army's manifest failures in documenting and treating PTSD and TBI during the Iraq and Afghanistan wars.  Moreover, even if the presumption applied here, the applicant has supplied ample evidence to rebut it.

e.  The OTSG opinion fails to consider the evidence in the record.  To meet the legal standards for review of a disability retirement claim, the Army must consider all of the competent evidence, whether original or supplemental.  The OTSG opinion, however, ignores numerous sources of competent evidence that document the applicant's debilitating conditions during his Army service.  Instead, the OTSG memorandum states that the applicant has presented "no evidence to support the need for disability processing prior to his discharger [sic] in 2008."  That is plainly wrong.  The memorandum ignores—and contradicts—the overwhelming evidence presented to the ABCMR and the Court of Federal Claims and that court's recognition that there is evidence supporting the applicant's claims.  Indeed, that is precisely why the Court remanded the case to the ABCMR for further proceedings.

f.  To reiterate, there is a large body of evidence that the Board must consider.  The OTSG opinion did not mention, much less consider, any of the following contemporaneous medical records, post-service military medical records, post-discharge ARBA, VA and civilian physician evidence, detailed below and is therefore wholly inadequate and cannot form the basis of the Boards decision.

g.  His contemporaneous medical records not considered by OTSG are as follows:

(1)  In 2004 at Fort Hood, the applicant sought help from his chain of command, reporting that he suffered from significant mental distress because of his traumatic experiences in Iraq.

(2)  A June 30, 2004 report detailing the applicant seeking help from an Army mental health specialist at Fort Hood and reported distress as well as symptoms including "poor disrupted sleep, decreased appetite, excessive anxiety, rapid breathing, rapid heartbeat, crying a lot, difficult[y] control[ling] worry, decreased ability to have fun, sadness, rage, anxiety, [and] hopeless[ness]."

(3)  An October 23, 2006 Army physical examination stating that the applicant reported symptoms including fever, chills, visual change, sore throat, chest pain,

002402

sputum, abdominal pain, vomiting, dysuria, hematuria, rash, headache, depression and another neurological symptom that is indecipherable in the record.

h.  His post-service military medical records not considered by OTSG are as follows:

(1)  On March 14, 2018, MEB physician L_____, DO conducted an "Initial Evaluation of Residuals of Traumatic Brain Injury (I-TBI) Disability Benefits Questionnaire" and concluded that:  "Based on the fact that he had a head trauma with LOC [loss of consciousness] and was exposed to multiple mortar blasts at close range and had AOC [alteration of consciousness] but no structural brain damage, it is at least as likely as not that he suffered mild traumatic brain injury."

(2)  On March 29, 2018, MEB Physician K____ C____, PhD, LCSW, BCDA conducted a "Review PTSD Disability Benefits Questionnaire" and concluded that the applicant "was experiencing PTSD, Depression, Anxiety and mTBI symptoms post his deployment from Iraq in 2004" and that "[t]hese symptoms interred [sic] with his sleep, appetite, concentration, focus, energy, and ability to perform his duties.

(3)  On April 2, 2018, MEB physician Dr. L_____ produced an "IDES Physical Disability Evaluation System West Point NARSUM and concluded that the applicant failed to meet retention standards for "post-traumatic stress disorder, generalized anxiety disorder, major depressive disorder (recurrent, moderate), and m-TBI with residuals of migraine headache and cognitive impairment."

i.  His post-discharge ARBA, VA, and civilian physician evidence not considered by OTSG are as follows:

(1)  A 2014 report by a clinical psychologist who treated the applicant for 6 psychotherapy sessions stated the "Mental Health Intake Questionnaire undertaken at Fort Hood on June 30, 2004 . . . indicates that [the applicant] was presenting with significant symptoms of depression and anxiety . . . [and] may have been a threat to himself[.] He further stated that "it sounds clear that [the applicant] was, at the time of the evaluation, seriously depressed and anxious, and that there may have been a history of suicidal thinking."

(2)  A 2014 report by an experienced clinical psychiatrist, who examined the applicant in person and reviewed his entire medical history:  This psychiatrist concluded that the applicant suffered from "residual symptoms of Major Depressive Disorder and []active symptoms of Posttraumatic Stress Disorder[,]" as well as "medical symptoms of new-onset cluster headaches and ringing in the ears . . . [that] strongly suggest TBI. . . . Given that the applicant's symptoms were worst in 2005 and worse in 2004 than now, and that he met criteria for both [major depressive disorder] and PTSD . . . it is highly

002403

likely that he had both Disorders when he presented to the chaplain and then the Fort Hood Mental Health Clinic in 2004, and that these illnesses were not addressed.

(3)   A 2015 report by an expert neurologist who examined the applicant stating the applicant "clearly suffered a severe concussive injury at the same time [as his 2004 fall] and immediately following his head trauma when he first regained consciousness and has suffered with headaches ever since· This neurologist based his TBI diagnosis on both clinical observation of the applicant's "impaired motor activity . . . [and] clinical evidence of brain dysfunction" as well as "subtle signs of damage on certain neurological findings of his exam."

(4)   The ABCMR's October 19, 2017 decision included a "medical advisory opinion" obtained from the ARBA psychiatrist stating [b]ased on the symptoms documented during his mental health intake, it is clear the applicant was suffering from a diagnosis more severe than adjustment disorder, most likely PTSD.

(5)   Repeated VA evaluations determined that the applicant suffered from service-connected TBI arising from his fall in Tikrit, Iraq.

j.   The OTSG ignores abundant evidence demonstrating that the applicant suffered from multiple unfitting conditions prior to his discharge, including PTSD and TBI.  The OTSG is wrong to conclude he did not have PTSD in service.

k.   There is ample evidence establishing that the applicant suffered from PTSD prior to his discharge.  The OTSG opinion concludes otherwise only by failing to acknowledge and examine the overwhelming competent evidence proving the applicant's claim.  As outlined above, the applicant reported symptoms indicating PTSD and other serious mental health conditions to his superiors on multiple occasions.  But instead of recognizing his symptoms for what they were, a mental health intake specialist, with neither the clinical expertise nor the authority to accurately diagnose medical conditions, incorrectly concluded that the applicant had "adjustment disorder" and failed to refer him for further medical treatment.  The applicant reported many of the same symptoms again during his pre-confinement physical examination.  Yet again, the Army medical examiner did nothing.  As ARBA, Army MEB, VA, and independent physicians have all recognized, the symptoms the applicant reported during his time in the Army were clearly far more serious than the Army's contemporaneous medical examinations acknowledged.  The absence of a contemporaneous diagnosis does not mean he did not have PTSD, or that he was not entitled to medical retirement.  The absence of an in-service PTSD diagnosis reflects nothing more than that the Army failed to provide him with appropriate medical treatment.

l.   The OTSG is wrong to apparently conclude that the applicant did not have TBI in service caused by a fall while serving in Iraq.  The OTSG opinion is similarly deficient with regard to the applicant's TBI. The OTSG's statement that it could not locate "any

002404

medical records to support a 30 foot fall to support the diagnosis of TBI" is, at best, severely misleading.  The applicant does not deny that the Army failed to provide him with appropriate treatment after he fell from the guard tower in Tikrit, Iraq.  On the contrary, he asserts that it is precisely because the Army failed to provide him with appropriate medical treatment that his TBI went undiagnosed and his condition worsened.  The OTSG opinion provides no evidence to support the inference it seemingly draws from the lack of medical records, that the applicant did not fall from a guard tower and did not suffer a TBI.  Based on the evidence the applicant has provided, such an inference is untenable.

m.  To deny that the applicant fell from a guard tower and suffered a TBI, the OTSG must disregard sworn testimony from several sources—including the applicant's fellow soldier—and provide some other explanation for the TBI he suffered during his service in Tikrit, Iraq.  The applicant has consistently maintained that he fell from a guard tower, woke up in a pool of his own blood, and received only cursory medical attention before being sent back to duty in a combat zone.  But the OTSG opinion does not need to rely on the applicant's own account to determine what happened.  Rather, numerous competent sources confirm that he fell from a guard tower and suffered a TBI, as the Court of Federal Claims outlined in its remand decision.  This includes a sworn affidavit from a fellow soldier who found the applicant unconscious in a pool of his own blood; a sworn affidavit from the applicant's father explaining that his son told him about his injury the day after his fall and describing his pronounced symptoms; and multiple post-service medical opinions and determinations that the applicant suffered a TBI.

n.  Further, it is not surprising that during deployment, the applicant did not receive the care to which he was entitled or that recordkeeping was inadequate.  That is precisely why this Board exists—to correct the errors and injustices stemming from less-than-perfect processes in the field.  Numerous reports have documented in detail the Army's pervasive failures in identifying, diagnosing, and treating TBIs during the Iraq and Afghanistan wars, even at well-equipped military bases far from active combat zones.  Even after Congress recognized this problem and passed a law designed to improve the military's capacity to diagnose and treat TBIs, the military struggled to develop adequate protocols for identifying wounded soldiers.  The applicant has produced compelling evidence that the Army on the whole, and his chain of command in particular, were ill-equipped to deal with soldiers' brain injuries during an intense, chaotic period of heavy combat.  Based on these accounts, the Army's failure to properly identify, diagnose, and treat the applicant's TBI is, unfortunately, unsurprising.  The record indicates only that the Army failed to provide the applicant with the treatment he needed.  That is not a reason to deny him relief now.

o.  The OTSG cannot rely on a supposed lack of contemporaneous evidence that it believes should exist.  As described in detail above, the OTSG's assertion that "there is a dearth of medical records available during [the applicant's] time in service" is factually

35

incorrect.  It is also legally irrelevant.  Any supposed missing contemporaneous medical record does not excuse the ABCMR from its legal obligation to consider all probative evidence, including evidence produced by VA and civilian physicians after the applicant's discharge.  The OTSG clearly has not.

p.  Moreover, the Army cannot rule against the applicant based on an unsubstantiated belief that there is a "dearth" of contemporaneous medical record evidence, especially when the Army's repeated failures to adhere to its own regulations caused this supposed evidentiary gap.  As the applicant has detailed, the Army unlawfully failed to follow its own procedures on at least four occasions:

- the Army failed to evaluate and treat him after he fell from a guard tower in an active combat zone
- it failed to provide him with disability evaluation system processing after he reported his symptoms to his superiors
- it failed to provide him with a separation physical within one year of his discharge
- it terminated his DES process prematurely, without cause, and without the standard rights of appeal provided to soldiers undergoing DES processing.

q.  Therefore, the ABCMR should not credit the OTSG opinion, which impermissibly relies upon an asserted—but easily disprovable—conclusion that the applicant lacks evidence supporting his claim.  Put differently, the OTSG opinion appears to implicitly rely on the "presumption of regularity" to conclude that because Army physicians did not diagnose the applicant with an unfitting condition prior to his discharge, he did not suffer from one.  This argument cannot justify denying the applicant's claim.

r.  As a preliminary matter, there is ample reason not to apply a presumption of regularity to the military's handling of active-duty service members' PTSD and TBI during the Iraq and Afghanistan wars.  More importantly, even if the presumption applies here, that presumption can be rebutted.  There is indeed clear evidence that establishes that the applicant did in fact have PTSD and TBI at the time of his discharge.  Evidence also establishes that Army officers did not properly discharge their official duties in responding to the applicant's injuries; therefore, even if he were lacking evidence, which he is not, the Army could not draw an inference against him from a circumstance caused by its own repeated failures.  The fact that the Army repeatedly mishandled the applicant's attempts to report and seek treatment for his injuries is more than sufficient to disturb whatever presumption of regularity military officials may typically enjoy.  When the Army fails to provide a Soldier with legally mandated medical examinations, it cannot invoke the lack of an official diagnosis to justify denying a soldier's claim for retroactive medical retirement

s.  Although the OTSG opinion naturally does not address the ABCMR's authority to grant the medical retirement status, the applicant is aware that the Board likely intends

002406

ABCMR Record of Proceedings (cont)                                    AR20180011561

to consider its authority now.  Put simply, the Board does possess the necessary authority.  Before the Court of Federal Claims, the United States invoked for the first time a novel (and incorrect) justification for its failure to grant the applicant's application: that the Secretary lacked valid authority under Title 10, U.S. Code, section 1552(f) to amend his court-martial conviction, thus rendering him categorically ineligible for medical retirement status.  However, the ABCMR possesses the authority to provide the applicant the medical retirement status he seeks, without disturbing his court-martial conviction and consistent with Title 10, U.S. Code, section 1552(f).

    t.  By its plain terms, section 1552(f)(2) expressly preserves, and in no way limits, the Secretary's authority to act on the sentence of a court martial for the purposes of clemency.  What section 1552(f) restricts is the Secretary's power to exercise non-clemency review of court-martial proceedings.  It dispossesses the Secretary of his power to amend, alter, overturn, and erase court martial trials and convictions, while leaving the circumscribed clemency power to act on lawfully adjudged sentences untouched.  Congress intentionally preserved the Review Boards' power to determine whether a sentence should be reduced as a matter of clemency.  Because Title 10 U.S. Code, section 1552(f) does nothing to alter the Secretary's clemency authority—and because it is a punitive discharge that precludes a service member from eligibility for medical retirement status, not a court-martial conviction standing alone—the sole determinative question concerning the ABCMR's authority to grant the applicant's medical retirement is whether the Secretary's clemency authority encompasses the power to relieve the applicant's punitive discharge. It does.

    u.  In fact, by granting the applicant clemency, the Secretary has already taken action on the applicant's sentence, which makes him eligible for medical retirement.  When the Secretary acted through the ADRB to grant clemency to the applicant, it exercised the clemency powers vested in it under the UCMJ Article 74(b).  UCMJ Article 74(b) expressly empowers the Secretary to "substitute an administrative form of discharge for a discharge or dismissal executed in accordance with the sentence of a court-martial." By its plain terms, Article 74(b) permitted the Secretary to relieve the applicant's Bad Conduct Discharge and replace it with an Administrative Discharge. This is precisely what the ADRB did in granting the applicant's clemency petition.

    v.  Because the applicant is no longer under sentence of a Bad Conduct Discharge, he is not subject to Army Regulation 635-40, 4-2 (2006), which provides that "[a] Soldier may not be referred for, or continue, disability processing if under sentence of dismissal or punitive discharge."  As the phrase "under sentence of" makes plain, the inquiry turns on an examination of the applicant's current sentence, which does not include a punitive discharge.  The fact that the applicant previously was "under sentence of" a punitive discharge is, for the purposes of determining his present eligibility for medical retirement status, irrelevant.  Accordingly, the applicant is currently eligible for disability processing and medical retirement benefits.

002407

w.  The Board should grant the applicant the medical retirement benefits he seeks. It has been more than 15 years since he enlisted in the United States Army and was first wounded in an active combat zone at the height of the Iraq War.  Since then, the applicant has struggled to overcome the debilitating consequences of his injuries and the Army's failure to treat them.  This Board possesses the legal authority to grant the applicant the relief that he seeks, and must give weight to the overwhelming competent evidence supporting his claim rather than rely on the OTSG's perfunctory and deeply flawed opinion.  The Board should take this opportunity to rectify the Army's longstanding failures and finally deliver justice to a soldier who sacrificed greatly for his nation.

BOARD DISCUSSION:

1.  After reviewing the application and all supporting documents, the Board found that relief was not warranted.

2.  The Board reviewed the applicant's contentions, his complaint and the Court's remand order, and the evidence of record.  The Board found the applicant has not demonstrated by a preponderance of evidence an error or injustice warranting the requested relief, specifically, that the record be corrected to reflect a disability retirement with a disability rating of at least 80 percent with all benefits, allowances, and back pay associated with retroactive disability retirement.  The Board found the applicant has not demonstrated by a preponderance of the evidence that any further changes were warranted based on liberal consideration or clemency regarding his discharge from service.

3.  The Board, while noting that the applicant was ineligible for referral into the Disability Evaluation System (DES) prior to service separation because of he was charged with an offense under the Uniform Code of Military Justice (UCMJ) that could, and did, result in a punitive discharge, considered whether the applicant failed medical retention standards and was unfit prior to service separation in light of the previous upgrade of the discharge to general (under honorable conditions).  The applicant has been diagnosed with posttraumatic stress disorder (PTSD) and traumatic brain injury (TBI) related to service.  The Board found a preponderance of the evidence, to include a November 2016 ARBA Psychiatrist advisory opinion, reflected that the applicant's PTSD was a mitigating factor in the misconduct that led to the UCMJ action and subsequent discharge.  The Board determined that a preponderance of the evidence does not support a finding that the applicant failed medical retention standards or had any unfitting conditions, to include PTSD and TBI, warranting a disability separation/retirement prior to service separation.  The Board considered the lay and medical evidence submitted by the applicant, the November 2016 advisory opinion from an ARBA Psychiatrist that specifically applied liberal consideration in consideration of

002408

the evidence (codified at Title 10, U.S.C., section 1552(h)(2)(B)), and the 2018 and 2020 reviews conducted by Office of the Surgeon General (OTSG) physicians.  The Board considered counsel's contentions regarding the findings of the draft MEB conducted at West Point during the 2018 OTSG review that indicated certain disabilities failed medical retention standards.  The draft MEB appears based on the state of disabilities in 2018 and not prior to service separation in 2008.  As such, the Board finds it outweighed by the other evidence of record addressing the state of disabilities in 2008 that indicate the applicant met medical retention standards prior to service separation.  While acknowledging the diagnosed PTSD and TBI that existed prior to service separation and resultant mitigation of the misconduct by these conditions, the Board determined that a preponderance of the evidence reflected that the applicant met medical retention standards prior to service separation and referral into DES or disability separation/retirement was not warranted.

4.  The Board considered the applicant's contentions and evidence of record in light of the statutory and policy guidance regarding liberal consideration and clemency.  The Board found that the applicant's PTSD was a mitigating factor in the misconduct, being absent without leave (AWOL), which led to his discharge.  However, the Board found this mitigation of the misconduct is recognized in the previous upgrade from a bad conduct to a general (under honorable conditions) discharge.  The previous upgrade to a general (under honorable conditions) discharge is supported by the evidence of record and congruent with statutory and policy guidance.  However, the Board found the evidence in mitigation does not outweigh the severity of the misconduct and a full upgrade to honorable is not warranted.  The applicant's service does not meet the criteria for an honorable discharge characterization and is not otherwise so meritorious that any other characterization would be inappropriate.  The Board found the applicant has not demonstrated by a preponderance of the evidence that any further discharge upgrade is warranted.

002409

ABCMR Record of Proceedings (cont)                    AR20180011561

BOARD VOTE:

| Mbr 1 | Mbr 2 | Mbr 3 | |
|-------|-------|-------|---|
| : | : | : | GRANT FULL RELIEF |
| : | : | : | GRANT PARTIAL RELIEF |
| : | : | : | GRANT FORMAL HEARING |
| :MA | :KL | :AE | DENY APPLICATION |

BOARD DETERMINATION/RECOMMENDATION:

The evidence presented does not demonstrate the existence of a probable error or injustice. Therefore, the Board determined the overall merits of this case are insufficient as a basis for correction of the records of the individual concerned.

4/29/2020

X   Michael F. Anglemyer
_____

CHAIRPERSON
Signed by: ANGLEMYER.MICHAEL.F  Redacted PII

I certify that herein is recorded the true and complete record of the proceedings of the Army Board for Correction of Military Records in this case.

REFERENCES:

1. Title 10, U.S. Code, section 1552, provides that the Secretary of a Military Department may correct any military record of the Secretary's Department when the Secretary considers it necessary to correct an error or remove an injustice. With respect to records of courts-martial and related administrative records pertaining to court-martial cases tried or reviewed under the Uniform Code of Military Justice, action to correct any military record of the Secretary's Department may extend only to correction of a record to reflect actions taken by reviewing authorities under the Uniform Code of Military Justice or action on the sentence of a court-martial for purposes of clemency. Such corrections shall be made by the Secretary acting through boards of civilians of the executive part of that Military Department.

002410

2.  Title 10, U.S. Code, section 1552(h) provides that, in claims for review of a discharge or dismissal based in whole or in part on matters relating to posttraumatic stress disorder (PTSD) or traumatic brain injury (TBI) as supporting rationale, or as justification for priority consideration, and whose PTSD or TBI is related to combat or military sexual trauma (MST), the board shall review medical evidence of the Secretary of Veterans Affairs or a civilian health care provider that is presented by the claimant; and, review the claim with liberal consideration to the claimant that PTSD or TBI potentially contributed to the circumstances resulting in the discharge or dismissal or to the original characterization of the claimant's discharge or dismissal.

3.  Title 10, U.S. Code, chapter 61, provides the Secretaries of the Military Departments with authority to retire or discharge a member if they find the member unfit to perform military duties because of physical disability.  The U.S. Army Physical Disability Agency is responsible for administering the Army physical disability evaluation system and executes Secretary of the Army decision-making authority as directed by Congress in chapter 61 and in accordance with DOD Directive 1332.18 and Army Regulation 635-40 (Physical Evaluation for Retention, Retirement, or Separation).

   a.  Soldiers are referred to the disability system when they no longer meet medical retention standards in accordance with Army Regulation 40-501 (Standards of Medical Fitness), chapter 3, as evidenced in an MEB; when they receive a permanent medical profile rating of 3 or 4 in any factor and are referred by an MOS Medical Retention Board; and/or they are command-referred for a fitness-for-duty medical examination.

   b.  The disability evaluation assessment process involves two distinct stages: the MEB and PEB.  The purpose of the MEB is to determine whether the service member's injury or illness is severe enough to compromise his/her ability to return to full duty based on the job specialty designation of the branch of service.  A PEB is an administrative body possessing the authority to determine whether or not a service member is fit for duty.  A designation of "unfit for duty" is required before an individual can be separated from the military because of an injury or medical condition.  Service members who are determined to be unfit for duty due to disability either are separated from the military or are permanently retired, depending on the severity of the disability and length of military service.  Individuals who are "separated" receive a one-time severance payment, while veterans who retire based upon disability receive monthly military retired pay and have access to all other benefits afforded to military retirees.

   c.  The mere presence of a medical impairment does not in and of itself justify a finding of unfitness.  In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the Soldier may reasonably be expected to perform because of his or her office, grade, rank, or rating.  Reasonable performance of the preponderance of duties will invariably result in a

002411

finding of fitness for continued duty.  A Soldier is physically unfit when a medical impairment prevents reasonable performance of the duties required of the Soldier's office, grade, rank, or rating.

4.  Army Regulation 635-40 (Physical Evaluation for Retention, Retirement, or Separation) establishes the Army Disability Evaluation System and sets forth policies, responsibilities, and procedures that apply in determining whether a Soldier is unfit because of physical disability to reasonably perform the duties of his office, grade, rank, or rating.  Only the unfitting conditions or defects and those which contribute to unfitness will be considered in arriving at the rated degree of incapacity warranting retirement or separation for disability.

a.  Paragraph 3-1 states the mere presence of an impairment does not, of itself, justify a finding of unfitness because of physical disability.  In each case, it is necessary to compare the nature and degree of physical disability present with the requirements of the duties the Soldier reasonably may be expected to perform because of their office, grade, rank, or rating.  The overall effect of all disabilities present in a Soldier whose physical fitness is under evaluation must be considered.  All relevant evidence must be considered in evaluating the fitness of a Soldier.  Findings with respect to fitness or unfitness for military service will be made on the basis of the preponderance of the evidence.

b.  Paragraph 3-2 states disability compensation is not an entitlement acquired by reason of service-incurred illness or injury; rather, it is provided to Soldiers whose service is interrupted and who can no longer continue to reasonably perform because of a physical disability incurred or aggravated in military service.

c.  Paragraph 3-4 states Soldiers who sustain or aggravate physically-unfitting disabilities must meet the following line-of-duty criteria to be eligible to receive retirement and severance pay benefits:

(1)  The disability must have been incurred or aggravated while the Soldier was entitled to basic pay or as the proximate cause of performing active duty or inactive duty training.

(2)  The disability must not have resulted from the Soldier's intentional misconduct or willful neglect and must not have been incurred during a period of unauthorized absence.

d.  Paragraph 4-1 states that a Soldier charged with an offense under the Uniform Code of Military Justice (UCMJ) or who is under investigation for an offense chargeable under the UCMJ, which could result in dismissal or punitive discharge, may not be referred for, or continue, disability processing unless − (1) the investigation ends without

002412

charges; (2) the officer exercising proper court-martial jurisdiction dismisses the charges; or, (3) the officer exercising proper court-martial jurisdiction refers the charges for trial to a court-martial that cannot adjudge such a sentence.

e. Paragraph 4-2 states that a Soldier may not be referred for, or continue, disability processing if under sentence of dismissal or punitive discharge.  If the sentence is suspended, the Soldier's case may then be referred for disability processing.  A copy of the order suspending the sentence must be included in the Soldier's records.  If action to vacate the suspension is started after the case is forwarded for disability processing, the PEB serving the area must be promptly notified to stop disability processing.  Disability processing may resume if the commander decides not to vacate the suspension.

5.  Title 10, U.S. Code, section 1201, provides for the physical disability retirement of a member who has at least 20 years of service or a disability rating of at least 30 percent.  Title 10, U.S. Code, section 1203, provides for the physical disability separation of a member who has less than 20 years of service and a disability rating of less than 30 percent.

6.  Title 38, U.S. Code, sections 1110 and 1131, permits the VA to award compensation for disabilities that were incurred in or aggravated by active military service.  However, an award of a higher VA rating does not establish error or injustice on the part of the Army.  The Army rates only conditions determined to be physically unfitting at the time of discharge which disqualify the Soldier from further military service.  The VA does not have the authority or responsibility for determining physical fitness for military service.  The VA awards disability ratings to veterans for service-connected conditions, including those conditions detected after discharge, to compensate the individual for loss of civilian employability.  These two government agencies operate under different policies.  Unlike the Army, the VA can evaluate a veteran throughout his or her lifetime, adjusting the percentage of disability based upon that agency's examinations and findings.

7.  Army Regulation 635-200 (Personnel Separations – Enlisted Personnel) sets forth the basic authority for the separation of enlisted personnel.

a.  An honorable discharge is a separation with honor and entitles the recipient to benefits provided by law.  The honorable characterization is appropriate when the quality of the member's service generally has met the standards of acceptable conduct and performance of duty for Army personnel or is otherwise so meritorious that any other characterization would be clearly inappropriate.

b.  A general discharge is a separation from the Army under honorable conditions.  When authorized, it is issued to a Soldier whose military record is satisfactory but not sufficiently meritorious to warrant an honorable discharge.

ABCMR Record of Proceedings (cont)                    AR20180011561

 

c.  Chapter 3, paragraph 3-11, provides that an enlisted person would be given a bad conduct discharge pursuant only to an approved sentence of a general or special court-martial.  The appellate review is required to be completed and the affirmed sentence ordered duly executed.

d.  paragraph 1-33c states that disability processing is inappropriate if UCMJ action has been initiated.

//NOTHING FOLLOWS//

44

002414

# The Jerome N. Frank Legal Services Organization

### YALE LAW SCHOOL

VIA E-MAIL

April 20, 2020

MEMORANDUM FOR Army Board for Correction of Military Records
Director, Case Management Division, Army Review Boards Agency
251 18th Street South, Suite 385
Arlington, VA 22202-3531

SUBJECT: Robert J. LaBonte Jr.'s Response to the OTSG Medical Advisory Opinion Issued on
April 1, 2020

## <u>INTRODUCTION</u>

Robert LaBonte Jr. submits this memorandum in response to the Office of the Surgeon

General ("OTSG")'s medical advisory opinion issued on April 1, 2020, and accompanying

memorandum dated April 3, 2020 (collectively, "OTSG opinion"). The OTSG opinion is, at best,

a cursory review of Mr. LaBonte's voluminous record. It fails to mention, much less consider,

the overwhelming evidence in favor of granting his claim for medical retirement benefits. It also

does nothing to address the deficiencies of the previous OTSG medical advisory opinion that the

Court of Federal Claims identified in its remand order.[1] Therefore, it would be arbitrary,

capricious, and contrary to law for the Board to rely on it. Mr. LaBonte urges the Army Board

for Correction of Military Records ("ABCMR") to disregard the OTSG opinion entirely and

instead weigh the ample evidence in Mr. LaBonte's favor under the required liberal

consideration standard.[2]

In addition, although the OTSG opinion does not address the Board's authority to grant

Mr. LaBonte relief, the Board does in fact possess such authority. Based on the evidence and its

---

[1] Corrected Order Staying Proceedings, Vacating Decision of ABCMR, and Remanding for Further Proceedings,
*United States v. LaBonte*, Ct. Fed. Cl. Case 1:**18-cv-01784-RAH** (Dec. 3, 2019).
[2] 10 U.S.C. § 1552(h)(2)(B). *See also* Secretary of Defense Kurta, *Memorandum for Secretaries of the Military
Departments* (Aug. 25, 2017).

1

authority, therefore, the Board should grant Mr. LaBonte's request for retroactive medical retirement status.

**I. Relying on the OTSG opinion would fail to meet the Board's legal standard of review.**

The OTSG opinion has obvious shortcomings and is an unacceptable basis for ruling on Mr. LaBonte's claim. The ABCMR should not accord it any deference for at least three reasons.

First, the opinion fails to canvass Mr. LaBonte's full medical record, completely ignoring evidence produced by the Army, the Department of Veterans Affairs ("VA"), and independent physicians, both before and after Mr. LaBonte's discharge.

Second, the OTSG opinion is wrong to assert that there is insufficient evidence establishing that Mr. LaBonte suffered from post-traumatic stress disorder ("PTSD") and traumatic brain injury ("TBI") prior to his discharge from the Army. This conclusion ignores Mr. LaBonte's contemporaneous reports of PTSD symptoms to Army medical examiners and his superiors, as well as post-discharge medical evidence confirming his conditions from Army, VA, and civilian physicians. The OTSG's conclusion on TBI is similarly inadequate because it ignores the multiple third-party affidavits attesting to Mr. LaBonte's fall and inappropriate lack of treatment, photographic evidence of Mr. LaBonte's head wound, and the multiple physicians who subsequently confirmed that Mr. LaBonte suffered a TBI resulting from his fall.

Third, the OTSG opinion implicitly, and wrongfully, concludes that because Army physicians did not diagnose Mr. LaBonte with any medically unfitting conditions prior to his discharge, he did not suffer from any such conditions. Although a "presumption of regularity" may typically be appropriate in reviewing military records and decision-making, it does not apply here, given the Army's manifest failures in documenting and treating PTSD and TBI during the Iraq and Afghanistan wars. Moreover, even if the presumption applied here, Mr. LaBonte has supplied ample evidence to rebut it.

2

**A. The OTSG opinion fails to consider the evidence in the record.**

To meet the legal standards for review of a disability retirement claim, the Army must

consider "*all* of the competent evidence . . . whether original or supplemental."[3] The OTSG

opinion, however, ignores numerous sources of competent evidence that document

Mr. LaBonte's debilitating conditions during his Army service. Instead, the OTSG memorandum

states that Mr. LaBonte has presented "no evidence to support the need for disability processing

prior to his discharger [sic] in 2008."[4] That is plainly wrong. The memorandum ignores—and

contradicts—the overwhelming evidence presented to the ABCMR and the Court of Federal

Claims and that court's recognition that there is evidence supporting Mr. LaBonte's claims.

Indeed, that is precisely why the Court remanded the case to the ABCMR for further

proceedings.

To reiterate, there is a large body of evidence that the Board must consider. The OTSG

opinion did not mention, much less consider, any of the following:

*Contemporaneous Medical Records*
- In 2004 at Fort Hood, Mr. LaBonte sought help from his chain of command, reporting that he suffered from significant mental distress because of his traumatic experiences in Iraq.[5]
- A June 30, 2004 report detailing Mr. LaBonte seeking help from an Army mental health specialist at Fort Hood:[6]
  - Mr. LaBonte reported distress as well as symptoms including "poor disrupted sleep, decreased appetite, excessive anxiety, rapid breathing, rapid heartbeat, crying a lot, difficult[y] control[ling] worry, decreased ability to have fun, sadness, rage, anxiety, [and] hopeless[ness]."[7]
- An October 23, 2006 Army physical examination stating that:
  - "Mr. LaBonte reported symptoms including 'fever, chills, visual change, sore throat, chest pain, sputum, abdominal pain, vomiting, dysuria, hematuria, rash,

---

[3] *Heisig v. United States*, 719 F.2d 1153, 1157 (Fed. Cir. 1983).
[4] Office of the Surgeon General, *Memorandum for Army Board for Correction of Military Records* (Apr. 3, 2020).
[5] *See, e.g.*, Administrative Record ("AR") 657-58. Citations to the administrative record refer to the page number of the agency's record as filed in *LaBonte v. United States*, Ct. Fed. Cl. Case 1:18-cv-01784-RAH (2019), Docket No. 27, supplemented at Docket No. 44.
[6] AR488.
[7] AR490.

002417

headache, depression' and another neurological symptom that is indecipherable in the record."[8]

*Post-Service Military Medical Records*
- On March 14, 2018, MEB physician Labib N. Labib, DO conducted an "Initial Evaluation of Residuals of Traumatic Brain Injury (I-TBI) Disability Benefits Questionnaire" and concluded that:
  - "Based on the fact that he had a head trauma with LOC [loss of consciousness] and was exposed to multiple mortar blasts at close range and had AOC [alteration of consciousness] but no structural brain damage, it is at least as likely as not that he suffered mild traumatic brain injury."[9]
- On March 29, 2018, MEB Physician Kheuikay Chitopheng, PhD, LCSW, BCDA conducted a "Review Post Traumatic Stress Disorder (PTSD) Disability Benefits Questionnaire" and concluded that:
  - Mr. LaBonte "was experiencing PTSD, Depression, Anxiety and mTBI symptoms post his deployment from Iraq in 2004" and that "[t]hese symptoms interred [sic] with his sleep, appetite, concentration, focus, energy, and ability to perform his duties."[10]
- On April 2, 2018, MEB physician Dr. Labib produced an "IDES Physical Disability Evaluation System West Point NARSUM ["Narrative Summary"]" and concluded that:
  - Mr. LaBonte failed to meet retention standards for "post-traumatic stress disorder, generalized anxiety disorder, major depressive disorder (recurrent, moderate), and m-TBI with residuals of migraine headache and cognitive impairment."[11]

*Post-Discharge ARBA, VA, and Civilian Physician Evidence*
- A 2014 report by a clinical psychologist who treated Mr. LaBonte for six psychotherapy sessions:
  - The "Mental Health Intake Questionnaire undertaken at Fort Hood on June 30, 2004 . . . indicates that [Mr. LaBonte] was presenting with significant symptoms of depression and anxiety . . . [and] may have been a threat to himself[.]"[12] He further stated that "it sounds clear that [Mr. LaBonte] was, at the time of the evaluation, seriously depressed and anxious, and that there may have been a history of suicidal thinking."[13]
- A 2014 report by an experienced clinical psychiatrist, who examined Mr. LaBonte in-person and reviewed his entire medical history:

---

[8] AR 2067.
[9] AR46-53.
[10] AR54-59.
[11] AR60-77.
[12] AR873.
[13] *Id.*

4

- o This psychiatrist concluded that Mr. LaBonte suffered from "residual symptoms of Major Depressive Disorder and []active symptoms of Posttraumatic Stress Disorder[,]" as well as "medical symptoms of new-onset cluster headaches and ringing in the ears . . . [that] strongly suggest TBI. . . . Given that Mr. LaBonte's symptoms were worst in 2005 and worse in 2004 than now, and that he met criteria for both [major depressive disorder] and PTSD . . . it is highly likely that he had both Disorders when he presented to the chaplain and then the Fort Hood Mental Health Clinic in 2004, and that these illnesses were not addressed."[14]
- A 2015 report by an expert neurologist who examined Mr. LaBonte:
  - o Mr. LaBonte "clearly suffered a severe concussive injury at the same time [as his 2004 fall] and immediately following his head trauma when he first regained consciousness and has suffered with headaches ever since."[15] This neurologist based his TBI diagnosis on both clinical observation of Mr. LaBonte's "impaired motor activity . . . [and] clinical evidence of brain dysfunction" as well as "subtle signs of damage on certain neurological findings of his exam[.]"[16]
- The ABCMR's October 19, 2017 decision included a "medical advisory opinion" obtained from the Army Review Boards Agency ("ARBA") psychiatrist:
  - o "[B]ased on the symptoms documented during his mental health intake, it is clear the applicant was suffering from a diagnosis more severe than adjustment disorder, most likely PTSD."[17]
- Repeated VA evaluations determined that Mr. LaBonte suffered from service-connected TBI arising from his fall in Tikrit, Iraq.[18]

Thus, the OTSG opinion is wholly inadequate and cannot form the basis of the Board's decision.

### B. The OTSG ignores abundant evidence demonstrating that Mr. LaBonte suffered from multiple unfitting conditions prior to his discharge, including PTSD and TBI.

i.   *The OTSG is wrong to conclude Mr. LaBonte did not have PTSD in service.*

There is ample evidence establishing that Mr. LaBonte suffered from PTSD prior to his

discharge. The OTSG opinion concludes otherwise only by failing to acknowledge and examine

the overwhelming competent evidence proving Mr. LaBonte's claim. As outlined above, Mr.

LaBonte reported symptoms indicating PTSD and other serious mental health conditions to his

---

[14] AR198.
[15] AR187.
[16] AR188.
[17] AR105.
[18] *See, e.g.*, AR363 (VA decision of December 23, 2014 recognizing "that based on the facts that you had an inservice (sic) head trauma with loss of consciousness and were also exposed to multiple mortar blasts at close range and had alteration of consciousness . . . it is at least as likely as not that you suffered a mild traumatic brain injury (TBI). Therefore, service connection is established for [TBI]").

002419

superiors on multiple occasions. But instead of recognizing Mr. LaBonte's symptoms for what they were, a mental health intake specialist, with neither the clinical expertise nor the authority to accurately diagnose medical conditions, incorrectly concluded that Mr. LaBonte had "adjustment disorder" and failed to refer Mr. LaBonte for further medical treatment. Mr. LaBonte reported many of the same symptoms again during his pre-confinement physical examination. Yet again, the Army medical examiner did nothing. As Army Review Boards Agency, Army Medical Evaluation Board, VA, and independent physicians have all recognized, the symptoms Mr. LaBonte reported during his time in the Army were clearly far more serious than the Army's contemporaneous medical examinations acknowledged. The absence of a contemporaneous diagnosis does not mean Mr. LaBonte did not have PTSD, or that Mr. LaBonte was not entitled to medical retirement.[19] The absence of an in-service PTSD diagnosis reflects nothing more than that the Army failed to provide Mr. LaBonte with appropriate medical treatment.

ii.   *The OTSG is wrong to apparently conclude that Mr. LaBonte did not have TBI in service caused by a fall while serving in Iraq.*

The OTSG opinion is similarly deficient with regard to Mr. LaBonte's TBI. The OTSG's statement that it could not locate "any medical records to support a 30 foot fall to support the diagnosis of TBI" is, at best, severely misleading. Mr. LaBonte does not deny that the Army failed to provide him with appropriate treatment after he fell from the guard tower in Tikrit, Iraq. On the contrary, Mr. LaBonte asserts that it is precisely *because* the Army failed to provide him with appropriate medical treatment that his TBI went undiagnosed and his condition worsened. The OTSG opinion provides no evidence to support the inference it seemingly draws from the lack of medical records: that Mr. LaBonte did not fall from a guard tower and did not suffer a TBI. Based on the evidence Mr. LaBonte has provided, such an inference is untenable.

---

[19] *See* Secretary of Defense Kurta, *Memorandum for Secretaries of the Military Departments* (Aug. 25, 2017).

002420

To deny that Mr. LaBonte fell from a guard tower and suffered a TBI, the OTSG must disregard sworn testimony from several sources—including Mr. LaBonte's fellow soldier—and provide some other explanation for the TBI Mr. LaBonte suffered during his service in Tikrit, Iraq. Mr. LaBonte has consistently maintained that he fell from a guard tower, woke up in a pool of his own blood, and received only cursory medical attention before being sent back to duty in a combat zone. But the OTSG opinion does not need to rely on Mr. LaBonte's own account to determine what happened. Rather, numerous competent sources confirm that he fell from a guard tower and suffered a TBI, as the Court of Federal Claims outlined in its remand decision.[20] This includes a sworn affidavit from a fellow soldier who found Mr. LaBonte unconscious in a pool of his own blood; a sworn affidavit from Mr. LaBonte's father explaining that his son told him about his injury the day after his fall and describing Mr. LaBonte's pronounced symptoms; and multiple post-service medical opinions and determinations that Mr. LaBonte suffered a TBI.[21]

Further, it is not surprising that during deployment, Mr. LaBonte did not receive the care to which he was entitled or that recordkeeping was inadequate. That is precisely why this Board exists—to correct the errors and injustices stemming from less-than-perfect processes in the field. Numerous reports have documented in detail the Army's pervasive failures in identifying, diagnosing, and treating TBIs during the Iraq and Afghanistan wars, even at well-equipped military bases far from active combat zones.[22] Even after Congress recognized this problem and passed a law designed to improve the military's capacity to diagnose and treat TBIs, the military

---

[20] *See* Corrected Order Staying Proceedings, Vacating Decision of ABCMR, and Remanding for Further Proceedings, *United States v. LaBonte*, Ct. Fed. Cl. Case 1:18-cv-01784-RAH (Dec. 3, 2019).

[21] *See* Plaintiff's Response and Cross-Motion for Judgment on the Administrative Record 26, *LaBonte v. United States*, Case 1:18-cv-01784-RAH (Oct. 25, 2019).

[22] *See* T. Christian Miller & Daniel Zwerdling, *With Traumatic Brain Injuries, Soldiers Face Battle For Care*, NPR (June 9, 2010), https://www.npr.org/2010/06/09/127542820/with-traumatic-brain-injuries-soldiers-face-battle-for-care.

002421

struggled to develop adequate protocols for identifying wounded soldiers.[23] Mr. LaBonte has

produced compelling evidence that the Army on the whole, and his chain of command in

particular, were ill-equipped to deal with soldiers' brain injuries during an intense, chaotic period

of heavy combat.[24] Based on these accounts, the Army's failure to properly identify, diagnose,

and treat Mr. LaBonte's TBI is, unfortunately, unsurprising. The record indicates only that the

Army failed to provide Mr. LaBonte with the treatment he needed. That is not a reason to deny

Mr. LaBonte relief now.

### C. The OTSG cannot rely on a supposed lack of contemporaneous evidence that it believes should exist.

As described in detail above, the OTSG's assertion that "there is a dearth of medical

records available during Mr. LaBonte's time in service" is factually incorrect. It is also legally

irrelevant. Any supposed missing contemporaneous medical record does not excuse the ABCMR

from its legal obligation to consider all probative evidence, including evidence produced by VA

and civilian physicians after Mr. LaBonte's discharge.[25] The OTSG clearly has not.

Moreover, the Army cannot rule against Mr. LaBonte based on an unsubstantiated belief

that there is a "dearth" of contemporaneous medical record evidence, especially when the

Army's repeated failures to adhere to its own regulations caused this supposed evidentiary gap.[26]

---

[23] *See* Joaquin Sapien, *Testing Program Fails Soldiers, Leaving Brain Injuries Undetected*, PROPUBLICA (Nov. 28, 2011), https://www.propublica.org/article/testing-program-fails-soldiers-leaving-brain-injuries-undetected.

[24] *See* AR217-18 (Affidavit of Sgt. James Mastroianni) ("Our leaders knew nothing about post-traumatic stress disorder (PTSD) or traumatic brain injury (TBI). I had never heard of these conditions before, and nobody ever spoke about them. There was, however, a huge stigma against soldiers who had mental health problems or mental health treatment.").

[25] 10 U.S.C. §1552(h)(2)(B).

[26] *See Stuart v. United States*, 108 Fed. Cl. 458, 470 (Fed. Cl. 2013) ("The Court will not speculate that Plaintiff met retention standards when he was discharged merely because the Army's failure to follow its procedures resulted in a lack of evidence to the contrary."); *see also Ferrell v. United States*, 23 Cl. Ct. 562, 570 (Cl. Ct. 1991) (rejecting the government's argument that the absence of evidence in the plaintiff's medical records created a presumption that he was fit for service at the time plaintiff was discharged).

002422

As Mr. LaBonte has detailed, the Army unlawfully failed to follow its own procedures on at least

four occasions:[27]

- The Army failed to evaluate and treat Mr. LaBonte after he fell from a guard tower in an active combat zone;[28]
- It failed to provide Mr. LaBonte with disability evaluation system processing after he reported his symptoms to his superiors;[29]
- It failed to provide Mr. LaBonte with a separation physical within one year of his discharge;[30] and
- It terminated Mr. LaBonte's DES process prematurely, without cause, and without the standard rights of appeal provided to soldiers undergoing DES processing.[31]

Therefore, the ABCMR should not credit the OTSG opinion, which impermissibly relies upon an

asserted—but easily disprovable—conclusion that Mr. LaBonte lacks evidence supporting his

claim.

Put differently, the OTSG opinion appears to implicitly rely on the "presumption of

regularity"[32] to conclude that because Army physicians did not diagnose Mr. LaBonte with an

unfitting condition prior to his discharge, he did not suffer from one. This argument cannot

justify denying Mr. LaBonte's claim.

As a preliminary matter, there is ample reason *not* to apply a presumption of regularity to

the military's handling of active-duty servicemembers' PTSD and TBI during the Iraq and

---

[27] Plaintiff's Response and Cross-Motion for Judgment on the Administrative Record 30-35, *LaBonte v. United States*, Case 1:18-cv-01784-RAH (Oct. 25, 2019).

[28] Department of the Army Personnel Policy Guidance for Overseas Contingency Operations, Part 7-2(i) ("All episodes of health care will be documented in the individual's permanent or deployment health record while participating in contingency operations [in accordance with Army Regulation] 40-66"; see also *Stuart*, 108 Fed. Cl. at 466 (acknowledging this portion of the PPG applied to injured soldiers in Iraq in 2005); Army Reg. 40-66, Part 3-12 (describing the details to be recorded for all battle and nonbattle injuries, including: 1) the nature of the injury; 2) the parts of the body affected; 3) how the injury occurred; and 4) the date and location of the injury).

[29] *See* Army Reg. 635-40, Part 2-9. *See also* Army Reg. 40–501 ¶¶ 3–30(g), 3–31, 3–32, 3–33 (2003) (describing requirements for mandatory referrals for disability processing).

[30] *See* Army Reg. 635-200 Ch. 1, Sec. VI, 1-32; Army Reg. 40-501, Ch. 8-24 (requiring a separation physical under various chapters, and if requested by the separating servicemember); Army Reg. 40-501 Part 8-24 (requiring a Separation Health Assessment within twelve months of discharge).

[31] See Army Reg. 635-40, 4-13; Army Reg. 40-400 Ch. 7 (MEB governing procedures).

[32] *See e.g.*, *Butler v. Principi*, 244 F.3d 1337, 1340 (Fed. Cir. 2001) ("In the absence of clear evidence to the contrary, the doctrine presumes that public officers have properly discharged their official duties.").

002423

Afghanistan wars.[33] More importantly, even if the presumption applies here, that presumption can be rebutted.[34] There is indeed clear evidence that establishes that Mr. LaBonte did in fact have PTSD and TBI at the time of his discharge. Evidence also establishes that Army officers did not properly discharge their official duties in responding to Mr. LaBonte's injuries; therefore, even if Mr. LaBonte were lacking evidence, which he is not, the Army could not draw an inference against Mr. LaBonte from a circumstance caused by its own repeated failures. The fact that the Army repeatedly mishandled Mr. LaBonte's attempts to report and seek treatment for his injuries is more than sufficient to disturb whatever presumption of regularity military officials may typically enjoy. When the Army fails to provide a soldier with legally mandated medical examinations, it cannot invoke the lack of an official diagnosis to justify denying a soldier's claim for retroactive medical retirement.[35]

## II. The ABCMR has the legal authority to grant Mr. LaBonte medical retirement status.

Although the OTSG opinion naturally does not address the ABCMR's authority to grant Mr. LaBonte medical retirement status, Mr. LaBonte is aware that the Board likely intends to consider its authority now. Put simply, the Board does possess the necessary authority.

Before the Court of Federal Claims, the United States invoked for the first time a novel (and incorrect) justification for its failure to grant Mr. LaBonte's application: that the Secretary lacked valid authority under 10 U.S.C. §1552(f) to amend Mr. LaBonte's court-martial

---

[33] *See* Terri Tanielian & Lisa H. Jaycox, *Invisible Wounds of War: Psychological and Cognitive Injuries, Their Consequences, and Services to Assist Recovery*, RAND CORPORATION, CENTER FOR MILITARY HEALTH POLICY RESEARCH (2008), https://www.rand.org/content/dam/rand/pubs/monographs/2008/RAND_MG720.pdf; Secretary of Defense Kurta, *Memorandum for Secretaries of the Military Departments* (Aug. 25, 2017); Secretary of Defense Hagel, *Memorandum for Secretaries of the Military Departments* (Sept. 3, 2014).
[34] *See e.g., Crain v. Principi*, 17 Vet. App. 182, 190 (Vet. App. 2003) (holding that a claimant had met his burden of providing "the 'clear evidence' necessary to rebut the presumption of regularity").
[35] *See, e.g., Stuart*, 108 Fed. Cl. at 470.

002424

conviction, thus rendering him categorically ineligible for medical retirement status.[36] However, the ABCMR possesses the authority to provide Mr. LaBonte the medical retirement status he seeks, without disturbing his court-martial conviction and consistent with 10 U.S.C. §1552(f).

By its plain terms, §1552(f)(2) expressly preserves, and in no way limits, the Secretary's authority to act on the sentence of a court martial for the purposes of clemency. What §1552(f) restricts is the Secretary's power to exercise non-clemency review of court-martial proceedings. It dispossesses the Secretary of his power to amend, alter, overturn, and erase court martial *trials and convictions*, while leaving the circumscribed clemency power to act on lawfully adjudged *sentences* untouched.[37] Congress intentionally preserved the Review Boards' power to determine whether a sentence should be reduced as a matter of clemency.[38] Because 10 U.S.C. §1552(f) does nothing to alter the Secretary's clemency authority—and because it is a punitive discharge that precludes a servicemember from eligibility for medical retirement status, not a court-martial conviction standing alone—the sole determinative question concerning the ABCMR's authority to grant Mr. LaBonte medical retirement is whether the Secretary's clemency authority encompasses the power to relieve Mr. LaBonte's punitive discharge. It does.

In fact, by granting Mr. LaBonte clemency, the Secretary has *already* taken action on Mr. LaBonte's sentence, which makes him eligible for medical retirement. When the Secretary acted through the Army Discharge Review Board ("ADRB") to grant clemency to Mr. LaBonte, it exercised the clemency powers vested in it under Uniform Code of Military Justice ("UCMJ")

---

[36] *See* Defendant's Motion to Dismiss and Motion for Judgment on the Administrative Record 6, *LaBonte v. United States*, Case 1:18-cv-01784-RAH (May 17, 2019).

[37] *See, e.g.*, *Cossio v. Donley*, 527 F. App'x 932, 935 (Fed. Cir. 2013) (per curiam) ("Just as the Board may not overturn a conviction, it likewise has no authority to amend sentencing judgments other than through a grant of clemency."); *Cothran v. Dalton*, 83 F.Supp. 2d 58, 65 (D.D.C. 1999) (holding that § 1552 could not provide plaintiff with relief "since he [was] not asking for clemency and ha[d] not obtained reversal of his conviction through military channels").

[38] *Bolton v. United States*, 914 F.3d 401 (6th Cir. 2019).

11

Article 74(b).[39] UCMJ Article 74(b) expressly empowers the Secretary to "substitute an administrative form of discharge for a discharge or dismissal executed in accordance with the sentence of a court-martial." By its plain terms, Article 74(b) permitted the Secretary to relieve Mr. LaBonte's Bad Conduct Discharge and replace it with an Administrative Discharge. This is precisely what the ADRB did in granting Mr. LaBonte's clemency petition.

Because Mr. LaBonte is no longer under sentence of a Bad Conduct Discharge, he is not subject to Army Regulation 635-40, ¶ 4-2 (2006), which provides that "[a] Soldier may not be referred for, or continue, disability processing *if under sentence of dismissal or punitive discharge*."[40] As the phrase "under sentence of" makes plain, the inquiry turns on an examination of Mr. LaBonte's *current* sentence, which does not include a punitive discharge. The fact that Mr. LaBonte *previously* was "under sentence of" a punitive discharge is, for the purposes of determining his present eligibility for medical retirement status, irrelevant. Accordingly, Mr. LaBonte is currently eligible for disability processing and medical retirement benefits.

## CONCLUSION

The Board should grant Mr. LaBonte the medical retirement benefits he seeks. It has been more than 15 years since Robert LaBonte, Jr. enlisted in the United States Army and was first wounded in an active combat zone at the height of the Iraq War. Since then, Mr. LaBonte has

---

[39] *See Lasky v. McHugh*, 92 F. Supp. 3d 3, 13 (D. Conn. 2015) (defining the scope of the ABCMR's clemency authority as controlled by U.S. Dep't of Army, Reg. 27–10, Military Justice, ¶ 5–39a, titled "Clemency under Article 74," which mirrors the exact language of UCMJ Article 74(a) and 74(b)). *See also* Air Force Board for the Correction of Military Records, *Discharge Review Board Authority over Discharges from Special Courts-Martial* (27 Sept. 2017) (stating that when a military review board considers a petition for clemency, it is "[e]ssentially, in granting relief as to an approved discharge from a final court-martial conviction . . . exercising the same 'clemency' power reserved to the Secretary and the same power that the other administrative review boards (BCMR, C&PB) exercise").

[40] Emphasis added. A punitive discharge refers to a BCD or a dismissal, which only concerns officers. *See United States v. Carbo*, 37 M.J. 523 (A.C.M.R. 1993).

002426

struggled to overcome the debilitating consequences of his injuries and the Army's failure to treat them.

This Board possesses the legal authority to grant Mr. LaBonte the relief that he seeks, and must give weight to the overwhelming competent evidence supporting his claim rather than rely on the OTSG's perfunctory and deeply flawed opinion. The Board should take this opportunity to rectify the Army's longstanding failures and finally deliver justice to a soldier who sacrificed greatly for his nation.

Respectfully submitted,

Dated: April 20, 2020

By: */s/ **Renee Burbank***

Renee Burbank, Supervising Attorney
Lernik Begian, Law Student Intern
Samuel Davis, Law Student Intern
Casey Smith, Law Student Intern
Veterans Legal Services Clinic
Yale Law School
127 Wall Street
New Haven, CT 06511

*Counsel for Robert J. LaBonte, Jr.*

002427

**Abrams, Stacy R Sr CIV USARMY HQDA ARBA (USA)**

| | |
|---|---|
| **From:** | Renee Burbank <renee.burbank@YLSClinics.org> |
| **Sent:** | Tuesday, April 7, 2020 12:52 PM |
| **To:** | Abrams, Stacy R Sr CIV USARMY HQDA ARBA (USA); Michael Wishnie |
| **Cc:** | Boehme, Kenneth L CIV USARMY HQDA ARBA (USA) |
| **Subject:** | [Non-DoD Source] Re: ABCMR (RE: LABONTE, ROBERT) |

All active links contained in this email were disabled. Please verify the identity of the sender, and confirm the authenticity of all links contained within the message prior to copying and pasting the address to a Web browser.

---

Dear Mr. Abrams,
We have received both this passphrase and the DoD SAFE link.
Thank you,
Renee Burbank

---

**From:** "Abrams, Stacy R Sr CIV USARMY HQDA ARBA (USA)" <stacy.r.abrams.civ@mail.mil>
**Date:** Tuesday, April 7, 2020 at 12:38 PM
**To:** Mike Wishnie <michael.wishnie@ylsclinics.org>, "renee.burbank@ylsclinics.org" <renee.burbank@ylsclinics.org>
**Cc:** "Boehme, Kenneth L CIV USARMY HQDA ARBA (USA)" <kenneth.l.boehme.civ@mail.mil>
**Subject:** ABCMR (RE: LABONTE, ROBERT)

Ms. Burbank/Mr. Wishnie, I provide administrative support to the Army Board for Correction of Military Records (ABCMR) to which your client (Mr. Labonte, Robert) has a court remanded case.  In the processing of his application we have obtained an advisory opinion for the Office of the Surgeon General (OTSG).  I have forwarded you a copy for your review using DoD SAFE (Secure Access File Exchange).  You will receive an email with instruction on how to access and download the advisory opinion;

Your PASSPHRASE is   CourtRmd01

Please contact me by email if you have any questions.

Mr. Stacy Abrams
Analyst
Army Review Boards Agency (ARBA)
251 18th South, Suite 385
Arlington, VA 22202-3531
DP (703) 545-5668
FAX (703) 601-0705
Caution-http://arba.army.pentagon.mil < Caution-http://arba.army.pentagon.mil >

NOTICE: The information contained in this communication may contain information that is exempt from disclosure under the Freedom of Information Act, 5 U.S.C. 552 and the Privacy Act, 5 U.S.C. 552a.  Recipients are not to disseminate this information to individuals other than those who have an official need to know in the course of their official

002428

government duties. If you received this communication in error, please do not examine, review, print, copy, forward, disseminate, or otherwise use the information. Please immediately notify the sender and delete the copy received.

CLASSIFICATION: UNCLASSIFIED

**002429**



**DEPARTMENT OF THE ARMY**
ARMY REVIEW BOARDS AGENCY
251 18TH STREET SOUTH, SUITE 385
ARLINGTON, VA  22202-3531

April 07, 2020

Case Management Division/sra
AR20180011561, LaBonte, Robert J. Jr.

Mr. Robert J. LaBonte, Jr
*Redacted PII*

Dear Mr. LaBonte:

This is in reference to your application to the Army Board for Correction of Military Records (ABCMR) December 06, 2017.

Title 10, United States Code, section 1556 requires we provide applicants a copy of various types of correspondence and communication we receive related to their application. This includes any advisory opinion provided from outside of the Army Review Boards Agency that directly pertains to or has a material effect on an applicant's case.

In your case, we received an advisory opinion from the Office of the Surgeon General, Falls Church, VA (copy enclosed).  The ABCMR can adopt the advisory opinion recommendation in whole, in part, or reject the recommendation, based on the Board's analysis of the facts and circumstances of your case.

We have placed the processing of your application on hold for 15 weeks from the date of this letter to allow you the opportunity to submit comments on the enclosed advisory opinion. Your comments must be submitted in writing to: Director, Case Management Division, Army Review Boards Agency, 251 18th Street South, Suite 385, Arlington, VA 22202-3531.  You may also fax your comments to 703-601-0705 to the attention of Mr. Abrams, or email to stacy.r.abrams.civ@mail.mil.

If you choose not to submit comments by the suspense date, the ABCMR will make a final determination in your case based on available facts and documents.

I copy of this letter has been proved to the counsel listed on your application, veterans legal Services Clinic, Jerome N. Frank Legal Service Organization ATTN:  Mr. Michael Wishnie and Ms. Renee Burbank, PO Box 209090, New Haven, CT 06520-9090.

Sincerely,

Kenneth L. Boehme
Acting Director, Case Management Division

Enclosure



**DEPARTMENT OF THE ARMY**
OFFICE OF THE SURGEON GENERAL
7700 ARLINGTON BOULEVARD
FALLS CHURCH, VA 22042-5140

DASG-HSZ                                                      3 April 202

MEMORANDUM FOR Army Board for Correction of Military Records

SUBJECT: Robert J. LaBonte

1.  This memorandum serves as the Office of the Surgeon General endorsement of the opinion provided by Dr. Denise Richardson of the Fort Meade, MD, Medical Evaluation Board (MEB) regarding the request for reconsideration of OTSG's review of his records and concerns presented by Robert J. LaBonte.

2.  After reviewing the ABCMR case for Mr. LaBonte it has been determined that there is no evidence to support the need for disability processing prior to his discharger in 2008.

3.  Point of contact is the undersigned at (703) 681-1833 or via email denise.r.brown24.civ@mail.mil



DENISE BROWN
Supv, Health System Specialist
Disability Evaluation System



**DEPARTMENT OF THE ARMY**
HEADQUARTERS, UNITED STATES ARMY MEDICAL DEPARTMENT ACTIVITY
2480 LLEWELLYN AVENUE STE 5800
FORT GEORGE G. MEADE, MARYLAND 20755-5129

MCXR-ZC                                                                  01 April 2020

MEMORANDUM FOR RECORD

SUBJECT: Advisory Opinion for Robert J. LaBonte

1. The purpose of this memorandum is to provide an advisory opinion of the above named individual. Specifically, to review his request for "reconsideration of OTSG's review of his records to the Disability Evaluation System."

2. The undersigned review all available documents, to include the United States Court of Federal Claims No. 18-1784 and a previous MFR written by Dr. Eric Doane dated 15 May 2008.

3. Per review of the medical records, there is no documentation to indicate that Mr. LaBonte required disability processing at the time of his separation from the Army. Regarding his diagnosis of PTSD, Mr. LaBonte was evaluated by Behavioral Health (BH) on 30 June 2004 after returning from his second AWOL. He indicated that the military was "causing problems back home for me." His desired result from that visit was to have his chain of command "to realize I need to be chaptered out of the Army ASAP." He was subsequently given a diagnosis of an Adjustment Disorder and did not return for treatment. There was no further BH documentation after this visit. The undersigned also did not find any medical records to support a 30 foot fall to support the diagnosis of TBI.

4. From a review of the available documents, it is clear that there is a dearth of medical records available during Mr. LaBonte's time in service. Therefore, there is no evidence to support the need for disability processing prior to his discharge in 2008.

5. The point of contact is Denise M. Richardson, Chief, KACC Medical Operations, at denise.m.richardson14.civ@mail.mil or (301) 677-8181.

RICHARDSON.
DENISE.MECHE
LE. *Redacted PII*

Digitally signed by
RICHARDSON.DENISE.ME
CHELE *Redacted PII*
Date: 2020.04.01 08:34:35
-04'00'

Denise M. Richardson, MD
Chief, Medical Operations
KACC, Ft. Meade



**DEPARTMENT OF THE ARMY**
ARMY REVIEW BOARDS AGENCY
251 18TH STREET SOUTH, SUITE 385
ARLINGTON, VA  22202-3531

S:  February 17, 2020

Case Management Division/sra                              January 17, 2020
AR20190015181

MEMORANDUM FOR Office of the Surgeon General (OTSG), Attn:  Mr. Shedrick C. Davis),
7700 Arlington Boulevard, Suite 4SW122, Falls Church, VA  22041-3258

SUBJECT:  Advisory Opinion – LaBonte, Robert J.

1.  Reference is made to the enclosed application for correction of military records in the case
of the subject individual.

2.  We request that the enclosed application, together with the military records, be reviewed
and administrative action taken, if appropriate.

**NOTE:  Applicant request reconsideration of OTSG'S review of his records to the
Disability Evaluation System**

3.  If full administrative relief is not possible, please furnish a comprehensive advisory opinion
for the guidance of the Army Board for Correction of Military Records (ABCMR), including
citation of the statutory or regulatory provisions supporting the opinion.  ***Your opinion should
also address any additional issue(s) your office deems appropriate.***

1.  Reference is made to the enclosed application for correction of military records in the case
of the subject individual.

2.  We request that the enclosed application, together with the military records, be reviewed
and administrative action taken, if appropriate.

3.  If full administrative relief is not possible, please furnish a comprehensive advisory opinion
for the guidance of the Army Board for Correction of Military Records (ABCMR), including
citation of the statutory or regulatory provisions supporting the opinion.

4.  The 1999 DOD Authorization Act enacted 10 U.S.C. §1556 – Ex parte communications
statute requires us to provide an applicant to the Army Review Boards Agency with a copy of
any correspondence and communications (including summaries of verbal communications).
This includes any advisory opinion to or from the agency with anyone outside the agency that
directly pertains to or has a material effect on the applicant's case.

5.  If your office must forward this case elsewhere for additional documentation/
opinions, or the suspense date cannot be met, we request the notification of
Ms. Abrams at 703-545-5668 or email at stacy.r.abrams.civ@mail.mil.

6.  We request the return of the advisory opinion not later than the suspense date.

Kenneth L. Boehme
Acting Director, Case Management Division

**002433**

Encl
DD Form 149 w/encls

002434

# CORRECTED

# In the United States Court of Federal Claims

No. 18-1784C

(Filed: December 3, 2019)



|  |  |
|---|---|
| **ROBERT J. LABONTE JR.,** | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES,** | ) |
| | ) |
| *Defendant.* | ) |

## ORDER

The Court heard oral argument on the pending motions on December 3, 2019.

For the reasons set out orally on the record of the hearing, except as to one claim, the Complaint is DISMISSED under Rule 12(b)(1) of the Rules of the Court of Federal Claims ("RCFC") for want of jurisdiction due to the plaintiff's conviction by court martial.

With respect to the plaintiff's claim that he should have been considered for medical retirement before being convicted by a court martial, the Court preliminarily finds it has jurisdiction because the Army Board for Correction of Military Records ("ABCMR") considered this claim on the merits. In the event the case returns after remand, the Court will allow the defendant to reassert its jurisdictional defense to this claim.

Because the ABCMR relied on a medical opinion that failed to consider medical evidence as required by 10 U.S.C. § 1552(h)(2)(B), its decision to reject the plaintiff's claim for medical retirement is contrary to law. *See Walls v. United States*, 582 F.3d 1358 (Fed Cir. 2009).

Accordingly, a decision on the cross-motions for judgment on the administrative record under RCFC 52.1 is deferred on this one claim. The decision of the ABCMR to reject the claim for medical retirement is VACATED, and the case is REMANDED to the ABCMR for a period not to exceed four months, until March 26, 2020, so that the ABCMR may obtain a further medical opinion that considers the medical evidence as required by law and thereafter resolve the plaintiff's claim.

The parties shall file a Joint Status Report within 14 days of the decision of the ABCMR on remand advising as to what further proceedings may be necessary and proposing a schedule for them.

The requirement under RCFC 52.2(b)(1)(D) that the parties file a Joint Status Report within 90 days of this Order is waived.

The case is STAYED during the pendency of the proceedings on remand and until further order of the Court.

The Clerk of Court is directed to serve a certified copy of this remand order on the Army Review Boards Agency, Army Board for Correction of Military Records, 251 18th Street South, Suite 385, Arlington, Virginia 22202-3531.

It is so **ORDERED.**

s/ Richard A. Hertling
**Richard A. Hertling
Judge**

2

**002436**

Receipt number 9998-5048028

## UNITED STATES COURT OF FEDERAL CLAIMS

ROBERT J. LABONTE, JR.,

*Plaintiff,*

v.

THE UNITED STATES OF AMERICA,

*Defendant.*

No. ___18-1784 C___

**COMPLAINT**

Plaintiff Robert J. LaBonte, Jr., through counsel, alleges the following facts:

### INTRODUCTION

Robert J. LaBonte, Jr. is a United States Army veteran who served his country honorably from 2003 to 2008, at the height of the Iraq War. He joined the Army, pledging to fight for his country, when he was 18 years old. While in Iraq, he participated in heavy combat and witnessed gruesome violence. In 2004, Mr. LaBonte fell thirty feet from a guard tower, where a fellow soldier found him unconscious. His head was bleeding profusely. Because of his service, Mr. LaBonte suffered a traumatic brain injury (TBI), post-traumatic stress disorder (PTSD), and other debilitating injuries.

After his return home from Iraq, Mr. LaBonte unsuccessfully sought help from superiors in his chain-of-command and from military mental health resources. The Army should have recognized Mr. LaBonte's service-connected injuries and granted him medical retirement. Instead, as a result of misconduct arising from his undiagnosed, untreated PTSD and TBI, the Army court-martialed Mr. LaBonte and separated him with a bad conduct discharge.

Nearly a decade later, Mr. LaBonte obtained a discharge upgrade from the Army Discharge Review Board to general, under honorable conditions. That upgrade, however, did not

1

do enough. Without a medical retirement, Mr. LaBonte was denied access to retirement pay and associated health benefits. Therefore, in 2015 Mr. LaBonte applied to the Army Board for the Correction of Military Records (ABCMR) to correct his record to medical retirement. The Deputy Assistant Secretary of the Army (Review Boards) directed the Office of the Surgeon General "to determine if [Mr. LaBonte] should have been retired or discharged by reason of physical disability through the Integrated Disability Evaluation System (IDES)." As a result, the Army began processing Mr. LaBonte through the Disability Evaluation System (DES). He submitted medical records and other evidence documenting his pre-discharge health conditions. Two Army physicians examined him. Both concluded that he met the threshold for medical retirement.

But rather than completing the DES process, the Army abruptly terminated Mr. LaBonte's application. The ABCMR reversed course and simply denied Mr. LaBonte's claim, basing its decision on the cursory and incorrect opinion of a single, unqualified Army physician whom Army personnel themselves referred to as "[Dr.] Doane (Denies Everything)."

The Army's rejection of Mr. LaBonte's claim for medical retirement status was arbitrary, capricious, unsupported by the evidence, contrary to the Army's own rules, and in violation of the Due Process Clause of the Fifth Amendment. Mr. LaBonte respectfully asks the Court to hold unlawful the Army's decision, grant his medical retirement, and award him the back pay and retirement pay to which he is entitled.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction under the Tucker Act, 28 U.S.C. § 1491. Plaintiff raises claims arising under the Military Pay Act, 37 U.S.C. § 204(a); the Disability Retirement and Compensation Act, 10 U.S.C. § 1201; and the Fifth Amendment of the U.S. Constitution.

2

002438

2.      If successful in this action, Plaintiff would be entitled to monetary relief in excess of $10,000.00.

## PARTIES

3.      Plaintiff Robert J. LaBonte, Jr. served in the United States Army and is a combat veteran of Iraq. He is a citizen of the United States and currently resides in Connecticut.

4.      Defendant is the United States of America.

## STATUTORY AND REGULATORY BACKGROUND

5.      The Secretary of each military branch may retire a service member with disability retirement pay upon determining that the service member is "unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay." 10 U.S.C. § 1201(a).

6.      The Department of Defense established the Disability Evaluation System (DES) to determine if the service member is unfit for further military service due to a medical condition or physical defect. Department of Defense Instruction (DODI) 1332.18; Department of Defense Memorandum (DODM) 1332.18. The Army adopted this system in Army Regulation (AR) 635-40; *see also* AR 40-501, 3-1 (medical fitness standards for retention, separation, and retirement).

7.      The DES process consists of three main steps: (1) Medical Evaluation Board (MEB); (2) Physical Evaluation Board (PEB); and (3) final disposition by the Secretary. DODI 1332.18.

8.      The purpose of the first step, the MEB, is to determine whether the service member has one or more medical conditions that fail to meet Army retention standards under AR 40-501. Conditions that fail to meet retention standards prevent him from "reasonably

3

002439

performing" the "duties of [his] office, grade, rank, or rating." DODI 1332.18; AR 635-40, 4-7(a).

9.      The MEB is comprised of two or more physicians. One physician serves as the MEB "approving" or "convening" authority, who must have "detailed knowledge of regulations pertaining to standards of medical fitness and disability separation processing." AR 635-40, 4-11(a)(2). "When a MEB is considering a psychiatric diagnosis," such as PTSD, "the MEB will include a psychiatrist or a clinical psychologist with a doctoral degree in psychology, who may also substitute for the second MEB physician member." AR 635-40, 4-11(a)(2); DODI 1332.18.

10.     A member of the MEB also prepares a Narrative Summary (NARSUM) of the Soldier's history, present status, and medical conditions. DODM 1332.18. "The MEB NARSUM is the heart of the MEB." AR 635-40, 4-12(a).

11.     After the Board has made its decision, "it will recommend that the case file be forwarded to a PEB for a fitness determination when the MEB finds that one or more of a Soldier's medical conditions individually or collectively do not meet medical retention standards." AR 635-40, 4-12(b).

12.     Upon receiving the MEB's decision, the Soldier may elect to (1) concur with the MEB decision, (2) request an impartial medical review (IMR) by a physician independent of the MEB, or (3) submit a written rebuttal of the MEB findings. AR 635-40, 4-13.

13.     Following the MEB, the second step of the DES process is a Physical Evaluation Board. Upon referral from the MEB, all cases are initially adjudicated by an Informal Physical Evaluation Board (IPEB). The IPEB determines the Soldier's fitness for purposes of retention, separation, or retirement for disability based on a "documentary review" of the Soldier's case file. AR 635-40, 4-22.

4

**002440**

14.    A soldier who disagrees with the IPEB's findings may appeal by requesting a

Formal Physical Evaluation Board or submitting a written rebuttal. *Id.* at 4-23.

15.    The final step in the DES process is a "final disposition by the Secretary of the

Military Department concerned." DODI 1332.18; AR 635-40, 2-2(b)(f). This disposition

constitutes the final decision as to whether or not the Soldier is eligible to be retired or

discharged by reason of physical disability.

## FACTS AND PROCEEDINGS

### *Mr. LaBonte's Military Service*

16.    Mr. LaBonte was born in 1984, in Springfield, Massachusetts. He grew up in

Rocky Hill, Connecticut.

17.    Around November 2002, at 18 years old, Mr. LaBonte enlisted in the Army as a

95B Military Police (MP). As an MP, he hoped to fulfill his dream of becoming a police officer

like his father, while protecting his country and continuing a family tradition of military service.

18.    Mr. LaBonte completed his basic training in Fort Leonard Wood, Missouri and

was initially stationed at Fort Hood, Texas. Mr. LaBonte excelled during training, becoming a

squad leader, representing his unit as the guidon carrier, and carrying the phase banner at his

graduation.

19.    The following photograph was taken shortly before Mr. LaBonte's deployment to

Iraq:

5

**002441**



20.    In September 2003, Mr. LaBonte deployed to Tikrit, Iraq. Mr. LaBonte had two main duties at the Forward Operating Base (FOB) Ironhorse in Tikrit: (1) provide security on patrols as a turret gunner on an unarmored Humvee and (2) serve as a prison guard at a containment facility.

21.    In Tikrit, Mr. LaBonte manned the guard towers and watched over enemy prisoners of war at the containment facility, where he was a frequent target of mortar, small arms fire, and rocket attacks.

22.    As a turret gunner, Mr. LaBonte's unit traveled outside the FOB Ironhorse gate almost every day. The enemy frequently targeted Mr. LaBonte and his unit, which engaged in several firefights with insurgent groups. Their vehicles often encountered improvised explosive devices (IEDs), which severely injured Mr. LaBonte's fellow soldiers and Iraqi civilians.

23.    On or about January 23, 2004, Mr. LaBonte witnessed a disturbing death. He was guarding a convoy when a man stepped out in front of one of the convoy's trucks, was hit by a truck, and flew through the air.

24.    The convoy stopped, and Mr. LaBonte saw the man lying in a puddle of water with a confused look on his face. The man's head then suddenly started gushing blood, which the

6

**002442**

wind picked up and sprayed everywhere. The person in charge of the convoy feared that the man had killed himself so that the convoy would stop and expose itself to attack. He therefore ordered the convoy to move out without helping the man.

25.     On or about February 6, 2004, near the end of his deployment, Mr. LaBonte fell from a 30-foot guard tower. Mr. LaBonte lost consciousness and has no memory of what caused his fall.

26.     His friend and fellow MP, Brandon DeLaune, found him face down and unconscious in a pool of blood near the base of the tower. Mr. DeLaune, a trained medic, helped rouse Mr. LaBonte and, at the order of a non-commissioned officer (NCO), helped him to the bathroom. Mr. DeLaune was surprised by the amount of blood from Mr. LaBonte's injuries. He took a photograph to document Mr. LaBonte's facial gash and extreme bleeding.  Shortly afterwards, Mr. LaBonte began rambling incoherently. Mr. DeLaune took Mr. LaBonte to the FOB Ironhorse medical aid center.

27.     Mr. LaBonte received stitches at the medical aid center, but no other medical treatment. Sergeant (SGT) James Mastroianni stated that he saw Mr. LaBonte both before and after the fall and noticed the new gash on his face. Mr. LaBonte explained to SGT Mastroianni that he had fallen from the guard tower. Mr. LaBonte also sent an AOL message to his family to let them know about the injury. Apart from the photo taken by Mr. DeLaune, SGT Mastroianni's statements, Mr. LaBonte's AOL message, and numerous photos of Mr. LaBonte taken before and after the fall, Mr. LaBonte's official military treatment records contain no documentation of his fall or treatment at the aid station.

002443

28.     Following his head injury, Mr. LaBonte became markedly more depressed and anxious. He had significant difficulty sleeping, experienced constant nightmares, and woke up throughout the night panicking.

29.     As a result of his fall, Mr. LaBonte also began to experience back pain and severe headaches. Army medics provided him over-the-counter painkillers, and he began taking 16 to 20 painkillers daily.

30.     Mr. LaBonte's combat tour ended on or about April 5, 2004.

31.     Between April and June 2004, when he returned to Fort Hood, Mr. LaBonte repeatedly told his chain of command about the symptoms he was experiencing, including increased mental distress due to the traumatic events he witnessed in Iraq. He explained that he felt both physically and mentally unable to continue serving.

32.     Mr. LaBonte shared his concerns with his company commander, Captain (CPT) Murray; his Platoon Sergeant, Sergeant Michaud; and several other NCOs. Mr. LaBonte's parents also called Sergeant Michaud and other members of Mr. LaBonte's chain of command several times to plead with the Army to provide their son with the medical attention he needed.

33.     Mr. LaBonte's chain of command told him to toughen up and to tell his parents to stop calling. Instead of referring Mr. LaBonte for evaluation and treatment, Mr. LaBonte's chain of command sent him to speak with a chaplain.

34.     Mr. LaBonte explained to the chaplain that he did not feel that he was able to continue serving. Yet the chaplain also did not refer Mr. LaBonte for medical care.

35.     After returning to Fort Hood, Mr. LaBonte believed he could not handle life in the Army any longer. On two separate occasions around June 2004, he drove off base in his car, each time for only a few hours. The second time, he missed formation, and an NCO called and

8

002444

promised Mr. LaBonte that he would receive help if he returned. Instead, when Mr. LaBonte returned to base, CPT Murray placed him on barracks restrictions and threatened that he could be executed for going AWOL.

36. On June 30, 2004, shortly after his barracks restriction ended, Mr. LaBonte sought help at the Fort Hood Mental Health Clinic during walk-in hours.

37. On the clinic's intake form, Mr. LaBonte noted that he was experiencing poor and disrupted sleep, excessive anxiety, rapid breathing, rapid heartbeat, decreased appetite, frequent crying, racing thoughts, and difficulty controlling worry. He wrote that he was seeking help because he was "depressed" and could not "take military life away from home." Mr. LaBonte answered the question "What result do you desire from this clinic today?" by writing, "my chain of command to realize I need to be chapterd [sic] out of the army ASAP."

38. SPC Jason S. Keith, an enlisted mental health specialist, evaluated Mr. LaBonte. SPC Keith's notes state that Mr. LaBonte was feeling anxious, was getting only "5 hrs restless" sleep, had a decreased appetite, and felt "[h]opeless about situation in military" and "trapped."

39. SPC Keith, whose military occupational specialty did not qualify him to make a medical diagnosis, misdiagnosed Mr. LaBonte with Axis I Adjustment Disorder. He did not inform Mr. LaBonte of this diagnosis, schedule any follow-up evaluation, or confer with Mr. LaBonte's chain of command.

### *Mr. LaBonte's Separation*

40. In 2004, Mr. LaBonte's unit dissolved. He joined a new unit and learned it would deploy to Iraq. He immediately told his new chain of command that he was not physically or mentally ready to deploy for a second time, reporting severe symptoms including panic attacks.

9

41.    Mr. LaBonte's new chain of command did not refer him for medical evaluation and told him that he would have to re-deploy.

42.    Shortly before his unit's scheduled deployment, in November 2005, Mr. LaBonte went home to Connecticut for his grandfather's funeral on emergency leave. When Mr. LaBonte arrived at the airport to board his return flight to Texas, he found himself unable to return to his impending deployment. He instead remained at his parents' home for about six months.

43.    In May 2006, after Mr. LaBonte was able to bring himself to return to base, he sought help from the new chain of command at Fort Hood. However, like his previous chains of command, this new one also did not refer Mr. LaBonte for evaluation or treatment.

44.    Instead, on June 9, 2006, Mr. LaBonte received an Article 15, an administrative, non-judicial punishment, for going AWOL that lowered his rank to private first class. The Army instructed Mr. LaBonte to prepare for deployment.

45.    On September 11, 2006, over three months after Mr. LaBonte had returned to base, Major Paul Webb charged Mr. LaBonte with desertion despite his previous non-judicial punishment.

46.    Mr. LaBonte's court-martial took place on October 23, 2006. At that time, he continued to suffer from symptoms of his undiagnosed and untreated PTSD, depression, and TBI. Under the advice of the defense counsel provided to him, Mr. LaBonte pled guilty to the charge and highlighted marital problems as the main source of his stress.

47.    Mr. LaBonte was sentenced to a reduction in his pay grade to E-1, forfeiture of $849 pay per month for four months, four months confinement at Fort Sill, Oklahoma, and a bad conduct discharge, which made Mr. LaBonte ineligible for VA and nearly all other post-service care and benefits.

10

002446

*Post-Discharge Struggles*

48.     After separating from the Army, Mr. LaBonte struggled with the symptoms of his

undiagnosed PTSD and TBI, and the stigmatizing effects of his bad conduct discharge.

49.     Mr. LaBonte was unable to retain employment because his debilitating symptoms

made it difficult for him to perform basic professional tasks. He repeatedly made impulsive

financial and personal decisions that were entirely out of character with his pre-service

personality. His relationship with his family and his then-wife deteriorated as he increasingly

withdrew from the outside world.

50.     Because the Army had repeatedly told him that he was healthy, Mr. LaBonte

convinced himself that there was no medical cause for his distress. This added to his sense of

despair and belief that he was "weak" for being unable to cope with the war.

51.     Even if Mr. LaBonte had sought medical help, it would have been difficult for

him to obtain. Because of his bad conduct discharge, Mr. LaBonte did not have access to medical

benefits, including Tricare,[1] that help traumatized veterans transition back into civilian life.

*PTSD and TBI Diagnosis*

52.     Mr. LaBonte continued to suffer. In 2012, Mr. LaBonte's father convinced him to

see Dr. J. Mark Hall, a clinical psychologist in Glastonbury, Connecticut. Dr. Hall diagnosed Mr.

LaBonte with service-connected PTSD.

53.     Dr. Hall also evaluated the intake form and notes from Mr. LaBonte's visit to the

Fort Hood Mental Health Clinic and concluded that at the time of this visit Mr. LaBonte was "a

---

[1] Tricare is a government-managed health care program available to active duty and medically
retired/discharged service members. *About Us*, Tricare (June 15, 2018),
https://www.tricare.mil/About.

002447

highly compromised individual" who "should [have been] referred for treatment . . . as well as an evaluation for psychiatric medication."

54.     In March 2014, Dr. Bandy Lee, Assistant Clinical Professor of Psychiatry at Yale University School of Medicine and Director of the Violence and Health Study Group at Yale University, evaluated Mr. LaBonte and diagnosed him with service-connected PTSD.

55.     In August 2015, Dr. Sanjay Rathi, a neurologist with more than 25 years of experience, evaluated Mr. LaBonte and diagnosed him with a TBI. Dr. Rathi concluded that he suffered a "severe concussive injury" and at least a moderate TBI when he fell from the guard tower. He explained that Mr. LaBonte's motor activity is impaired because his central nervous system was damaged by the fall, his left hemisphere showed subtle signs of damage from his TBI, and that his severe, persistent migraine headaches "are causally related to the original traumatic brain injury [e.g. caused by the fall from the guard tower]."

### Applications for Discharge Upgrade

56.     After being diagnosed with PTSD, Mr. LaBonte began to come to terms with the extent to which his medical conditions had contributed to his struggles both in the Army and after his discharge. At the encouragement of his father, Mr. LaBonte sought formal review of his service history and post-discharge benefits.

57.     In January 2014, a U.S. Department of Veterans Affairs (VA) Character of Service Determination concluded that Mr. LaBonte's service was "honorable and . . . not a bar to VA Benefits under the provisions of 38 CFR 3.12(c)(6)(i-ii)," relying in part on the symptoms that Mr. LaBonte reported during his visit to the Fort Hood Mental Health Clinic. The VA service-connected Mr. LaBonte for PTSD, TBI, depression, headaches, back pain, tinnitus, painful scar, and ulcers.

002448

58.     In September 2014, after Mr. LaBonte retained undersigned counsel and made the

appropriate application, the Army Discharge Review Board (ADRB) upgraded his discharge

status to general, under honorable conditions. The ADRB concluded that the "overall length and

quality of [Mr. LaBonte's] service," his combat tour in Iraq, and his PTSD were mitigating

factors for his misconduct. The ADRB further concluded that "[i]f [Mr. LaBonte] had a firm

diagnosis of PTSD and indication of TBI, this would have been mitigating at his trial, [sic] in

turn would have led to a more lenient sentence."

59.     On November 17, 2015, Mr. LaBonte filed a petition to the ABCMR asking the

Board to (1) retroactively medically retire him by reason of permanent disability for PTSD,

depression, and TBI, (2) upgrade his discharge status to honorable, and (3) correct his DD-214,

Certificate of Release or Discharge from Active Duty, to remove the reason for his separation

(e.g. court-martial conviction) and to reflect his accomplishments while serving in Iraq and the

education he obtained while in the military.

60.     On September 29, 2016, the VA increased Mr. LaBonte's combined service-

connected disability rating to 100%, based on ratings of 70% for PTSD, 70% for TBI, 50% for

headaches, 20% for gastric ulcers, 20% for convergence insufficiency with accommodative

disorder and photosensitivity, and 10% for disfigurement of forehead scar.

61.     On October 19, 2017, the ABCMR unanimously granted Mr. LaBonte partial

relief. The Board corrected his DD-214 to reflect some of his military accomplishments but

denied his discharge upgrade request. The ABCMR further found that it did not have authority to

amend his DD-214 to remove his court-martial conviction.

62.     As to his request for medical retirement, the ABCMR concluded that "based on

the post-service medical evidence," Mr. LaBonte may have met the criteria for referral to the

13

002449

Army Physical Disability Evaluation System at the time of his separation. The ABCMR

observed that "it appears from reviewing the record [Mr. LaBonte's] behavioral health

conditions were not duly considered during medical separation processing."

63.     On November 27, 2017, Deputy Assistant Secretary of the Army (Review

Boards) Francine Blackmon found "sufficient evidence to grant additional relief" and therefore

"direct[ed] that [Mr. LaBonte's] case be referred to the Office of the Surgeon General to

determine if he should have been retired or discharged by reason of physical disability through

the Integrated Disability Evaluation System."

### *Disability Evaluation System Processing*

64.     After Secretary Blackmon referred Mr. LaBonte into the DES process, the Army

assigned Mr. LaBonte a Physical Evaluation Board Officer (PEBLO) with the West Point Keller

Army Community Hospital.

65.     In an e-mail, the PEBLO explained that Mr. LaBonte had "been referred to our

office for a Medical Evaluation Board as part of the ABCMR Decision."

66.     At the PEBLO's request, Mr. LaBonte provided the Office of the Surgeon

General with a memorandum describing his extensive post-separation medical records. He had

also included the records as part of his application to the ABCMR.

67.     As part of the Legacy Disability Evaluation System,[2] Mr. LaBonte was then

evaluated by two Army providers.

---

[2] Although Mr. LaBonte was referred to the IDES by Secretary Blackmon, he was processed through the Legacy Disability Evaluation System (LDES). Army regulations provide that "[t]he legacy process will be used for Army Veterans referred to the DES by the Army Board for Correction of Military Records." AR 635-40, 402(e). Unlike the IDES, the LDES uses military instead of VA physicians to evaluate fitness for military duty at the time of separation and does not interact with the VA system. *See* Dep't of Def. Manual 1332.18, Vol. 1 (Aug. 5, 2014), http://www.secnav.navy.mil/mra/CORB/Documents/DoDM-1332.18-Volume-1.pdf. However,

002450

68.     Major Kai Chitaphong, a licensed clinical social worker and an Activated Army Reservist at West Point, evaluated Mr. LaBonte on March 20, 2018.

69.     Major Chitaphong concluded that Mr. LaBonte "was experiencing PTSD, Depression, Anxiety, and mTBI symptoms post his deployment from Iraq in 2004" and that "[t]hese symptoms interred [sic] with his sleep, appetite, concentration, focus, energy, and ability to perform his duties." He also noted that "[t]here is no history in the family of mental health issues, and [Mr. LaBonte] did not exhibit these symptoms prior to deploying to Iraq in 2003."

70.     Dr. Labib N. Labib, an MEB physician at West Point, evaluated Mr. LaBonte on April 2, 2018 and completed Mr. LaBonte's Narrative Summary (NARSUM) later that day. The NARSUM states that Mr. LaBonte's conditions—PTSD, generalized anxiety disorder, major depressive disorder, and TBI—did not meet medical retention standards at the time of Mr. LaBonte's separation from the Army. The NARSUM further states that Mr. LaBonte was "not deployable" to outside the continental United States.

71.     The Army began to complete Mr. LaBonte's MEB Proceedings Form, DA Form 3947, dated April 2, 2018. The form states that Mr. LaBonte's PTSD, generalized anxiety disorder, major depressive disorder, and mTBI are service-connected and did not meet AR 40-501 retention standards at the time of separation.

72.     Consistent with Army regulations, the form was signed by the provider who completed the NARSUM, Dr. Labib, and a clinical psychologist with a doctoral degree in psychology, Dr. Joseph Marasia. AR 635-40, 4-11(a)(2). The form also lists Colonel Laura Dawson of West Point as the MEB Approval Authority.

---

both processes are part of the DES and governed by DoD regulations establishing procedures for medical retirement. *See* DoD 1332.18.

15

002451

73.     On April 3, 2018, the PEBLO contacted Dr. Eric L. Doane, a Senior MEB Physician at Fort Gordon, Georgia, and asked him to "sign [Mr. LaBonte's] medical board" as the "Approving Authority." She contacted Dr. Doane despite the fact that Mr. LaBonte was being processed at West Point, and his DA Form 3947 therefore properly lists Colonel Dawson at West Point as the Approval Authority.

74.     Dr. Doane graduated from Kansas City University of Medicine and Biosciences, College of Osteopathic Medicine, in 1983 and completed a residency in Family Practice at Ft. Belvoir, VA in 1986.

75.     Dr. Doane is a family medicine specialist. According to the Georgia Composite State Board of Medical Examiners, Dr. Doane reports that he does not hold certifications from any mental health or neurological field or sub-specialty.

76.     On April 4, 2018, Dr. Doane responded to the PEBLO, "I cannot sign this. The ABCMR . . . was sent to your IDES to determine whether PDES [Physical Disability Evaluation System] processing WAS WARRENTED [sic] at the time of separation. Clearly it was NOT warranted."

77.     Dr. Doane further stated that Mr. LaBonte "cannot come back years later after receiving VA ratings and now demand that he should have been put through the MEB." Dr. Doane did not refer to the NARSUM, Mr. LaBonte's post-separation medical records, the ABCMR decision, or Secretary Blackmon's order to refer Mr. LaBonte into the IDES process.

78.     In response, and at the PEBLO's request, Mr. LaBonte's counsel sent a letter explaining that after returning from Iraq, Mr. LaBonte repeatedly sought help from his superiors and the Fort Hood Mental Health Clinic, but that the Army failed to properly diagnose or treat his injuries while he was in service.

16

002452

79.     The PEBLO forwarded the letter to Dr. Doane on April 12, 2018, along with Mr. LaBonte's pre- and post-discharge medical records, the ABCMR decision, and the Secretary's order to refer Mr. LaBonte into the IDES. She also stated that she had attached an email from Jacqueline Floyd, DES Consultant at the Office of the Surgeon General, "directing us to do the board."

80.     After receiving from the PEBLO over one hundred pages of Mr. LaBonte's medical records, ABCMR application, decision, and further explanation from Mr. LaBonte's counsel, Dr. Doane replied, "Well this is amazing" and added that he was "still not convinced we are being forced to do IDES processing on him." The PEBLO replied that she understood Secretary Blackmon's directive to require conducting an MEB.

81.     On April 20, 2018, Colleen P. Campbell, Chief of the Patient Administration Branch for Keller Army Community Hospital, wrote to Dr. Doane and the PEBLO requesting that "[i]f there is still an issue with signing this board please let me know, we will have COL Dawson do the review." Dr. Doane responded that "[t]here is clearly no basis for this soldier requiring a MEB prior to his separation" and told her to wait for his reply.

82.     In an email regarding Mr. LaBonte's case, the Soldiers' MEB Counsel at West Point referred to Dr. Doane as "Dr. Eric Doane (Denies Everything)."

### *Denial of Medical Evaluation Board*

83.     On May 7, 2018, the PEBLO told Mr. LaBonte that she had spoken with the Office of the Surgeon General and that Dr. Doane would not be permitted "to not sign the board." Although Dr. Doane could disagree with the NARSUM, "[t]his board is going to proceed like any other board—the board can't just be stopped/ not signed [sic] by the approving authority."

17

84.     On May 15, 2018, Dr. Doane sent a memorandum to Ms. Campbell at Keller Army Community Hospital denying Mr. LaBonte an MEB, even though the MEB had already begun and the NARSUM had been completed. On May 21, 2018, the PEBLO informed Mr. LaBonte that Dr. Doane had unilaterally denied Mr. LaBonte access to the MEB. She also stated that Mr. LaBonte would not be permitted to appeal this decision through the regular DES channels, as provided for under AR 635-40, 4-13(a).

85.     The Doane memorandum fails to reference to any of the evidence provided by Mr. LaBonte or produced by the Army during its review of his case, including: medical examinations conducted by Army, VA, and independent physicians; Mr. LaBonte's NARSUM; contemporaneous communications and records documenting Mr. LaBonte's symptoms during his time in service; sworn affidavits by members of Mr. LaBonte's family and members of the Army who served with him in Iraq; and determinations by the ADRB, ABCMR, and VA that Mr. LaBonte suffers from service-connected PTSD or TBI.

86.     The Doane memorandum also contains numerous significant factual errors.

87.     For example, the memorandum states that "Mr. LaBonte and his legal team contend that because Mr. LaBonte currently has a 90% rating by the Veteran's Administration [sic], he must therefore have been unfit for duty at the time of separation March 2008."

88.     This is incorrect. Mr. LaBonte is rated at 100% by the Department of Veterans Affairs.

89.     Further, Mr. LaBonte has never argued that he is entitled to a disability retirement simply because of his VA rating.

90.     Mr. LaBonte has instead argued that the Army improperly evaluated and misdiagnosed him, that he would have been entitled to DES processing had he been properly

18

002454

diagnosed, and that his subsequent medical history—including, but not limited to, examinations by competent VA physicians, in addition to multiple examinations conducted by independent expert physicians and, in 2018, the Army's own medical personnel—demonstrates that he should have been medically retired at the time of his discharge.

91.     Dr. Doane also states that Mr. LaBonte "was in good health with no physical limitations" throughout his time in the Army.

92.     This too is incorrect. The Army diagnosed Mr. LaBonte with Adjustment Disorder in 2004, based on severe symptoms he reported to the Fort Hood Mental Health Intake physician. Although this erroneous diagnosis failed to identify his PTSD, it demonstrates that Mr. LaBonte was not "in good health" for the entirety of his service.

93.     Dr. Doane claims that there is "no documentation of" Mr. LaBonte's fall from the guard tower or a "subsequent head bump."

94.     This is also incorrect. Mr. LaBonte provided to the Office of the Surgeon General a photograph of him bleeding profusely from his head on the night he fell from the guard tower. He also provided sworn affidavits from his fellow soldier Brandon DeLaune attesting that Mr. DeLaune found Mr. LaBonte face down and unconscious near the guard tower, that Mr. LaBonte was bleeding profusely from his forehead, and that Mr. LaBonte began rambling incoherently soon after regaining consciousness; and Sergeant James Mastroianni attesting that he saw Mr. LaBonte after the fall with a new "huge gash on his forehead that was stitched up." Additionally, the Army Discharge Review Board, ABCMR, and VA have all acknowledged Mr. LaBonte's service-connected TBI and suggested no alternative source for his symptoms other than his fall from the guard tower in Tikrit.

19

95.     Dr. Doane states that Mr. LaBonte was "still DEERS/Tricare eligible"[3] from the

time he left the military until August 2010. Dr. Doane concludes that because Mr. LaBonte did

not seek treatment for his condition at "any military treatment facility or use his Tricare benefit,"

he "apparently [was] not in need of any healthcare during this period, which I would contend,

further supports the finding that Mr. LaBonte was not in need of disability processing at the time

of separation from Active Duty."

96.     This is incorrect. Mr. LaBonte was not DEERS/Tricare eligible upon his

separation because Mr. LaBonte received a bad conduct discharge by way of court-martial. 38

CFR § 3.12.

97.     Dr. Doane states that "the scar that Mr. LaBonte allegedly received from his fall

. . . was also noted in his 2002 MEPS [Military Entrance Processing Station] induction physical

examination."

98.     This is incorrect. The scar noted in Mr. LaBonte's 2002 MEPS induction physical

examination is a different scar than the one he incurred after his fall from the 30-foot guard

tower in Iraq. The VA recognized the difference when it rated Mr. LaBonte as service-connected

for the painful scar resulting from his fall.

99.     On June 21, 2018, the ABCMR denied Mr. LaBonte's claim for medical

retirement. Because Mr. LaBonte did not receive the DES processing to which he was entitled at

the time of his discharge, the June 2018 decision was the first time any competent military board

had denied the claim in a final decision.

---

[3] The Defense Enrollment Eligibility Reporting System (DEERS) is a "computerized database of
active duty and retired service members, their family members and others who are eligible for
TRICARE." *Keep Your DEERS Information Up To Date*, Tricare (May 30, 2018),
https://tricare.mil/CoveredServices/BenefitUpdates/Archives/05_30_18_DEERS_Update.

002456

100.    In its denial, the ABCMR relied solely on Dr. Doane's memorandum, which did

not cite any of the medical records produced subsequent to Mr. LaBonte's discharge, or any of

the contemporaneous records attesting to Mr. LaBonte's symptoms.

101.    Mr. LaBonte submitted a request for reconsideration to the ABCMR on August 9,

2018. In support of his request for reconsideration, Mr. LaBonte again submitted extensive

medical evidence documenting his pre-discharge PTSD and TBI.

102.    On September 7, 2018, the ABCMR denied Mr. LaBonte's request for

reconsideration.

## LEGAL CLAIMS

### FIRST CLAIM FOR RELIEF
### Tucker Act, 28 U.S.C. § 1491; Retirement, 10 U.S.C. § 1201;
### Military Pay, 37 U.S.C. § 204(a)

*The ABCMR Decision is Arbitrary, Capricious, and Not Supported by Substantial Evidence*

103.    The allegations of the preceding paragraphs are incorporated by reference as if

fully set forth herein.

104.    This Court has jurisdiction "to render judgment upon any claim against the United

States founded upon either the Constitution, or any Act of Congress or any regulation of an

executive department, . . . in cases not sounding in tort." 28 U.S.C. § 1491 (Tucker Act).

105.    37 U.S.C. § 204 and 10 U.S.C. § 1201 are money-mandating statutes within the

meaning of the Tucker Act.

106.    The ABCMR's decision denying Mr. LaBonte medical retirement was arbitrary,

capricious, unsupported by substantial evidence, contrary to law, and an abuse of discretion for

reasons including but not limited to those discussed below.

002457

107.    The ABCMR's decision is arbitrary and capricious because it was not based on substantial evidence. In adopting and relying solely upon Dr. Doane's memorandum, the Board failed to acknowledge, much less consider, the extensive medical evidence of Mr. LaBonte's PTSD, TBI, and other injuries arising from his service prior to his discharge.

108.    Moreover, the Board incorrectly concluded that Mr. LaBonte did not suffer from any physical or psychological impairment before his discharge, despite contemporaneous documentation of Mr. LaBonte's injuries, his improper diagnosis of Adjustment Disorder at an Army medical facility, and the Deputy Assistant Secretary's conclusion that there was "sufficient evidence" of Mr. LaBonte's service-connected injuries to warrant referring him to the DES.

109.    The Board erred by relying upon a highly selective, factually incorrect, and incomplete analysis of Mr. LaBonte's records.

110.    The ABCMR failed to give due consideration to Mr. LaBonte's arguments in his request for medical retirement. By fundamentally mischaracterizing Mr. LaBonte's claim and the record evidence, the Board failed to address Mr. LaBonte's arguments, and failed to provide substantial evidence supporting its conclusion that Mr. LaBonte was not entitled to medical retirement.

111.    The ABCMR also failed to articulate and apply the legal standards under which Mr. LaBonte's conditions were evaluated. The Board did not refer to a single DoD or Army regulation establishing the standards for medical retention and referral to an MEB.

112.    The Army violated its own procedures in processing Mr. LaBonte's DES referral. Dr. Doane acted contrary to Department of Defense Instructions and Army Regulations by unilaterally terminating Mr. LaBonte's DES processing. No DoD Instruction or Army Regulation grants one MEB physician, acting as Approving Authority, the authority to halt the

22

**002458**

MEB process without issuing a decision and allowing an opportunity for an independent medical review and/or rebuttal.

113. Dr. Doane was unqualified to serve as an Approving Authority as he lacked the required medical training and experience in mental health or neurology. He did not provide substantial evidence supporting his decision to override the opinions of the multiple expert neurological and mental health professionals who previously evaluated Mr. LaBonte and determined him unfit for military duty.

### *Dr. Doane Acted in Bad Faith*

114. Dr. Doane's actions and statements demonstrate that he acted in bad faith in adjudicating Mr. LaBonte's claim.

115. Upon receiving Mr. LaBonte's case, Dr. Doane pre-judged the outcome and immediately expressed his displeasure. Rather than cooperate in the legally-mandated procedure for processing medical retirement claims, Dr. Doane expressed his disbelief that the Army had referred Mr. LaBonte's case to him.

116. The record Dr. Doane encountered was lengthy and complicated. Rather than attempt to resolve this complexity, Dr. Doane failed to so much as consider the evidence in Mr. LaBonte's medical records. Dr. Doane impliedly dismissed Mr. LaBonte's account by suggesting that he had never fallen from a guard tower in Iraq. Dr. Doane did not engage in a judicious weighing of the evidence. Instead, he ignored the evidence entirely and arrived at a conclusion based on reasoning that did not meaningfully engage with the underlying record.

117. Dr. Doane's unwillingness to provide fair, honest, and unbiased evaluations is apparently so well known to Army personnel that at least one official has referred to him as "Dr. Doane (Denies Everything)."

23

002459

118.     Dr. Doane's repeated expressions of displeasure and disbelief at being asked to
participate in a Mr. LaBonte's DES processing, his immediate assessment that Mr. LaBonte's
claim lacked merit and that Mr. LaBonte was not credible without even considering the record
and medical evidence, and his refusal to cede to the proper Approving Authority when asked all
demonstrate that he did not act with the requisite good faith in evaluating Mr. LaBonte's record.

### SECOND CLAIM FOR RELIEF
### Fifth Amendment to the U.S. Constitution,
### Violation of Procedural Due Process

119.     The allegations of the preceding paragraphs are incorporated by reference as if
fully set forth herein.

120.     This Court has jurisdiction over ancillary constitutional claims and the authority
to grant injunctive relief. 28 U.S.C. § 1491(a)(2).

121.     The Due Process Clause of the Fifth Amendment provides that "[n]o person shall
be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

122.     Military disability retirement status and its corresponding benefits are a statutorily
granted property interest within the meaning of the Fifth Amendment.

123.     At a minimum, procedural due process requires notice and an opportunity to be
heard prior to deprivation of life, liberty, or property.

124.     The Due Process protections of the Fifth Amendment also require that an
administrative agency conduct adjudications in a fair and orderly manner.

125.     The Army violated Mr. LaBonte's Due Process rights by prematurely terminating
the DES process and prohibiting Mr. LaBonte from accessing the DES or MEB appeal
procedures, based solely on a cursory, factually erroneous, and legally incorrect memorandum by

24

002460

Dr Doane, who lacks training and expertise in mental health and neurology and acted in bad faith.

126.     The Army's perversion of the normal adjudication process unconstitutionally infringed upon Mr. LaBonte's property and liberty rights protected by the Due Process Clause of the Fifth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

(1)     Grant Mr. LaBonte all appropriate back pay, retirement pay, benefits, and allowances to which he is entitled;

(2)     Direct, by issuance of an injunction, that the Board correct Mr. LaBonte's record to reflect medical retirement by reason of permanent disability for PTSD and TBI, with a physical disability rating of at least 80% for all purposes, including healthcare and education benefits and backpay retirement;

(3)     Award attorneys' fees and costs; and

(4)     Grant any other relief that the Court deems just and proper.

002461

Dated: November 20, 2018
      New Haven, Connecticut

                    Respectfully Submitted,

                    By: s/Michael J. Wishnie

                    Samuel Davis, Law Student Intern[*]
                    Diana Lee, Law Student Intern[*]
                    Renee A. Burbank
                    Michael J. Wishnie
                    Veterans Legal Services Clinic
                    Jerome N. Frank Legal Services Organization
                    P.O. Box 209090
                    New Haven, CT 06520-9090
                    t. (203) 432-4800
                    f. (203) 432-1426
                    renee.burbank@ylsclinics.org
                    michael.wishnie@ylsclinics.org

                    *Counsel for Plaintiff*

---

[*] Application for law student admission forthcoming.

26

**002462**

Francine C. Blackmon                          Robert J. LaBonte Jr.
Deputy Assistant Secretary of the Army        HQDA201808134IkL9F
Army Review Boards Agency

                                              October 15, 2018

Dear DASA Francine C. Blackmon,


I am writing to you today on behalf of my son Robert J. LaBonte *(junior)*.  As his father, I
conducted a thorough review of my son's IDES process.  What I found was extremely
disturbing.  My response is to ask for your help once again. I attached documents to this cover
letter showing overwhelming, indisputable, verifiable facts and evidence showing that Eric L
Doane *(approving authority)* committed fraud to halt my son's IDES process.

On 27 November 2017, you were the one person who after reviewing my son's case found there
was sufficient evidence to grant additional relief.  You directed my son's case be referred to the
Office of the Surgeon General to determine if he should have been retired or discharged by
reason of physical disability through the Integrated Disability Evaluation System *(IDES)*. Our
entire family thank you for stepping up and helping our combat disabled veteran.

I recently reviewed your decision letter dated 7 September 2018.  In the second paragraph you
state "An authorized official representing the Office of the Surgeon General conducted a review
of Mr. LaBonte's records and determined Mr. LaBonte did not have any medical conditions
which failed to meet retention standards at the time of his separation." This opinion/conclusion
written entirely by one person is completely false! The memo you received was not based on
any verifiable facts or evidence.  Unknown to you at the time, the memo submitted by Eric L
Doane was a fraudulent document. It's conclusions are completely false and intended to
damage my son.  Doane's actions against my son are unconscionable.

I recently received copies of email exchanges (***New Evidence)*** between Eric L. Doane and
other people involved in my son's process.  All of the other people *(not Doane)* in the email
chain appeared to be very professional and were trying to assist my son through the process.
The emails clearly show in Doane's own words his intent, plan and efforts in committing fraud,
along with his bias/animus towards my son.

My investigation uncovered new indisputable verifiable evidence showing most, if not all of
Doane's memo is false fabrications and personal attacks against my son. His twenty libelous
fabrications in his memo, combined with his bias and animus shown towards my son in his
emails clearly show his state of mind *(intent)* along with his preparation to carry out his plan.
Doane and his unchecked power carried out his premeditated plan to block my son's retirement
due process by fraudulent means.

I am submitting for your review, additional matters *(exposing/reporting fraud by a government official)* along with overwhelming new evidence *(including MEB DBQs and NARSUM)* which was excluded by the approving authority *(Doane)*. Based on the fact that you were the only person at ABCMR to grant my son the IDES process. I am sure that you were unaware of the fraudulent activities being done by Doane to harm my son.

We are asking you to please review my attached documents. The facts and evidence speak for themselves. I am asking you to please step up once again in support of justice for my son. Based on this new very disturbing evidence, I am asking you to reconsider my son's case, granting him the right to have his IDES process continue at the point it had reached before Doane's fraud halted the process.

Included in the documents, a copy of Doane's memo. I highlighted and underlined each false claim and fabrication with in the memo. Making it easier for you to fact check, against the real facts and evidence. I also attached several of Doane's emails to show you his intent and actions to block my son's retirement process. I have copies of every record of Rob's case. Should you need further evidence, please do not hesitate to contact me.

I am sending this information addressed directly to you. Could you please confirm receipt of this packet when it arrives.

Sincerely,

Robert J. LaBonte (senior)
Wethersfield Police Sergeant, (retired)
*Redacted PII*

email: SGTFROG56@GMAIL.COM

A few omissions or errors in facts may be a sign of incompetence. However, indisputable verifiable evidence shows most, if not all of Doane's memo is false fabrications and personal attacks against my son. Doane has at least twenty libelous fabrications in his memo, combined with his bias and animus shown towards my son in his emails clearly show his state of mind (intent) along with his preparation to carry out his plan.  Doane and his unchecked power carried out his premeditated plan to block my son's retirement due process by fraudulent means.  I attached a copy of Doane's memo, highlighting his fabrications and false claims.



The above photo is Rob taken on February 6, 2004, while on combat duty in Tikrit Iraq during the event *(Fall-TBI facial injury)*. The photo was taken by the  Medic/MP Delaune who found Rob unconscious with his head laying in a pool of his blood at the base of his guard tower. Rob's file contains this photo along with a sworn affidavit of the Medic/ MP Delaune who assisted Rob to a medical unit and took the photo.

A-Is the 1 inch scar anterior forehead noted on Rob's MEP exam in 2002. Doane's memo implies that Rob is defrauding the VA for a 10% scar disability, *(blatantly false)*.

B-Is the gash sustained to Rob's face, resulting from the fall off the 30' guard tower in Tikrit Iraq on 2-6-2004. The photo shows blood pooled to the side of Rob's face and head. Affirming the facts in the sworn affidavit stating Rob was found *unconscious,* with his head laying in a pool of blood. This photo stands as indisputable evidence/documentation taken at the time of the event. Doane had this graphic photo and all evidence in his possession.

Doane's memo in part:  *"There is no documentation of this event" "Nor does Mr. LaBonte have any memory of the event" "subsequent head-bump" "The same scar the VA currently rates him service connected at 10% was also noted in his 2002 MEPS induction physical examination. At the time Mr. LaBonte came on Active duty his entrance examination documents a 1 inch scar, anterior forehead".*

This one graphic photo #1/evidence clearly and completely debunks the above four false fabricated claims listed as facts by Doane. This photo is documentation and was taken during the event.  Rob's file contains overwhelming evidence/documentation that the event did happen. Doane had this evidence in his possession and deliberately omitted it from his memo to defraud Rob from receiving his army medical retirement.

Doane stated: "*There is no documentation of this event*".  *Blatantly false!*  Doane knew it was false when he wrote this claim in his memo.  Through phone calls and emails, Ginny Randazzo *(Peblo)* documented that she forwarded all records and documents to Doane.  Doane made the deliberate decision to exclude the following evidence from his memo:

1.  Photo #1 taken of Rob on 2-6-2004 covered in blood, showing the gash to his face
2.  Sworn affidavit MEDIC/MP who found Rob unconscious, his head laying in a pool of his own blood. Assisted him to the medical station and took the photo of Rob.
3.  Sworn affidavit SGT who saw Rob before and after his injury. New gash to Rob's face.
4.  AOL msg. from Rob in Tikrit Iraq to his mom telling her he got hurt (dated 2-7-2004)
5.  Numerous photos of Rob serving in Iraq before and after the gash to his face.
6.  Photos of Rob on combat duty in Iraq with stitches on his face (he didn't stitch himself).
7.  The scar on Rob's face forever, incurred during his fall from the guard tower in Tikrit Iraq on 2-6-2004. The scar documented in photo #2 (VA rated at 10% facial scar)

Doane had all of the above evidence, yet chose to mislead the board by stating *"There is no documentation of this event".*  Omitting key objective evidence (element of fraud).

Doane stated,  *"Mr. LaBonte and his legal team report that he suffered a 30 foot fall and subsequent head bump".*  Mr. LaBonte, his legal team or myself never reported a "*subsequent head bump"*. This is a blatantly false description made up solely by Doane to minimize the serious head *(TBI)* and facial injury Rob suffered. The graphic photo speaks for itself, and totally debunks Doane's *"head bump"* description.  Doane's most serious false accusation against Rob is that he is defrauding the VA with a fake scar claim. It's very suspicious that Doane searched Rob's records looking for this one rating, but missed the photographic evidence of Rob's injury and BCD court martial record. The facts and evidence show Doane didn't miss anything. That in fact he knew exactly what he was doing by excluding all facts and evidence. Doane also stated Rob is currently rated 90% disabled by the VA. Another false claim, NO VA record existed or now exists showing a 90% rating. Rob is currently rated 100% combat service connected disabled. Doane intentionally conceals and omits all VA ratings, but could not help himself, thinking he had Rob committing a felony with the 10% pre existing facial scar rating.



This photo marked as #2 was taken sometime after having his stitches  (my son didn't stitch himself) removed from the gash between his eyes.  This photo clearly shows the scar left on Rob's face from the gash sustained from his fall from the guard tower on 6 February 2004.

This is the scar that the V.A. examined and rated at 10% for facial scarring.

Doane's memo alleges that Rob entered the army with this scar.  Implying that my son is defrauding the VA for a fake facial scar.  Doane also alleges or implies the fall never happened. Doane's claims go against all facts and evidence.


A- Is the 1 inch scar anterior forehead noted on my son's MEP exam in 2002.  This scar can be seen on numerous photos in my son's file (Doane had this evidence in his possession).

B- Is the permanent facial scar left on my son's face, from the facial gash incurred during the fall from the guard tower on 6 February 2004 in Tikrit Iraq.



This photo marked as #3 was taken of my son while serving on combat duty in Tikrit Iraq. This photo shows Rob prior to his fall (TBI and facial damage)This photo clearly shows no gash or facial scar to my son's face. It does show the scar noted on his MEP exam from 2002, marked as (A).

Doane's memo alleges that Rob entered the army with a facial scar. The same scar that he is being rated by the VA at 10%. Implying that my son is defrauding the VA for a fake facial scar. Doane also alleges or implies the fall never happened. Doane's claims go against all facts and evidence.

A- Is the 1 inch scar anterior forehead noted on my son's MEP exam in 2002. This scar can be seen on numerous photos in my son's file (Doane had this evidence in his possession).

B- Clearly shows no damage to my son's face, prior to his fall on 6 February 2004.

Neurology, Movement Disorders and Dystonia, on 8-29-2015, Dr. Sanjay Rathi MD Neurologist, studied my son's records. Then conducted a full thorough in person Neurological examination. His nine (9) page written medical findings were included in Rob's file *(forwarded to Doane by Ginny Randazzo, peblo)* In part, Dr. Rathi's opinion is that on February 6, 2004 ***"the patient clearly suffered a severe concussive injury"***. Through objective neurological testing he determined that Rob's motor activity was damaged due to apraxia caused by the TBI-fall in Tikrit Iraq. Dr. Rathi also diagnosed Rob with suffering from Chronic Migraine Syndrome and Tinnitus caused by the TBI-fall in Tikrit Iraq. *(objective medical evidence omitted by Doane).*

VA C&P Vision Exam dated 30 June 2016 shows: Neurological eye conditions-Eye disorder due to Traumatic Brain Injury *(TBI)*. Through objective testing they diagnosed the disabilities: ***Photosensitivity, Convergence Insufficiency, Accommodative Disorder and Diplopia. They found that all of the conditions are the result of Rob's TBI in Tikrit Iraq, this would mean prior to separation*** *(objective medical evidence omitted by Doane).*

Examine the written directive by DASA Blackmon referring Rob to IDES.  Then look at Doane's first paragraph in his memo.  Doane added six words to DASA Blackmon's directive: ***"prior to separating from Active Duty"***.   No normal, *honest* thinking person would believe that DASA Blackmon's directive was to hid all medical evidence. Including the ABCMR Psychiatrist advisory opinion, (*That Rob's PTSD led to his going AWOL and BCD ending his army career*) the same evidence DASA Blackmon used to make the decision to grant the referral to IDES. Doane deliberately excluded the ABCMR Psychiatrist advisory opinion from his memo. I'm told by everyone in Rob's process that this action has never been done by a approving authority.

*Doane's email to Ginny dated April 4, 2018 shows something is wrong:* ***"ABCMR was sent to your IDES to determine whether PDES processing WAS WARRENTED at the time of separation"***.  All caps and misspelled does not make Doane's claim true or a fact.  It does show Doane is upset. DASA Blackmon's directive didn't include this wording and I'm sure she didn't intend for Doane to hid all medical evidence, then fabricate his own damaging false facts.

*Doane's email to Ginny dated April 4, 2018* ***"He cannot come back years later after receiving VA ratings and now demand that he should have been put through the MEB"*** Doane's personal bias/animus towards my son is crystal clear. Doane's premeditated plan went into action, excluding overwhelming objective verifiable evidence. He then fabricated (*falsifying records*) his own facts to prevent the board from seeing the truth. Why was his memo kept from all of us (*including Rob's Peblo, an action never done before*) until the ABCMR already received his corrupt memo and closed the case. I believe Doane's emails show why.  He was in back channel discussions with someone at ABCMR and knew that if they received his memo without our factual rebuttal or fact checking, his memo would be taken as fact. Rob's file and the ABCMR original decision letter itself contained facts and evidence to completely debunk Doane's memo.  It appears that no one at ABCMR fact checked Doane's memo, because his entire memo goes against the evidence contained in their first decision letter. Doane's premeditated plan worked, he completely shut down my son's due process by fraud.

Doane's email to Ginny dated  April 4, 2018 "***If you would like our shop to do this ABCMR for you, we can, But I won't sign this as no MEB required at the time of separation.***" This appears to be Doane's first attempt to remove the case from Ginny's control.  Ginny does not agree to transfer the case to Doane.  Evidence (*emails*) show Doane then devises a plan to circumvent Ginny from seeing his memo. The evidence is clearly in the emails, He begins emailing Colleen Campbell and leaving Ginny (*Rob's PEBLO*) out of the email chain.  In fact (*documented in emails*) Ginny does not get a copy of the memo until weeks later from Avis Earl. After ABCMR already had Doane's memo (*not fact checked and accepted as factual*) and closed Rob's case. No opportunity for rebuttal, Doane's plan worked.

Ginny's email to Doane date April 12, 2018 she attached the ABCMR packet and a zip file containing the eleven page (11) memo prepared by Rob's legal team, answering Doane's concerns about the lack of military medical care records.  This memo was sent to Ginny on April 11, 2018 contained numerous facts and medical records. It clearly listed details under Chronology of injury symptoms and treatment.  Ginny also attached the initial email from Jackie Floyd directing them to do the board. Ginny further argued that Rob should be given a complete board process, due to the overwhelming facts and evidence supporting his case.

*Doane's email to Ginny dated April 15, 2018* "***Well this is amazing. I will have to digest this in detail next week and perhaps call someone at the ABCMR.  What is your suspense on this? I'm still not convinced we are being forced to do IDES processing on him***". Doane's response is very telling, when he is confronted by Ginny with overwhelming facts and evidence in support of Rob getting a complete board.  Doane's thought process was to call someone at the ABCMR, why?  Doane appears upset, appearing to not like having his authority challenged.  DASA Blackmon referred Rob's case for processing through IDES in December of 2017. The process including the MEB DBQs and NARSUM were complete.  Who is Doane to circumvent DASA Blackmon's referral and conduct back door discussions with someone at ABCMR.  Doane's bias and animus towards Rob is undeniable. So is his intent to commit fraud, along with his contempt for DASA Blackmon's decision to grant a IDES referral.

*Doane's last email to Ginny (evidence shows he removed Ginny from the seeing what he was doing) dated April 19, 2018* "***Is there a document actually directing a MEB to be done or are they asking if one should be done.***" For five months Rob was getting a MEB process. The NARSUM (*heart of the MEB*) was in place ready to be forwarded to the PEB.  Ginny told us that Rob's DBQs and NARSUM were completed in record time, due to the overwhelming facts and evidence in Rob's file (*these facts can be confirmed with Ginny*). Doane is the first person to go against all medical evidence and written medical opinions. Doane then excluded all medical evidence and facts from his memo. The evidence clearly shows why, Doane was out to block Rob's medical retirement at all costs, including committing criminal fraud. Doane's actions clearly show he believes he is above the law, and not accountable to anyone.

Doane stated: ***"Mr. LaBonte was diagnosed with adjustment disorder"*** What Doane failed to mention, the diagnosis was made by a ***non-doctor*** *(invalid diagnosis).* During a time when the Army didn't recognize, treat or screen for PTSD. The Army Advisory Psychiatrist and five other doctors have reviewed the walk in clinic form.  Based on the reviews of the 2004 form all of the doctor's found that Rob was suffering with PTSD,  NOT Adjustment Disorder in 2004. Doane had all these medical opinions in his possession. As a Senior MEB physician (*Doane knew or should have known the diagnosis by a health specialist was invalid*) why did Doane give the *non doctor* diagnosis full credibility and excluded all (6) real doctor's medical opinions from his memo. Because it fit his premeditated plan to block Rob's retirement process. Plus it's common knowledge that Doane has disdain for soldiers claiming PTSD.

Throughout the memo **Doane claims that Rob separated from Active Duty *31 March 2008 with all his benefits, including DEERS/TRICARE eligible until August 2010.*** *Blatantly false!* Rob was *court martialed 23 Oct 2006 (left active duty for confinement) separated in February 2007 with a Bad Conduct Discharge ending his army career.* No Army benefits, No VA benefits. Rob lost everything because he could not physically or mentally return to combat in Iraq.

Could Doane really conduct a thorough review (*as he claimed*) of Rob's records and not see that he was court martialed and separated with a Bad Conduct Discharge? It's impossible to believe, these facts are in numerous documents. That the Army Discharge Review Board, upgraded Rob's BCD discharge, finding that his PTSD and TBI symptoms were mitigating for the offense which led to his discharge from the Army.  The Army Review Boards Medical Advisor, Psychiatrist's opinion that the applicant's PTSD is mitigating for the offenses which led to his discharge from the Army. It is the recommendation of the Agency Psychiatrist that the applicant's record be referred to IDES for consideration of medical disability/retirement.

I read that the Disability Evaluation System (*DES*) compensates disabilities when they contribute to career termination (*Rob's PTSD & TBI symptoms caused him to go AWOL, resulting in a court martial BCD ending his army career*) and the resulting career loss. Doane knew these facts, and made the conscious intentional act of excluding Rob's court martial BCD from his memo.  The evidence is clear in Doane's *'Final Comment'* paragraph.  An ending Doane edited several times, to get it just right. A seriously disturbing ending, totally lacking a single shred of truth in the entire paragraph. The entire paragraph is a complete fabrication by Doane, intended to damage my son and block his case from due process.

Doane claims to have records showing Rob was in good physical health at the time of his separation 31 March 2008.  *Blatantly False!* How could this be possible when Rob separated BCD February of 2007. Doane claims to have a record of a physical exam for my son dated 22 June 2007, where the health care professional documented Mr. LaBonte's 30 June 2004 one time visit and *confirmed Adjustment disorder. Blatantly false!*  Rob wasn't there, he separated BCD February of 2007.  Indisputable evidence that Doane believing he is unchecked  is fabricating his facts to defraud Rob from his Army retirement benefits (element of fraud).